# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| VALUTA CORPORATION, INC., and PAYAN'S FUEL CENTER, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> FINANCIAL CRIMES ENFORCEMENT NETWORK; ANDREA GACKI, in her official capacity as Director of the Financial Crimes Enforcement Network; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; and PAM BONDI, in her official capacity as the Attorney General of the United States, <br><br> *Defendants*. | Civil Case No. _3:25-cv-191_____ |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      This case challenges a federal surveillance order that demands detailed information about everyday cash transactions in a targeted area along the southwest border. The order directs check cashers, currency exchangers, and other "money services businesses" in 30 zip codes to report all cash transactions over just $200 to federal law enforcement. Although the order will sweep up information about countless everyday transactions, the government has candidly explained that its purpose is to uncover evidence of crimes by drug cartels. Thus, the government has targeted particular types of businesses and particular types of cash transactions, in a particular geographic area, with an aim to target particular types of criminal actors. And the government has done all this without individualized suspicion or probable cause. In short, the government has issued a general warrant.

2.      In addition to violating the Fourth Amendment, the government's general warrant will impose ruinous burdens on the targeted businesses. The government estimates that every cash transaction report takes eight minutes to complete. The true time required is higher. But even accepting the government's estimate, given the number of over-$200 transactions, businesses in the affected zip codes face hours of new paperwork daily. Because the order applies to only certain businesses in certain zip codes, moreover, customers who do not want to provide this information will simply take their business to other stores. As a tool to target criminals, the order will be ineffective—but it will impose crushing costs on businesses and people who cannot leave the targeted jurisdiction.

3.      The surveillance order is unconstitutional and unlawful in other ways, as well. The statute under which the federal government claimed to find authority for the surveillance order cannot be read to authorize this type of vast surveillance regime; if it can, then it confers

standardless discretion in violation of the non-delegation doctrine. The order also fails review under the Administrative Procedure Act, both because the selection of these particular counties and businesses for crushing burdens is arbitrary and capricious and because the order was issued without following notice-and-comment procedures.

4.    The order should be vacated, set aside, and enjoined. Two federal judges have already preliminarily agreed that the order is illegal and have enjoined its enforcement in California and as to ten money-service businesses in Texas. *Tex. Ass'n for Money Servs. Bus. v. Bondi*, No. 25-cv-344 (W.D. Tex. May 19, 2025) (ECF 59); *Novedades y Servicios, Inc. v. Fin. Crimes Enf't Network*, No. 25-cv-886, 2025 WL 1501936 (S.D. Cal. May 21, 2025). Plaintiffs here, who do not benefit from that relief, have filed this suit to protect themselves and the other remaining MSBs still subject to the order.

## PARTIES

5.    Plaintiff Valuta Corporation, Inc., is a Texas corporation with its principal place of business in El Paso, Texas. Valuta is subject to the Geographic Targeting Order (GTO) because its sole store is located in one of the zip codes subject to the GTO (79901) and it is not covered by either preliminary injunction. It conducts business as an MSB and is registered with FinCEN as an MSB.

6.    Plaintiff Payan's Fuel Center, Inc., is a Texas corporation with its principal place of business in El Paso, Texas. Payan's is subject to the GTO because its sole store is located in one of the zip codes subject to the GTO (79905) and it is not covered by either preliminary injunction. It conducts business as an MSB and is registered with FinCEN as an MSB.

7.    Defendant Financial Crimes Enforcement Network (FinCEN) is a federal bureau tasked with administration and enforcement of the Bank Secrecy Act and its implementing regulations. FinCEN issued the GTO.

8.    According to FinCEN, "[t]he mission of the Financial Crimes Enforcement Network is to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence."

9.    According to FinCEN, FinCEN "carries out its mission by receiving and maintaining financial transactions data" and by "analyzing and disseminating that data for law enforcement purposes."

10.    Defendant Andrea Gacki is the Director of FinCEN and is sued in her official capacity as head of FinCEN. Director Gacki signed the GTO.

11.    Defendant U.S. Department of the Treasury is an executive agency of the United States tasked with administration and enforcement of the Bank Secrecy Act and its implementing regulations. FinCEN is a bureau within the Treasury Department.

12.    Defendant Scott Bessent is the United States Secretary of the Treasury and is sued in his official capacity as the head of the U.S. Department of the Treasury.

13.    Defendant Pam Bondi is the Attorney General of the United States and is sued in her official capacity as the chief law enforcement officer of the United States.

14.    AG Bondi is responsible for the uniform administration and enforcement of federal criminal law in the United States, including the offenses created by the Bank Secrecy Act.

## JURISDICTION AND VENUE

15.     Plaintiffs bring their claims under the Administrative Procedure Act, 5 U.S.C. § 702, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, as well as directly under the Fourth Amendment and Article I to the U.S. Constitution. *See Ex parte Young*, 209 U.S. 123 (1908). Plaintiffs seek declaratory and injunctive relief against the federal government's GTO imposing reporting requirements for cash transactions over $200 in certain zip codes near the border. *See Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border*, 90 Fed. Reg. 12106 (Mar. 14, 2025). The GTO imposes burdensome and discriminatory obligations on Plaintiffs without a lawful basis.

16.     This Court has jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331, as Plaintiffs' claims arise under federal law.

17.     This Court has the authority to grant an injunction and declaratory judgment under 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706(2), as well as under the Court's inherent equitable authority.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Defendants are federal agencies and officers and because Plaintiffs reside and conduct their affairs in El Paso, Texas, which is located within this district.

## FACTS

**Plaintiffs Provide Financial Services for Ordinary Americans**

19.     Money Services Businesses (MSBs) play a crucial role in Texas's financial ecosystem, providing essential services such as money transmission, currency exchange, and issuing or redeeming money orders and traveler's checks.

20.    These businesses are regulated at both federal and state levels to ensure compliance with financial laws and to protect consumers.

21.    An MSB is generally defined as any person or entity that conducts one or more of the following activities: currency exchange; check cashing; issuing or selling traveler's checks, money orders, or stored value cards; or money transmission. 31 C.F.R. § 1010.100(ff).

22.    Some MSBs are large corporations—e.g., Western Union. But many are small neighborhood businesses.

23.    For instance, both Plaintiffs operate just a single location where they provide general money services (Valuta) or check cashing (Payan's). Neighborhood MSBs can stand alone (as Valuta does) or can be associated with other services, such as a grocery store or a gas station (as Payan's is).

24.    These financial services are important for customers who do not have bank accounts and who rely on MSBs for financial services that they need to live their lives.

25.    MSBs are subject to strict regulatory oversight.

26.    MSBs overwhelmingly operate transparently and ethically.

27.    In Texas, most MSBs are regulated by the Texas Department of Banking. The Texas Department of Banking has the authority to enforce compliance through examinations and investigations. Non-compliance can result in administrative penalties, license suspension or revocation, and, in some cases, criminal charges.

28.    MSBs in Texas must also adhere to federal compliance obligations, including registration with FinCEN.

29.    The federal framework under the Bank Secrecy Act (BSA) and related FinCEN regulations is strict and aggressively enforced. As part of this framework, MSBs must register with

FinCEN, implement and maintain a written anti-money laundering (AML) program, and comply with federal recordkeeping and reporting obligations.

30.    Among the core regulatory duties imposed on MSBs are: registration with FinCEN within 180 days of beginning operations; implementation of an AML program that includes risk-based internal controls, training, independent testing, and designation of a compliance officer; and filing of Suspicious Activity Reports (SARs) for certain transactions and Currency Transaction Reports (CTRs) for cash transactions over $10,000.

31.    Failure to comply with these regulations carries significant civil and criminal consequences. Under 31 U.S.C. §§ 5318 and 5321, civil penalties may be imposed in amounts of up to $5,000 per day for failure to register as an MSB, and up to $100,000 or more per violation for failures related to AML programs or reporting obligations. Additionally, criminal penalties may be imposed under 31 U.S.C. § 5322 for willful violations, including up to five years' imprisonment and fines of $250,000 for individuals and $500,000 for business entities.

32.    For example, in 2022, FinCEN imposed a $1.5 million civil penalty on an MSB that failed to file required reports and operated without an AML program. The same entity was criminally charged for willful violations of the BSA.

33.    Accordingly, compliance with FinCEN regulations is not merely procedural—it is essential to the lawful operation and survival of an MSB within the regulated financial environment.

34.    Notwithstanding that MSBs are subject to regulation, MSBs are not generally required to collect information about their customers for small-dollar transactions.

35.    Federal law does require MSBs to collect information on certain transactions over $3,000—including identifying information about the customer—and to retain that information in

their records. But for transactions under $10,000, MSBs are not required to report that information to the federal government.

36.    Federal law requires currency exchange MSBs in particular to retain some customer information—including name and social security number—for transactions over $1,000. Again, however, MSBs do not report that information to the federal government.

37.    MSBs sometimes collect information on transactions for their own purposes. Again, however, MSBs are not required to report that information to the federal government.

38.    MSBs frequently conduct transactions that do not require collecting any information at all.

39.    The privacy of information that MSBs collect about their customers is protected by federal law. Federal law imposes privacy obligations on any "institution that is significantly engaged in financial activities," 16 C.F.R. § 313.3(k)(1), which includes entities that provide services covered by the GTO. Under these requirements, a business offering such services cannot "directly or through any affiliate, disclose any nonpublic personal information about a consumer to a nonaffiliated third party" without providing notice and "a reasonable opportunity, before [disclosure of] the information … to opt out of the disclosure." *Id.* § 313.10(a)(1).

40.    Plaintiffs value the privacy of their customers and comply with all applicable privacy laws governing the information of their customers.

41.    Plaintiffs also value the privacy of their business records, and Plaintiffs treat information about transactions at their businesses as proprietary business information.

**The Geographic Targeting Order**

42.    Invoking the Bank Secrecy Act, 31 U.S.C. § 5318(a)(2), and its implementing regulations at 31 C.F.R. § 1010.370, the Secretary of the Treasury, acting through FinCEN, issues

Geographic Targeting Orders. These administrative decrees require specific domestic financial institutions or trades and businesses in a defined geographic area to collect, report, and retain information about certain transactions that would not otherwise trigger mandatory reporting under the BSA.

43.    A GTO is a temporary regulatory action that may be issued for a period of up to 180 days and may be renewed repeatedly. GTOs may apply to any "financial institution" as defined by FinCEN regulations, including MSBs.

44.    FinCEN has issued GTOs in various contexts, including for real estate transactions, cash-based businesses, and high-volume transaction corridors. These orders often impose enhanced data collection and reporting obligations, including identification of customers, recordkeeping of transaction details, and periodic submission of information to FinCEN or other law enforcement agencies.

45.    Businesses subject to a GTO must comply under threat of civil and criminal penalties for noncompliance. Such penalties may include substantial fines, suspension or revocation of licenses, and referrals to federal law enforcement for investigation. GTOs are typically enforced without individualized suspicion or findings related to a specific business or actor. Instead, FinCEN issues the order based on its assessment of geographic trends in money laundering or other financial crime risks.

46.    The application of GTOs to MSBs often results in substantial compliance burdens, including increased administrative costs, changes to transaction monitoring systems, and exposure to heightened enforcement risk. Businesses may receive no formal notice or opportunity to contest inclusion, and GTOs are not subject to internal administrative appeal or waiver processes.

47.     On March 11, 2025, FinCEN issued a GTO with the stated purpose of combating illicit financial activity associated with Mexico-based cartels and other criminal organizations operating along the U.S. southwest border. *See Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border*, 90 Fed. Reg. 12106 (Mar. 14, 2025). The order imposes enhanced reporting requirements on MSBs located in specific areas of Texas and California.

48.     Per the order, MSBs operating within 30 designated zip codes are required to file Currency Transaction Reports for cash transactions exceeding $200, a fiftyfold reduction from the standard $10,000 threshold.

49.     The GTO is effective from April 14, 2025, through September 9, 2025, unless renewed or modified.

50.     The order applies to MSBs located in the following Texas counties and zip codes: Cameron County: 78520, 78521; El Paso County: 79901, 79902, 79903, 79905, 79907, 79935; Hidalgo County: 78503, 78557, 78572, 78577, 78596; Maverick County: 78852; Webb County: 78040, 78041, 78043, 78045, and 78046. (The order also applies to several zip codes in the Southern District of California.)

51.     MSBs covered by the GTO are required to: 1) file CTRs for cash transactions exceeding $200 but not exceeding $10,000 (this includes deposits, withdrawals, exchanges, or other forms of currency transfer); 2) verify and record the identity of individuals conducting such transactions, in line with anti-money-laundering-program requirements; and 3) submit CTRs within 15 calendar days of the transaction date.

52.     This means that for a cash transaction as small as $201, an MSB must collect the customer information that is required by a CTR, even though federal law generally does not require

MSBs to collect any customer information for transactions under $3,000 (or, in the case of a currency exchange MSB, under $1,000).

53.    This also means that for a cash transaction as small as $201, MSBs must report that customer information to FinCEN, even though such reports generally are not required for transactions under $10,000.

54.    In practice, the GTO means that cashing a check over $200, using over $200 in cash to buy a money order (for instance, to pay the rent), or using over $200 in cash to make a wire transfer (for instance, to send money to family abroad) now triggers a report to the federal government.

55.    For businesses, the GTO means crushing paperwork burdens. Before the GTO, nearly all transactions by MSBs did not require CTRs, because they were well below the $10,000 reporting threshold. But many of those transactions are not below $200, which means that, under the GTO, large numbers of transactions do require CTRs. This has resulted in a huge increase in costs to GTO-affected MSBs as they dedicate many hours per week just to gathering information from customers and then filling out paperwork to report that information to the federal government.

56.    Because neighboring zip codes are not targeted by the GTO, customers who do not want to provide private information can simply move their business to other nearby companies. Targeted businesses are thus losing revenue as customers flee GTO-affected MSBs for other MSBs not targeted by the GTO.

57.    For businesses, the GTO invades the privacy of business records by requiring MSBs to provide information on large numbers of transactions that otherwise would not be reported to the federal government.

58.     And, of course, for individuals, the GTO authorizes a significant invasion of personal privacy, as everyday, ordinary, and perfectly lawful transactions of just a few hundred dollars will be reported to the federal government.

59.     The time that customers spend to access services provided by MSBs has also increased, as it will take time for customers to provide the information required by the additional paperwork.

60.     By requiring MSBs to collect this information from individuals, the GTO also enlists MSBs to conduct surveillance on the private transactions of their own customers.

61.     FinCEN justifies the GTO as "in furtherance of Treasury's efforts to combat illicit finance by drug cartels and other illicit actors." 90 Fed. Reg. at 12107.

62.     In other litigation, FinCEN has produced an internal memorandum that purports to offer a rationale for the GTO. The memorandum is dated "March XX, 2025," so it is unclear whether the memorandum pre- or post-dates the issuance of the GTO.

63.     Indeed, based on the "March XX, 2025" date and the paucity of the administrative record, it is not clear that FinCEN considered *anything* before issuing the GTO.

64.     The internal memorandum states FinCEN's view that "MSBs are vulnerable to exploitation by money launderers," and that "FinCEN has identified money transfers through MSBs as a financial typology associated with Mexico-based drug cartels." In FinCEN's view, "MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels."

65.     In FinCEN's view, some MSBs are themselves criminal actors, as "services provided by MSBs are sometimes provided wittingly to drug cartels, turning the MSB into a professional money launderer."

66.     That same internal FinCEN memorandum, however, also concedes that "most of the business that MSBs conduct is legitimate and essential." Services offered by MSBs are "tailored to persons without bank accounts" and provide "competitively priced services and [a] convenient location offered near the border."

67.     The internal FinCEN memorandum therefore acknowledges that the GTO will indiscriminately sweep up information about both "licit and illicit" transactions.

68.     The internal FinCEN memorandum states that the information provided by the GTO will "generate new leads and identify new and related subjects in ongoing cases." It "may allow the identification of a comprehensive network of potential money mules in the geographic area in question," may "create leads related to professional money launderers," and will "likely capture information about the laundering of funds related to multiple criminal typologies."

69.     According to the internal FinCEN memorandum, the GTO will also "support investigations into MSBs themselves that may be complicit in supporting illicit activity or demonstrate poor [AML] controls."

70.     The internal memorandum states that the GTO will "provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Area, allowing FinCEN to more fully understand the money laundering risks related to MSBs."

71.     Taken together, the thirty zip codes targeted by the GTO have a population over 1.2 million people.

72.     While thirty zip codes is a large area, it is also a relatively small portion of the territory along the U.S./Mexico border. The targeted zip codes are not all contiguous, and other zip codes next to the targeted zip codes are not always targeted.

73.    FinCEN's internal memorandum claims that "MSBs in Arizona and New Mexico are likely also vulnerable to exploitation by drug cartels," but the GTO nonetheless does not include any counties in Arizona or New Mexico.

74.    Even if criminals are currently engaged in money laundering using over-$200 transactions at MSBs, criminals can respond to the GTO by simply moving their money to a zip code that is not covered by the GTO.

75.    The internal FinCEN memorandum explains that FinCEN targeted these zip codes based on "risk factors that include their proximity to the border and to a border crossing" as well as based on "whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes."

76.    The government believes that these factors are indicators of criminal activity. At a hearing in another case challenging the GTO, a government lawyer explained that the "counties weren't chosen at random" and were "chosen based on the intelligence available to FinCEN."

77.    In fact, however, the factors that the government relied on do not provide a reasoned basis to explain why these requirements are being imposed in these particular zip codes and not in other zip codes along the border.

78.    The fact that a high number of over-$10,000 transactions are occurring in these zip codes does not mean that those transactions are illegitimate. It simply means that there are more cash transactions occurring.

79.    In addition, even if the high number of over-$10,000 transactions in the zip codes were a sign of illicit financial activity involving *high-dollar* cash transactions, it would not follow that *small-dollar* transactions of just $201 are more likely to be associated with illicit activity in those jurisdictions.

80.     Beyond the irrelevant fact that over-$10,000 transactions occur in these jurisdictions, FinCEN has articulated no explanation for targeting over-$200 transactions in these jurisdictions rather than in other jurisdictions along the border.

81.     The absolute number of over-$10,000 transactions in these zip codes is not even that large. For instance, the FinCEN memorandum states that zip code 78040 had 702 CTRs filed in 2024. Other zip codes in Texas were targeted based on even lower numbers of CTRs. For instance, 78046 was targeted based on just 46 CTRs filed in 2024, and 78852 was targeted based on just 25 CTRs filed in 2024.

82.     The fact that 25, 46, or even 702 cash transactions over $10,000 occurred in a zip code within a year-long period is not a colorable reason to assume that over-$200 cash transactions in that zip code are more likely to be associated with criminal activity.

83.     FinCEN has articulated no basis to think that the number of over-$10,000 transactions in any of the zip codes is suspicious or in any way warrants enhanced focus on over-$200 transactions.

84.     FinCEN certainly has not established individualized probable cause to support targeting the MSBs in these jurisdictions.

85.     FinCEN has not obtained a warrant from a magistrate to target the MSBs that are covered by the GTO.

86.     MSBs that violate the GTO face civil fines up to $71,545 per violation, as well as criminal liability.

87.     Although the GTO was published in the Federal Register, *see* 90 Fed. Reg. 12106, it was issued by FinCEN without any notice or any opportunity to comment.

**Impact of the GTO on Plaintiffs**

88.     Plaintiffs are MSBs within the counties affected by the GTO. They are subject to the GTO because Valuta provides several regulated money services and Payan's provides regulated check-cashing services.

89.     Plaintiffs and other MSBs face irreparable injury from the continued operation of the GTO.

90.     The GTO imposes a substantial compliance burden on affected MSBs, including Plaintiffs. For instance, the GTO requires immediate updates to reporting protocols, staff training, and internal controls. Businesses that fail to comply may face civil or criminal penalties, including fines and potential loss of licensure.

91.     It also imposes crushing paperwork obligations.

92.     For instance, Valuta works on a skeleton crew. It is stretched thin financially and in terms of human resources.

93.     Even so, Valuta is meticulous about rule-following. It has never received a poor rating from the IRS, the Texas Department of Banking, its money-transfer provider MoneyGram, or its local bank during frequent audits.

94.     Last year, Valuta did about 68,270 transactions, so about 5,689 in a typical month, or 187 in a typical day. About 65% of those transactions were over $200.

95.     In all of 2024, Valuta filed about 123 CTRs total.

96.     Since the GTO went into effect, Valuta is seeing about 90 to 130 transactions per day and is having to file over 53 CTRs *per day*.

97.     In the first month the GTO was effective, Valuta filed over 1,600 CTRs. On May 28, 2025, Valuta had a backlog of 717 CTRs that needed filing. In the slow season.

98.     Valuta now must ask for more personal information, including social security numbers, for small dollar transactions. Customers don't like to give their personal, sensitive information like that, especially aloud in a lobby with a line of people behind them. Some have just walked out. Valuta is losing at least 10 customers per day because of it.

99.     For those customers who proceed with their transactions, the extra reporting is dominating Valuta's time and resources.

100.    Each CTR takes Valuta about 15 to 20 minutes. For about 53 CTRs per day, that's at least 13 hours per day just dedicated to CTRs.

101.    By late May, Valuta's owner had a backlog of over 700 CTRs to file with FinCEN. Since Valuta cannot afford to pay overtime, she and a salaried employee both increased their hours by about 50%. She has been working until 1:00 or 2:00 in the morning.

102.    There is no other option. Each late CTR could mean a fine of over $1,400 or over $70,000 if the government decides the violation is willful. If Valuta slips up at all, it faces potentially ruinous fines.

103.    Valuta receives a monthly commission from its money order and money transfer provider, MoneyGram, which commission is typically about $2,000 per month but in busy months could reach $4,000. Because the CTRs are taking so much time, Valuta decided to decrease the volume of CTRs by limiting the amount for money order and money transfer services. For five weeks, Valuta did not do money orders or transfers over $180. Over those five weeks, Valuta estimates it lost at least $2,500 in commissions.

104.    Valuta is losing money. It is losing customers and goodwill.

105.    If the GTO continues for even six months, Valuta will likely go out of business.

106.    Plaintiff Payan's is a gas station and convenience store that is an MSB because it offers check cashing. It was established in 1982 and has been the family business ever since.

107.    Payan's earns revenue from the check-cashing service itself in the form of commissions and fees. But because Payan's also offers convenience-store products, Payan's also earns revenue on sales that happen alongside the check cashing.

108.    So its check-cashing service is an important part of its business.

109.    Typically, Payan's cashes about 1,800 checks per month, and most of those—about 1,566, or 87%—are for amounts over $200.

110.    The average value of checks cashed by Payan's is about $400. Paychecks usually don't go over $1,800. For Payan's, a $2,000 check is really big. Checks over $3,000 are uncommon, and those checks are almost always tax-refund checks. Payan's has probably never cashed a check for over $10,000.

111.    Before the GTO went into effect, Payan's had never filed a CTR. After the GTO, it was filing a CTR for nearly every check it cashed.

112.    Since the GTO went into effect, many people are just walking out of Payan's. They do not want to wait in line, and they do not want to give out their social security numbers at a gas station.

113.    At the end of April, Payan's suspended cashing checks over $200 for a week, just to be able to catch up on the CTRs generated in the first two weeks of the GTO.

114.    Payan's estimates that since the GTO went into effect, it is losing about 35% of its check-cashing business, along with the secondary revenue that comes along with it, such as for goods that check-cashing customers might buy.

115.    Payan's estimates that it spends about an extra 15 minutes per check-cashing transaction complying with the GTO.

116.    If Payan's never lost a check-cashing customer, CTR filing would translate into something like 392 hours per month of paperwork (1,566 checks times 15 minutes). That is about 98 hours a week, enough work for about 2.45 full-time employees.

117.    The Payan family has been scrambling to keep up with CTRs. For multiple days in May there were about 100 CTRs stacked on one family member's desk waiting to be processed.

118.    Even a single late report could lead to a $1,400 penalty, and over $70,000 if Payan's chose to ignore a single CTR.

119.    The GTO has been the most serious threat to Payan's since the pandemic.

120.    If the GTO remains in place for 6 months, Payan's expects to lose about 20–25% of its net income.

121.    The GTO is causing serious financial harm to MSBs, and, because of sovereign immunity, they cannot recover that money as damages from the federal government.

122.    The GTO is causing customers to leave affected MSBs for other MSBs that won't have to take and report their personal information. Since the GTO does not include all zip codes along the border, some customers are simply going to other zip codes to make their transactions.

123.    The GTO is also causing reputational damage to affected MSBs, as some customers view Plaintiffs as prying into their personal information (either on their own initiative or at the behest of the government) when other MSBs outside the targeted area are not asking for that same information.

124.    The GTO is also invading the privacy of Plaintiffs' businesses, as it requires the affirmative disclosure of private business records without suspicion that Plaintiffs have done

anything wrong. The government has stated that part of the purpose of the GTO is to investigate MSBs for wrongdoing.

125.    Plaintiffs do not want to be enlisted to help the government monitor the private financial transactions of their customers.

126.    The government has not suggested that it has probable cause to suspect Plaintiffs of any wrongdoing, nor has the government presented a warrant for Plaintiffs' business records.

127.    The government has not suggested that it has probable cause to suspect Plaintiffs' customers of any wrongdoing, nor has the government presented a warrant for Plaintiffs' customers' private information or financial records.

128.    If the government ever had a warrant based on probable cause pertaining to actual crime, Plaintiffs would cooperate. Plaintiffs have no desire to deal with criminals or protect criminals.

129.    The GTO will not be effective to fight illicit activity. In Plaintiffs' experience, nearly all their customers are average people who regularly use Plaintiffs' services to facilitate legitimate, everyday transactions—and the government has not suggested that it suspects anything different.

130.    The GTO will also be ineffective because it allows other MSBs in other zip codes to continue reporting only transactions over $10,000. That means illicit actors—more mobile and sophisticated than the average low-income local—can just go to other zip codes to do their crimes.

## CLASS ALLEGATIONS

131.    As mentioned, two judges have already found the GTO likely unlawful and preliminary enjoined its operation. One ruling has enjoined the operation of the GTO throughout the Southern District of California. *Novedades y Servicios, Inc. v. Fin. Crimes Enf't Network*, No.

25-cv-886, 2025 WL 1501936 (S.D. Cal. May 21, 2025). The remaining target zip codes are all in Texas. In an earlier suit before Judge Biery, ten other Texas MSBs challenged the GTO. *Tex. Ass'n for Money Servs. Bus. v. Bondi*, No. 25-cv-344 (W.D. Tex. May 19, 2025) (ECF 59). Representatives of Plaintiffs here supported those other MSBs as testifying non-party witnesses. Because both earlier suits sought nationwide vacatur of the GTO, Valuta and Payan's had hoped a suit of their own would be unnecessary. Judge Biery's order, however, preliminarily enjoined operation of the GTO only as to the plaintiffs in the other Texas case, and the California court limited relief to its district. Plaintiffs here are thus still suffering under the GTO. They bring this suit to secure relief for themselves and the remaining unprotected MSBs in Texas.

132.     Although non-party relief is entirely appropriate under the Administrative Procedure Act, *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255–56 (5th Cir. 2024), Plaintiffs acknowledge that there is an ongoing debate about the scope of non-party relief in other kinds of cases. As a backstop, they provide the following class allegations, just in case the Court believes that a class action is the only appropriate means to enjoin, set aside, or delay the effective date of the GTO as to all the remaining unprotected MSBs.

133.     Plaintiffs are prepared, and if necessary will seek, to maintain this action on behalf of themselves and others similarly situated, per Federal Rule of Civil Procedure 23.

134.     Plaintiffs propose the following class: "All Money Services Businesses, that have not before the date of class certification sued to challenge the validity of the March 14, 2025 Geographic Targeting Order, that will do business in the targeted zip codes: Cameron County: 78520, 78521; El Paso County: 79901, 79902, 79903, 79905, 79907, 79935; Hidalgo County: 78503, 78557, 78572, 78577, 78596; Maverick County: 78852; Webb County: 78040, 78041, 78043, 78045, and 78046."

135.     This class meets all the Rule 23(a) prerequisites for maintaining a class action.

136.     **Numerosity under Rule 23(a)(1)***.* The putative class is so numerous that joinder of all members is impracticable.

137.     Based on FinCEN's publicly available MSB list, there are 38 MSBs headquartered in the targeted zip codes in Texas that are not currently protected by Judge Biery's preliminary injunction. (Technically, the number is higher, but to be conservative, this number treats multiple corporate entities doing business together as a single would-be plaintiff.)

138.     Additional unprotected MSBs operate in the targeted zip codes in Texas. They do not appear on the FinCEN search simply because they are registered elsewhere. On information and belief, there are at least a dozen such MSBs.

139.     On information and belief, none of those unprotected MSBs have sued to challenge the GTO.

140.     **Commonality under Rule 23(a)(2).** There are questions of law or fact common to the class. Plaintiffs' claims all depend on the legal nature of the GTO, the single administrative record, or the common nature of MSBs generally. No claim depends on facts unique to any class member.

141.     **Typicality under Rule 23(a)(3).** The claims of the representative parties are typical of the claims of the class. The claims of named Plaintiffs Valuta and Payan's and of the putative class all arise from a single policy: FinCEN's enforcement of the GTO. Plaintiffs' and the putative class's remedies are all the same: a declaration that the GTO is unenforceable, an injunction preventing its enforcement, and vacatur under the Administrative Procedure Act.

142.     **Adequacy under Rule 23(a)(4).** The representative parties will fairly and adequately protect the interests of the class. Named Plaintiffs have the same injuries, at the hands

of the same Defendants, as all other affected MSBs. There are no conflicts between named Plaintiffs and other MSBs as to the GTO.

143.    Additionally, the class will be ably represented by the Institute for Justice, a non-profit public-interest law firm. IJ is already counsel in and (successfully) leading the two other cases challenging the GTO. More generally, IJ has litigated constitutional issues nationwide, including in many federal class actions and putative class actions. *See, e.g.*, *Sourovelis v. City of Philadelphia*, No. 14-cv-4687, 2021 WL 344598, at *1 (E.D. Pa. Jan. 28, 2021) (appointing firm as Class Counsel and approving federal consent decree in challenge to civil-forfeiture procedures); *Cho v. City of New York*, No. 16-cv-7961 (S.D.N.Y. Oct. 2, 2020) (ECF 111) (approving settlement of a putative class action, under which New York City agreed not to enforce agreements extracted through coercive property seizures); *Whitner v. City of Pagedale*, No. 15-cv-1655 (E.D. Mo. May 21, 2018) (ECF 116) (approving federal consent decree prohibiting abusive ticketing practices); *Snitko v. United States*, No. 21-cv-4405 (C.D. Cal. Oct. 12, 2021) (ECF 78) (certifying class of property owners challenging FBI searches and seizures as unlawful).

144.    The proposed class also meets the requirements of Rule 23(b)(2) and (b)(3). These requirements are pleaded collectively and in the alternative.

145.    As to **Rule 23(b)(2)**, by issuing the GTO, Defendants have acted on grounds that apply generally to all MSBs in the targeted Texas zip codes, so final injunctive and corresponding declaratory relief is appropriate respecting the class as a whole.

146.    As to **Rule 23(b)(3)**, and for the same reason, the questions of law and fact common to all class members predominate. There are no merits questions affecting only individual members. A class action is superior to other methods for fairly and efficiently adjudicating the

controversy, including because the definition of the class excludes any MSB that has already begun litigation against the GTO.

### CLAIMS FOR RELIEF

**Count I: Violation of the Fourth Amendment (and the Administrative Procedure Act) (5 U.S.C. § 706(2)(A) and (B); *Ex parte Young*, 209 U.S. 123 (1908))**

147.    Plaintiffs repeat and reallege each and every allegation above (at paragraphs 1-146) as if fully set forth herein.

148.    The Fourth Amendment to the U.S. Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

149.    The Fourth Amendment prohibits general warrants, meaning warrants that allow government to broadly search for evidence of crimes without establishing particularized probable cause specific to the person or place to be searched.

150.    The GTO operates as a general warrant because it sweeps up information about otherwise private cash transactions at MSBs throughout the targeted zip codes in order to discover evidence to further law enforcement's stated objective of combatting Mexican cartels, yet does so without any individualized probable cause.

151.    The $200 threshold set by the GTO results in an unreasonable search because it requires businesses to spend huge amounts of time reporting information about their customers' ordinary, everyday cash transactions without any individualized suspicion or showing of probable cause.

152.    The GTO infringes on individuals' and businesses' reasonable expectation of privacy in their ordinary, everyday, small-dollar cash transactions, and the GTO demands information that businesses would otherwise have a legal and contractual obligation to hold private and confidential.

153.    The GTO also conscripts MSBs, forcing them to obtain information from their customers that they would not otherwise solicit and to report that information to federal law enforcement, even if they do not suspect those customers of any wrongdoing.

154.    The GTO is capturing and will continue to capture extensive information about ordinary, lawful, and legitimate transactions without any probable cause.

155.    Plaintiffs are injured by this Fourth Amendment violation insofar as the GTO will provide the government with information about their private business transactions.

156.    Because the GTO is unconstitutional under the Fourth Amendment, it must be declared unconstitutional, vacated, set aside, and enjoined.

## Count II: Violation of the Administrative Procedure Act
### The GTO is not in Accordance with Law, is Arbitrary and Capricious, and is Contrary to Constitutional Right
### (5 U.S.C. § 706(2))

157.    Plaintiffs repeat and reallege each and every allegation above (at paragraphs 1-146) as if fully set forth herein.

158.    The Administrative Procedure Act (APA) directs a court to "hold unlawful and set aside" any agency rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A), (B), (C).

159.    The GTO is a "final agency action," which is reviewable under the APA. *See* 5 U.S.C. § 704.

160.    The GTO is arbitrary and capricious because it imposes a crushing recordkeeping burden that vastly outweighs the theoretical *de minimis* benefit in crime control.

161.    The GTO is arbitrary and capricious because it selected thirty zip codes without articulating any satisfactory explanation for why those particular zip codes should be targeted for higher reporting obligations.

162.    FinCEN has stated, outside the GTO itself, that it selected these zip codes because these zip codes have a high proportion of CTRs filed given their population. But that merely reflects the fact that there are cash transactions in these zip codes—transactions that have not been shown to be criminal in nature.

163.    The GTO also is arbitrary and capricious because it offers no satisfactory explanation for setting the reporting threshold for MSBs within those zip codes at just $200.

164.    FinCEN has articulated no satisfactory explanation for why high numbers of over-$10,000 transactions in a zip code would be a reason to require reporting for transactions over $200 in that same zip code.

165.    Because the GTO is arbitrary and capricious, it must be vacated, set aside, and enjoined.

### Count III: Violation of APA – Exceeding Statutory Authority
### (5 U.S.C. § 706(2)(C))

166.    Plaintiffs repeat and reallege each and every allegation above (at paragraphs 1-146) as if fully set forth herein.

167.    The Bank Secrecy Act, 31 U.S.C. § 5311 *et seq*., grants the Secretary of the Treasury limited and specific authority to issue Geographic Targeting Orders pursuant to 31 U.S.C. § 5326(a). That statute permits the issuance of temporary orders requiring specific domestic financial institutions or trades and businesses within a narrowly defined geographic area to report

certain currency transactions when there is a reasonable belief that such transactions may be related to a violation of federal law.

168.    The statute limits the duration of any such order to 180 days and requires that the Secretary reasonably identify the class of transactions and the geographic area subject to the order. GTOs were originally designed as a tool to assist law enforcement in detecting structured transactions and other forms of money laundering activity involving specific identified businesses in narrowly tailored, high-risk areas. They were designed to be *orders*, as that term is defined in the APA.

169.    In issuing the March 11, 2025 GTO, FinCEN, acting under delegated authority from the Secretary of the Treasury, exceeded the bounds of its statutory authority in both scope and substance. The order imposes sweeping compliance obligations on a broad class of financial institutions across multiple counties, many of which lack any individualized findings or current, case-specific evidence of criminal activity.

170.    Moreover, the order reduces the currency transaction reporting threshold from $10,000 to $200—an unprecedented and *ultra vires* expansion of FinCEN's authority. There is no express or implied statutory basis within the Bank Secrecy Act or its implementing regulations that authorizes FinCEN to impose such a low-dollar threshold, nor to do so indefinitely through successive renewals without formal rulemaking or congressional authorization.

171.    The statute under which FinCEN purported to act, 31 U.S.C. § 5326, contemplates more limited orders targeted at particular businesses in more discrete geographic areas and does not clearly authorize executive officials to adopt this type of sweeping surveillance system for an area containing more than a million people.

172.    The March 2025 GTO is also devoid of procedural safeguards, individualized findings, or administrative recourse, effectively converting what was intended as a temporary investigative tool into a de facto rule of general applicability. FinCEN has thus not issued an "order" within the meaning of the APA.

173.    Moreover, under the major questions doctrine, courts hold that statutes should not be interpreted to allow agencies to adopt policies of economic and political significance unless authority to adopt such a policy is clear on the face of the statute. This doctrine upholds basic separation of powers principles because it ensures that such decisions will be made by Congress, rather than by executive agencies. The surveillance regime put in place by the GTO implicates the major questions doctrine because it singles out an area with a population of over one million people for additional burdensome reporting obligations not imposed on any other part of the country and because it will impose significant costs on the businesses that are subjected to these new obligations, while also unlawfully infringing the privacy rights of those businesses' customers.

174.    Because the GTO is *ultra vires* and exceeds the authority granted to the executive branch, it must be vacated, set aside, and enjoined.

**Count IV: Violation of APA – Procedural Defects – The GTO Was Promulgated Without Following Notice-and-Comment Procedures
(5 U.S.C. § 553 and 5 U.S.C. § 706(2)(D))**

175.    Plaintiffs repeat and reallege each and every allegation above (at paragraphs 1-146) as if fully set forth herein.

176.    The APA, 5 U.S.C. § 553, establishes that federal agencies must engage in notice-and-comment rulemaking before adopting rules that affect the rights and obligations of regulated parties, unless a specific statutory exemption applies. Under the APA, a "rule" includes any agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy.

27

177.    On March 11, 2025, FinCEN, acting under delegated authority from the Secretary of the Treasury, issued a GTO that significantly alters the legal obligations of MSBs in 30 zip codes by lowering the transaction reporting threshold from $10,000 to $200 and requiring the identification, recordkeeping, and reporting of routine cash transactions far below the existing regulatory minimums.

178.    The issuance of the GTO operates as a binding rule of general applicability, imposing new substantive compliance requirements that extend beyond the statutory and regulatory baseline set by the Bank Secrecy Act and its implementing rules. Affected MSBs are compelled to modify internal operations, file additional transaction reports, collect customer data for previously exempt transactions, and face potential penalties for noncompliance—all without any opportunity to submit comments or raise objections before implementation.

179.    Despite the substantial and ongoing impact of this order on a class of regulated businesses, FinCEN did not fully initiate or properly conduct notice-and-comment rulemaking as prescribed by law.

180.    No exception to notice-and-comment rulemaking applies to the GTO.

181.    This failure to engage in notice-and-comment procedures violates the APA and deprives affected parties, including Plaintiffs and members of the putative class, of procedural rights guaranteed by law. The GTO therefore constitutes an unlawful agency action that must be set aside under 5 U.S.C. § 706(2)(D) as it was issued "without observance of procedure required by law."

182.    Because the GTO was issued in violation of procedural requirements set out in the APA, it must be vacated, set aside, and enjoined.

**Count V: Violation of the Non-Delegation Doctrine**
**(5 U.S.C. § 706(2)(A) and (B); *Ex parte Young*, 209 U.S. 123 (1908))**

183.    Plaintiffs repeat and reallege each and every allegation above (at paragraphs 1-146) as if fully set forth herein.

184.    As discussed in Count III, the GTO exceeds FinCEN's statutory authority. In the alternative, however, if FinCEN does have statutory authority to issue the GTO, that authority violates the non-delegation doctrine.

185.    Article I, section 1, of the U.S. Constitution provides that "[a]ll legislative Powers … shall be vested in a Congress of the United States." Congress therefore cannot delegate the power to make basic legislative decisions for the country to other branches of government.

186.    This means that legislative policy decisions must be made by Congress, not by executive agencies. When Congress delegates power to executive agencies, Congress must establish the governing rule of law by articulating an "intelligible principle" for the agency to apply. The agency's permissible role is then to apply that intelligible principle to specific facts and circumstances.

187.    The statute under which FinCEN purported to act when issuing the GTO, 31 U.S.C. § 5326, does not articulate any intelligible principle to be followed when issuing geographic targeting orders. Instead, it grants open-ended authority for executive officials to issue any geographic targeting order that they find necessary to implement the anti-money laundering laws—granting executive officials unfettered discretion to determine the businesses, geographic areas, reporting thresholds, and reports that should be required.

188.    Plaintiffs are injured by this non-delegation violation insofar as FinCEN relied on this broad, open-ended grant of authority to issue the GTO targeting their cash transactions for additional reporting burdens.

189.    Because the GTO was enacted under purported statutory authority that violates the non-delegation doctrine and separation of powers principles, it must be vacated, set aside, and enjoined.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs demand judgment against Defendants as follows:

(i)    An order vacating and setting aside the GTO under 5 U.S.C. § 706(2);

(ii)    A declaratory judgment, under 5 U.S.C. § 706(2) and 28 U.S.C. §§ 2201 and 2202, invalidating the GTO;

(iii)    The issuance of an injunction prohibiting Defendants from enforcing the GTO pursuant to 5 U.S.C. §§ 705 and 706(2) and *Ex parte Young*, 209 U.S. 123 (1908);

(iv)    If the Court believes it necessary, certification of the proposed class and extension of this relief to the proposed class;

(v)    An award of attorneys' fees and costs to Plaintiffs, under the Equal Access to Justice Act or otherwise; and

(vi)    Any other relief as the Court deems just, equitable and proper.

Dated: May 30, 2025

Respectfully submitted,

/s/ Christen Mason Hebert

Andrew Ward (NY Bar No. 5364393)*
Elizabeth L. Sanz (CA Bar No. 340538)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
ahward@ij.org
bsanz@ij.org

Christen Mason Hebert (TX Bar No. 24099898)
Jeffrey Rowes (TX Bar No. 24104956)*
INSTITUTE FOR JUSTICE
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936
chebert@ij.org
jrowes@ij.org

Katrin Marquez (FL Bar No. 1024765)*
INSTITUTE FOR JUSTICE
2 South Biscayne Blvd., Suite 3180
Miami, FL 33131
(305) 721-1600
kmarquez@ij.org

Robert E. Johnson (DC Bar No. 1013390)*
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
(703) 682-9320
rjohnson@ij.org

* *Pro Hac Vice* motions to be filed

*Attorney for Plaintiffs*