## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| VALUTA CORPORATION, INC., and PAYAN'S FUEL CENTER, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> FINANCIAL CRIMES ENFORCEMENT NETWORK; ANDREA GACKI, in her official capacity as Director of the Financial Crimes Enforcement Network; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; and PAM BONDI, in her official capacity as the Attorney General of the United States, <br><br> *Defendants*. | Civil Case No.  3:25-cv-191 |

## PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

# TABLE OF CONTENTS

Table of Authorities ....................................................................................................... ii

Introduction ..................................................................................................................... 1

Background ....................................................................................................................... 3

    A.  Plaintiff businesses perform everyday transactions for ordinary people. ................ 3

    B.  In certain border zip codes, FinCEN suddenly lowers the reporting threshold. ...... 4

    C.  Lowering the reporting threshold by 98% creates a law-enforcement dragnet. ...... 6

    D.  The paperwork burden and invasion of privacy are immense. ............................... 7

Legal Standard ................................................................................................................. 8

Argument ........................................................................................................................... 8

    I.  Plaintiffs Are Likely To Succeed On The Merits. ................................................. 9

        A.  The GTO likely violates the Fourth Amendment. ..................................... 9

        B.  The GTO is likely *ultra vires*. ................................................................ 13

        C.  The GTO is likely arbitrary and capricious. .......................................... 15

        D.  Notice and comment was likely required. ............................................... 17

    II.  There Are Profound Irreparable Harms. ............................................................ 18

    III. The Remaining Factors Favor A Restraining Order. ........................................... 18

    IV. The Court Can And Should Temporarily Restrain The GTO In Its Entirety..................... 19

Conclusion ...................................................................................................................... 20

# TABLE OF AUTHORITIES

CASES                                                                                     Page(s)

*Airbnb, Inc. v. City of New York*,
   373 F. Supp. 3d 467 (S.D.N.Y. 2019) .................................................................. 11

*Ala. Ass'n of Realtors v. DHHS*,
   594 U.S. 758 (2021) ............................................................................................. 15

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*,
   878 F.2d 806 (5th Cir. 1989) ................................................................................ 18

*Biden v. Nebraska*,
   600 U.S. 477 (2023).............................................................................................. 15

*Burgess v. FDIC*,
   871 F.3d 297 (5th Cir. 2017) ................................................................................ 18

*Cal. Bankers Ass'n v. Shultz*,
   416 U.S. 21 (1974) ............................................................................................... 10

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
   98 F.4th 220 (5th Cir. 2024)........................................................................... 2, 20

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
   145 S. Ct. 1039 (Jan. 10, 2025)........................................................................... 20

*Carpenter v. United States*,
   585 U.S. 296 (2018)......................................................................................... 12–13

*City of Arlington v. FCC*,
   668 F.3d 229 (5th Cir. 2012) ................................................................................ 17

*City of Arlington v. FCC*,
   569 U.S. 290 (2013).............................................................................................. 17

*Clark v. Prichard*,
   812 F.2d 991 (5th Cir. 1987) .................................................................................. 8

*Craig v. Boren*,
   429 U.S. 190 (1976).............................................................................................. 12

*Donovan v. Lone Steer, Inc.*,
   464 U.S. 408 (1984).............................................................................................. 12

*FBME Bank Ltd. v. Lew*,
   125 F. Supp. 3d 109 (D.D.C. 2015) ..................................................................... 16

*FHFA v. SFR Invs. Pool 1, LLC*,
  2:17-cv-914, 2018 WL 1524440
  (D. Nev. Mar. 27, 2018) ................................................................................................ 12

*Flight Training Int'l, Inc. v. FAA*,
  58 F.4th 234 (5th Cir. 2023)......................................................................................... 17

*Free Speech Coal., Inc. v. Paxton*,
  95 F.4th 263 (5th Cir. 2024)......................................................................................... 18

*Free Speech Coal., Inc. v. Paxton*,
  144 S. Ct. 2714 (July 2, 2024) ...................................................................................... 18

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022) ......................................................................................... 8

*In re Application for Hist. Cell Site Data*,
  747 F. Supp. 2d 827 (S.D. Tex. 2010).......................................................................... 12

*In re Grand Jury Investigation of Possible Violation of 18 U.S.C. s 1461 et seq.*,
  706 F. Supp. 2d 11 (D.D.C. 2009) ............................................................................... 12

*Kort v. Burwell*,
  209 F. Supp. 3d 98 (D.D.C. 2016) ................................................................................ 16

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023)........................................................................................... 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
  463 U.S. 29 (1983)................................................................................................... 15–16

*Nken v. Holder*,
  556 U.S. 418 (2009)......................................................................................................... 8

*Plante v. Gonzalez*,
  575 F.2d 1119 (5th Cir. 1978) ...................................................................................... 18

*Rest. L. Ctr. v. DOL*,
  120 F.4th 163 (5th Cir. 2024) ...................................................................................... 15

*Riley v. California*,
  573 U.S. 373 (2014)......................................................................................................... 9

*Safari Club Int'l v. Zinke*,
  878 F.3d 316 (D.C. Cir. 2017) ...................................................................................... 17

*Space Expl. Techs., Corp. v. Bell*,
  701 F. Supp. 3d 626 (S.D. Tex. 2023).......................................................................... 18

*Tex. Top Cop Shop, Inc. v. Garland*,
    758 F. Supp. 3d 607 (E.D. Tex. 2024) .......................................................... 18, 20

*Tex. v. Seatrain Int'l, S. A.*,
    518 F.2d 175 (5th Cir. 1975) ............................................................................... 8

*United States v. Miller*,
    425 U.S. 435 (1976) ............................................................................................ 13

*United States v. Morton Salt Co.*,
    338 U.S. 632 (1950) ...................................................................................... 10–11

*United States v. Smith*,
    110 F.4th 817 (5th Cir. 2024) ......................................................................... 9, 12

*W & T Offshore, Inc. v. Bernhardt*,
    946 F.3d 227 (5th Cir. 2019) ............................................................................. 17

*Wages & White Lion Invs., LLC v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) ........................................................................... 18

*Whole Woman's Health v. Paxton*,
    264 F. Supp. 3d 813 (W.D. Tex. 2017) .............................................................. 8

**RULES**

Fed. R. Civ. P. 1 ........................................................................................................ 19

**CODES AND STATUTES**

5 U.S.C. § 551(4) ...................................................................................................... 14

5 U.S.C. § 551(6) ...................................................................................................... 13

5 U.S.C. § 551(7) ................................................................................................. 13, 17

5 U.S.C. § 554 ........................................................................................................... 13

5 U.S.C. § 556(d) ...................................................................................................... 13

5 U.S.C. § 557(c)(3)(B) ............................................................................................ 13

5 U.S.C. § 705 ........................................................................................................... 20

5 U.S.C. § 706(2) ...................................................................................................... 20

16 C.F.R. § 313.3(k)(1) ............................................................................................. 13

31 C.F.R. § 415(a) ...................................................................................................... 4

31 C.F.R. § 1010.310 ................................................................................................ 5

31 C.F.R. § 1010.311 ................................................................................................ 5

31 C.F.R. § 1010.410(e) ........................................................................................... 4

31 C.F.R. § 1022.410(b)(3) ...................................................................................... 4

31 U.S.C. § 5313(a) ................................................................................................ 14

31 U.S.C. § 5326 ............................................................................................... 13–15

31 U.S.C. § 5326(a) ............................................................................................... 14

31 U.S.C. § 5326(c) ............................................................................................... 14

**OTHER AUTHORITIES**

85 Fed. Reg. 29,022 (May 14, 2020) ......................................................................... 5

89 Fed. Reg. 7,767 (Feb. 5, 2024) ............................................................................. 5

90 Fed. Reg. 12106 (Mar. 14, 2025) ............................................................... *passim*

*A.A.R.P. v. Trump*,
   Application 24A1007 (U.S. May 16, 2025) ......................................................... 20

*Novedades y Servicios, Inc. v. FinCEN*,
   3:25-cv-00886 (S.D. Cal.) .................................................................................. 2

*Tex. Ass'n for Money Servs. Bus. v. Bondi*,
   5:25-cv-00344 (W.D. Tex.) .................................................................................. 2

*Trump v. CASA, Inc.*,
   Application 24A884 (U.S. May 15, 2025) ......................................................... 19

## INTRODUCTION

Plaintiff Valuta Corporation is a small, family-owned money services business in El Paso—a city where, as this Court knows, everyday people doing everyday things on both sides of the border need to exchange currency to live their lives. Customers also come to Valuta to cash paychecks to buy groceries, get money orders to pay rent, and transfer money to family. Plaintiff Payan's Fuel Center is also a money services business. It is a gas station and convenience store in El Paso that cashes checks for people who do not have the access to banking enjoyed by white-collar professionals. In other words, Plaintiffs provide routine, helpful, and perfectly legal services.

But after decades of compliance with financial regulations, these businesses and others now face crushing regulatory burdens imposed at the whim of the federal government. On April 14, Defendant the Financial Crimes Enforcement Network implemented an unprecedented form of financial surveillance on money-services businesses. Through a new geographic targeting order, FinCEN now requires money services businesses in 30 zip codes along the border to file a Currency Transaction Report for every transaction over $200—a *fiftyfold* reduction from the usual $10,000 threshold that still applies in the rest of the country. Under threat of ruinous fines, Valuta and Payan's are now forced to participate in an Orwellian system of financial surveillance on regular people. Predictably, their customers have begun using services offered by businesses unaffected by the order in untargeted zip codes that are literally minutes away. And those customers that remain now trigger an avalanche of paperwork. Valuta, for instance, filed 123 Currency Transaction Reports in all of 2024. In just the first four weeks of the order, it filed about 1,600. At 15 minutes each, that's *16 days* spent working around the clock to fill out forms.

Two federal judges—Judge Biery and Judge Janis Sammartino of the Southern District of California—are overseeing challenges to the order. Both have held that it is likely illegal. Both issued temporary restraining orders. And both have issued preliminary injunctions. Judge Biery's

takeaway was simple: "It appears the Government did not think." *See* Sanz Decl. Ex. D (Order Granting Pls.' Mot. for Prelim. Injunction 2–4, 11, *Tex. Ass'n for Money Servs. Bus. v. Bondi*, 5:25-cv-00344 (W.D. Tex. May 19, 2025) (ECF 59) (hereinafter "Tex. PI Order"); *see also* Sanz Decl. Ex. E (Order Granting Mot. for Prelim. Injunction 1–2, 11–12, *Novedades y Servicios*, *Inc. v. Fin-CEN*, 3:25-cv-00886 (S.D. Cal. May 21, 2025) (ECF 47) (hereinafter "Cal. PI Order").

Plaintiffs here dedicated days to participating in the preliminary injunction hearing before Judge Biery as non-party witnesses. They testified, as he summarized it, to "skyrocketing labor costs, a permanent decrease in customers, … a decrease in revenue" and an "explosion in paper-work." Tex. PI Order 40. They also shared their experiences though declarations with the court in California. They'd hoped that at least one of the two cases would stay enforcement of the order entirely so that they did not have to bring a third suit. Indeed, Judge Sammartino recognized that the relief sought, under the Administrative Procedure Act, "is not party-restricted and allows a court to 'set aside' an unlawful agency action" entirely. Cal. PI Order 50 (citing *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024)).

Even so, because Judge Sammartino thought the issues "might benefit from development … in multiple decisions," she preliminarily enjoined enforcement of the order only as to the tar-geted zip codes in California, which are all in her district. *Id.* (citation omitted). Judge Biery, meanwhile, had granted his temporary restraining order to only the plaintiffs before him, and at the preliminary-injunction stage, he did not want to "go back on [his] word." *See* Sanz Decl. Ex. L (Tr. Mot. Hr'g 18:4–8, *Tex. Ass'n for Money Servs. Bus. v. Bondi*, 5:25-cv-00344 (W.D. Tex. May 14, 2025)). So he limited relief to only those plaintiffs. Today, then, the order is preliminarily enjoined everywhere it was effective in California, but it is still enforceable against Valuta, Payan's, and, except for the ten plaintiffs in Judge Biery's case, all targeted businesses in Texas.

In limiting relief to the parties before him, Judge Biery added, "if they want to file their own lawsuit … that's up to the people who are not plaintiffs." *Id.* at 18:8–13. That is exactly what Valuta and Payan's now do: sue to protect themselves and the remaining affected businesses in Texas. There is no longer any sense in piecemeal litigation about a requirement so illogical that, per Judge Biery, Aristotle is "spinning" in his grave. Tex. PI Order 4. Plaintiffs will thus ask this Court to stop the bleeding that money services businesses in Texas are continuing to suffer. And until the Court can decide whether it agrees with Judges Biery and Sammartino about a preliminary injunction, it should enter a temporary restraining order for everyone that's left.[1]

## BACKGROUND

### A.    Plaintiff businesses perform everyday transactions for ordinary people.

Plaintiff Valuta is a money services business (MSB) with a single storefront in southern El Paso. Decl. of Clarissa Ashley Light in Support of Pls.' Mot. for a TRO ("Light Decl.") ¶¶ 4, 5, 10. Its owner, Ashley Light, is an American citizen whose parents opened Valuta 41 years ago to provide financial services, primarily currency exchange, to the El Paso community. *Id.* ¶¶ 1, 9–10. Valuta holds Texas MSB license number 1, and half of its 9-person staff have worked for Valuta for over 30 years. *Id.* ¶¶ 9–10. El Paso is, of course, a border city, where regular people cross between the U.S. and Mexico every day for normal legal reasons, such as tourism, family visits, and work. *Id.* ¶ 13. Currency exchange is a common and vital service in El Paso, and it's normal that there's a lot of it. *Id.* Beyond currency exchange, Valuta also provides other money services to regular people, many of whom do not use banks. *Id.* ¶¶ 8, 16.c.

Because it provides those services, Valuta is a federally registered MSB. 31 C.F.R. 1010.100(ff).

---

[1] Plaintiffs have notified the U.S. Attorney's Office for the Western District of Texas of this filing and have also separately emailed counsel for Defendants in the *TAMSB* case to notify them of this filing and to offer to meet and confer. Sanz Decl. ¶ 4.

Currency exchange is a straight trade of one currency for another, and Valuta offers 12 to 16 currencies. Light Decl. ¶ 16.d. A money order is prepaid form of payment: A customer gives Valuta cash and Valuta provides a document that is good for that cash, which a recipient can redeem. *Id.* ¶ 16.a. Customers often use money orders to pay rent or bills. *See id.* ¶¶ 16.a, 39. For a money transfer, Valuta acts as an agent for a service called MoneyGram that enables someone to present money at location X so that a recipient can pick up the money at location Y. *See id.* ¶ 16.b. Finally, check cashing is simple: Valuta turns a check into cash, minus a fee. *Id.* ¶ 16.c.

Payan's Fuel Center, Inc. is a family-owned, one-location gas station and convenience store that has been serving the El Paso community since 1982. Decl. of Andres Payan, Jr., in Support of Pls.' Mot. for a TRO ("Payan Decl.") ¶¶ 2, 4. All four members of the family—Mr. and Mrs. Payan, son Andres Payan, Jr., and daughter Samantha—make their livings working for Payan's. *Id*. ¶ 8. Payan's is an MSB because, in addition to selling gas, snacks, and beverages, it cashes checks. *Id*. ¶¶ 6, 11. Payan's earns revenue from the check cashing service itself in the form of commissions and fees. *Id*. ¶ 11. But because Payan's also offers convenience store products, Payan's also earns revenue on sales that happen alongside the check cashing. *Id*. For these reasons, check cashing is central to the family's business. *Id*. ¶ 12. Ordinarily, nearly all these transactions at Valuta and Payan's take just a few minutes. *See* Light Decl. ¶ 16; Payan Decl. ¶ 15.

**B.    In certain border zip codes, FinCEN suddenly lowers the reporting threshold.**

Generally speaking, FinCEN does not require MSBs to record customers' personal information to complete transactions. For instance, for currency exchange, FinCEN does not require an MSB to record customer information unless the transaction is over $1,000. 31 C.F.R. § 1022.410(b)(3). For money transfers and money orders, the threshold is $3,000. 31 C.F.R. § 1010.410(e), 415(a). And even then, these thresholds are for recordkeeping, not reporting.

Also generally speaking, automatic *reporting* does not kick in until a transaction is for more than

$10,000. *See id.* This has been the reporting threshold for decades. For cash transactions over it, MSBs must file a form called a Currency Transaction Report ("CTR"). 31 C.F.R. § 1010.311. This $10,000 reporting requirement applies to all covered financial institutions, banks and MSBs alike, all across the country. 31 C.F.R. § 1010.310. The CTR has four sections with 128 fillable boxes. *See* Sanz Decl. Ex. C ("Sample CTR"). On top of containing detailed information about the entity facilitating the transaction, *id.* at 2–3, and form the currency takes, *id.* at 5, FinCEN requires each person involved in the transaction to reveal highly personal information, including full legal name, age, gender, address, phone number, email address, social security number (or other taxpayer identification number), specific occupation (from a dropdown list of dozens), the number from a valid driver's license (or passport or green card), the amount of money, and bank account numbers that transmit or receive the money, *id.* at 4.

FinCEN has estimated that each Currency Transaction Report takes eight minutes to complete. 89 Fed. Reg. 7,767, 7,768 (Feb. 5, 2024). But this is an average that includes large firms using automated processes to generate the reports. 85 Fed. Reg. 29,022, 29,029 (May 14, 2020). For non-bank filers who do not have automated processes—like Valuta and Payan's—FinCEN estimates that each Currency Transaction Report takes 23.93 minutes to complete. *Id.*

On March 14, 2025, FinCEN issued an order, effective April 14, 2025, that requires MSBs (but not banks) in certain zip codes near the border to file a CTR for every cash transaction over $200. *See* Sanz Decl. Ex. A (*Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border*, 90 Fed. Reg. 12106 (Mar. 14, 2025) ("the GTO"). It does not apply to all MSBs, just those in 30 zip codes in Texas and California. *See* Sanz Decl. Exs. F–J (maps of targeted zip codes). No New Mexico or Arizona zip codes are included. And the targeted zip codes are not all

contiguous. Some targeted zip codes are surrounded by untargeted zip codes. FinCEN's entire written analysis underlying the GTO appears to be an internal memorandum dated "March XX, 2025" that may or may not have been written before the GTO was issued. *See* Sanz Decl. Ex. B ("March XX Memo"); *see also* Cal. PI Order 36 n.4.

### C.    Lowering the reporting threshold by 98% creates a law-enforcement dragnet.

Dropping the CTR threshold from $10,000 to $200 is a reduction by a factor of 50. FinCEN justifies it as "in furtherance of Treasury's efforts to combat illicit finance by drug cartels and other illicit actors." 90 Fed. Reg. at 12107. The internal memorandum states FinCEN's view that "MSBs are vulnerable to exploitation by money launderers," and that "FinCEN has identified money transfers through MSBs as a financial typology associated with Mexico-based drug cartels." March XX Memo at 4–5. In FinCEN's view, "MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels." *Id.* at 5.

FinCEN admits that the purpose of lowering the threshold is to cast a much wider net for criminal investigations by creating a much larger CTR database than what exists at the $10,000 level. By gathering much more information, the GTO will supposedly "generate new leads and identify new and related subjects in ongoing cases." March XX Memo at 9. It "may allow the identification of a comprehensive network of potential money mules in the geographic areas in question," may "create leads related to professional money launderers," and will "likely capture information about the laundering of funds related to multiple criminal typologies." *Id.* The GTO will also "provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Areas, allowing FinCEN to more fully understand the money laundering risks related to MSBs." *Id.* at 13–14.

At the same time, the memo acknowledges that "most of the business that MSBs conduct is legitimate and essential." *Id.* at 4. And the GTO has already altered how "legitimate and

essential" MSBs like Valuta and Payan's operate. Because much of the financial services they offer involves cash transactions over $200, most customers now generate a CTR.

### D.    The paperwork burden and invasion of privacy are immense.

The GTO will likely destroy, or at least seriously wound, Valuta, Payan's, and other MSBs. They cannot realistically comply with the tidal wave of paperwork or withstand the loss of privacy. Take the paperwork. In all of 2024, Plaintiff Valuta filed about 123 CTRs. Light Decl. ¶ 17. In the first month of the GTO, it filed about 1,600 and had a backlog of over 700. *Id*. ¶¶ 18, 22. That is over 53 CTRs per day. *Id*. It is filing CTRs one at a time, and each takes about 15 to 20 minutes to do, which amounts to at least 13 hours per day filling out forms. *Id*. ¶¶ 21, 27. Payan's, too, is drowning in CTRs. Payan Decl. ¶ 17. Before the GTO, Payan's had never filed a CTR; now, it is filing a CTR for about 87% of its cashed checks. *Id*. ¶ 13. It got so out of control that after just two weeks of the GTO, Payan's had to stop cashing checks over $200 for a whole week, just to catch up on CTRs. *Id*. ¶ 17. Valuta has tried to get systems in place to file CTRs faster, such as "batch processing" that FinCEN has said is possible, but it cannot get FinCEN to respond to questions about how to do it. Light Decl. ¶¶ 28–31. Same with Payan's. Payan Decl. ¶¶ 32–33.

People are also taking their business elsewhere to preserve their privacy. Payan's check cashing services, for example, involve modest amounts that working-class people make in their paychecks. Payan Decl. ¶¶ 9–10, 14. And there are many MSBs in nearby zip codes that are not covered by the GTO, meaning people can take their business there without invasive surveillance. *See* Light Decl. ¶ 40; Payan Decl. ¶ 22. They are likely doing that now, as customers are walking out of both Valuta and Payan's. *See* Light Decl. ¶ 19; Payan Decl. ¶ 22. Payan's worries that customers will never come back, because they will remember that Payan's asked them for their personal information to give to the government. Payan Decl. ¶ 24. Valuta also worries about customers being driven away. Light Decl. ¶¶ 41–43. Both fear the loss of goodwill. Light Decl. ¶ 44;

Payan Decl. ¶ 42.

Worse than that, Valuta fears the end of its business. Light Decl. ¶ 44. It is bleeding customers. *Id.* ¶ 19. And while Payan's is hanging on for now, it still expects to lose 20–25% of its net revenue if the GTO runs its course—and that's if it isn't renewed. *See* Payan Decl. ¶ 42. Both businesses made every effort to stop the GTO by sharing their experiences in the prior suits. Light Decl. ¶ 45; Payan Decl. ¶ 44. Those efforts have not afforded them relief. Now they seek it here.

## LEGAL STANDARD

"The party moving for a temporary restraining order, like an applicant for a preliminary injunction, must establish four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the temporary restraining order is denied; (3) that the threatened injury outweighs any damage that the temporary restraining order might cause the defendant; and (4) that the temporary restraining order will not disserve the public interest." *Whole Woman's Health v. Paxton*, 264 F. Supp. 3d 813, 818 (W.D. Tex. 2017); *see also, e.g.*, *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). When, as here, the government is the opposing party, the last two factors, the equities and the public interest, "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Fifth Circuit considers these factors on a "sliding scale," *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023), so the strength of the arguments on the merits can "vary significantly, depending upon the magnitude of the injury which would be suffered … and the relative balance of the threatened hardship." *Texas v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975); *see also, e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) ("[W]hen the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits.'").

## ARGUMENT

As two federal judges have already held, a TRO should issue. Valuta and Payan's are

likely to succeed on the merits of at least four claims: The GTO acts as general warrant in violation of the Fourth Amendment; FinCEN had no statutory authority to issue it; if FinCEN did have statutory authority, it exercised it arbitrarily; and if Congress granted the authority, notice and comment was required. (Parts I(A)–I(D).) Next, Valuta and Payan's are suffering irreparable injuries. Every day the GTO is in effect, they are losing customers, goodwill, and revenue that they cannot recover as damages. (Part II.) And the public interest favors allowing essential services like these to operate as they have for decades, not hobbling them because FinCEN might someday catch cartels laundering money in $201 increments. (Part III.) Finally, the Court should stay the effective date of the GTO for *all* unprotected MSBs left in Texas. Efficiency and fairness show that it should, and black-letter Fifth Circuit precedent holds that it can. (Part IV.)

## I.      Plaintiffs Are Likely To Succeed On The Merits.

### A.      The GTO likely violates the Fourth Amendment.

Judge Biery held that the GTO likely violates the Fourth Amendment as a general warrant: "The rebellious idea that King George III should not be able to have his red-coated soldiers and agents rifle haphazardly through American colonists' homes and businesses is foundational to our national existence," but now, through the GTO, "violation of that bedrock principle is accomplished by over-burdensome technological requirements." Tex. PI Order 3.

In other words, the GTO is a drastic, novel method of criminal investigation that functions as "reviled 'general warrants' … which allowed … an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014); *see also United States v. Smith*, 110 F.4th 817, 838 (5th Cir. 2024) (invalidating general search of Google phone data for thousands of customers). Requiring a CTR for every transaction over $200 covers a majority of transactions at Plaintiffs' businesses. *See* Payan Decl. ¶ 13 (87%); Light Decl. ¶ 14 (65%). Moreover, the CTR is strictly a tool for criminal investigation, not ordinary regulatory compliance. Putting these two

together, FinCEN is treating essentially every customer and MSB as a potential criminal and forcing them to disclose personal information as part of a general campaign to catch members of Mexican drug cartels. This turns the rules of ordinary criminal investigation on their head. Normally, the government obtains personal information via a warrant supported by probable cause. Here, by contrast, FinCEN has issued a general warrant that applies to everyone so it can go on fishing expeditions in the targeted zip codes.

In the earlier cases, the government has argued that the GTO is a permissible application of *California Bankers Association v. Shultz*, 416 U.S. 21 (1974), which upheld the requirement to file CTRs for transactions over $10,000. To the contrary, however, *Shultz* confirms the GTO's unlawfulness. *See* Tex. PI Order 20–21. *Shultz* held that the key Fourth Amendment question was whether the reporting requirement was "reasonable," including whether the "information is sufficiently described and *limited in nature*." 416 U.S. at 67 (emphasis added). The Supreme Court focused on the $10,000 threshold, which after inflation is equivalent to $70,000 today. That very high threshold limited reporting to "abnormally large transactions in currency," and so was "reasonable" compared to business privacy interests because it intruded on few transactions. *Id.*; *see also id.* at 78 (Powell, J., concurring) (specifically citing $10,000 threshold and stating that "[a] significant extension of the regulations' reporting requirements, however, would pose substantial and difficult constitutional questions").[2] But the GTO sets the threshold at $200, which would have been about $30 in 1974. It's over *300 times* smaller than the threshold the Supreme Court considered. It intrudes on *most* transactions, obliterating financial privacy. That is not reasonable.

The limits of *Shultz* are confirmed by *United States v. Morton Salt Co.*, 338 U.S. 632

---

[2] Justice Powell's concurrence was joined by Justice Blackmun. 416 U.S. at 78. With three Justices dissenting, *see id.* at 79, 91, 93, the concurring Justices provided necessary votes for the decision.

(1950), the primary authority cited in *Shultz*. *See* Tex. PI Order 21. That decision addressed an agency order directing 20 companies and a trade association to file reports verifying compliance with an FTC cease-and-desist order. 338 U.S. at 634–35. The Court upheld the reporting requirement on the ground that it was sufficiently related to the FTC's need to ensure compliance with its prior orders, but the Court also explained that authority to require reports is limited by the Fourth Amendment—which "is not confined literally to searches and seizures as such, but extends as well to the orderly taking [of information] under compulsion of process." *Id.* at 651–52. The Court underscored that "a governmental investigation into corporate matters may be of *such a sweeping nature* and so *unrelated to the matter properly under inquiry* as to exceed the investigatory power." *Id.* at 652 (emphasis added). The $200 GTO is precisely the kind of "sweeping" requirement *Morton Salt* condemned.

In this regard, one way to think about the GTO is as a (staggeringly) overbroad subpoena for corporate records. In fact, a federal district court adopted precisely that framing in *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 472, 474–75 (S.D.N.Y. 2019), which applied the Fourth Amendment to grant a preliminary injunction against an ordinance that required short-term rental companies to file "monthly transaction reports" with "voluminous data regarding customers who use their platforms." The court in *Airbnb* analogized the bulk reporting requirement to a vastly overbroad subpoena, explaining that, unlike a typical subpoena, the reporting obligation "applies across-the-board" without any need for individualized suspicion. *Id.* at 491. The *Airbnb* court explained that, historically, "[a]n attempt … to compel an entire industry monthly to copy and produce its records as to all local customers would have been unthinkable under the Fourth Amendment." *Id.* at 494. But that's exactly what is happening here.

Further, applying the Fourth Amendment standards applied to agency subpoenas, the GTO

is unreasonable because it is immensely burdensome. *See* Tex. PI Order 22; *see also Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (subpoena for corporate records must be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome"). Plaintiffs are spending hours every day complying with these obligations; they are pausing transactions to clear out paperwork backlogs; and they are losing significant revenue and even facing the potential destruction of their businesses. *See* Light Decl. ¶ 38; Payan Decl. ¶¶ 17, 23. An obligation of that scope "unduly disrupt[s]" and "seriously hinder[s]" normal operations of a business." *FHFA v. SFR Invs. Pool 1, LLC*, 2:17-cv-914, 2018 WL 1524440, at *7 (D. Nev. Mar. 27, 2018).

That's more than enough, but the GTO also unreasonably invades the privacy of Plaintiffs' customers. *See* Tex. PI Order 22–23.[3] The Supreme Court has held that, when government subpoenas corporate records, "a warrant is required in the rare case where the suspect has a legitimate privacy interest in records held by a third party." *Carpenter v. United States*, 585 U.S. 296, 319 (2018); *see also Smith*, 110 F.4th at 838. That rule applies here, as Plaintiffs' customers have a legitimate expectation of privacy in these records of their ordinary, everyday financial transactions. This expectation is reflected in federal law, which protects the privacy of information about transactions like these. *See In re Application for Historical Cell Site Data*, 747 F. Supp. 2d 827, 841–42 (S.D. Tex. 2010) (explaining, in context of cellphone location data, that "an act of Congress affecting proprietary interest in a thing is undeniably relevant to the legitimate-expectation-of-privacy inquiry"). Federal law imposes privacy obligations on any "institution that is significantly

[3] Plaintiffs may raise the privacy interests of their customers when challenging a subpoena for Plaintiffs' own books and records. *See, e.g., In re Grand Jury Investigation of Possible Violation of 18 U.S.C. s 1461 et seq.*, 706 F. Supp. 2d 11, 17 n.3 (D.D.C. 2009); *see also Craig v. Boren*, 429 U.S. 190, 196 (1976) (explaining that a party subject to a legal restriction has "standing to defend the privacy interests of third parties" affected by that legal restriction).

engaged in financial activities," 16 C.F.R. § 313.3(k)(1), which includes entities that provide services covered by the GTO. These regulations confirm not only that this information is private, but that this expectation of privacy is one that society is prepared to consider reasonable.

The government has argued that Plaintiffs' customers lack any legitimate privacy interest in this information under *United States v. Miller*, 425 U.S. 435 (1976), which held that bank customers' privacy interests were not implicated by the requirement that banks report transactions over $10,000. But *Miller* must be read in conjunction with *Carpenter*, which explains that the third-party doctrine does not apply when customers *do* have a legitimate privacy interest in corporate records; addressing *Miller*, the Court in *Carpenter* specifically warned that courts should not "uncritically extend existing precedents" to new contexts, including the "novel" context of digital cell site location data. 585 U.S. at 309, 319. Here, the Court likewise should not uncritically extend a case about reporting of abnormally large transactions to a requirement that encompasses ordinary, everyday transactions over $200. *See* Tex. PI Order 22. MSBs and customers both have legitimate privacy interests, and the government needs a warrant.

### B.    The GTO is likely *ultra vires*.

Next, as Judge Sammartino concluded, the GTO is also likely unlawful because it exceeds FinCEN's statutory authority. *See* Cal. PI Order 20–33. The statute that FinCEN relied on, 31 U.S.C. § 5326, contemplates "limited, investigatory tools directed to an identifiable business or group of businesses based on particularized facts," not a sweeping information-gathering measure directed to an entire industry operating across 30 zip codes. Cal. PI Order 20. Three arguments confirm the limited nature of FinCEN's authority.

First, Section 5326 contemplates that FinCEN will act via "order," a term of art in the Administrative Procedure Act that—in contrast to a "rule"—applies to more limited adjudicatory decrees. 5 U.S.C. § 551(6)-(7); *see also id.* §§ 554, 556(d), 557(c)(3)(B). Other provisions of the

Bank Secrecy Act do authorize FinCEN to promulgate reporting obligations by "rule," *see* 31 U.S.C. § 5313(a), but Congress "opted to deviate from § 5313 when it authorized GTOs to issue by 'order.'" Cal. PI Order 22. In substance, however, (and as discussed more below) the GTO is not an order. It is a rule, an "an agency statement of general or particular applicability and future effect designed to implement … or prescribe law or policy." 5 U.S.C. § 551(4). To be sure, the government has argued that because Section 5326 authorizes an "order," *any* action that FinCEN takes under Section 5326 is necessarily an "order," but "[t]he circularity of this argument is facially apparent." Cal. PI Order 24 n.2. Congress's use of the word "order" in Section 5326 defined and limited the scope of FinCEN's authority: It must do this sort of thing through "adjudication." 5 U.S.C. § 551(7). It didn't. The GTO is not in fact an "order," so it is not authorized by statute.

Second, Section 5326(a) specifies that a GTO should apply to a "domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area." That language limits GTOs to an *identified* business or group of businesses, not a *category* of businesses such as "MSBs" that applies indiscriminately to everyone meeting certain regulatory criteria. *See* Cal. PI Order 29 ("The most natural way to read this provision, in context, is that FinCEN may issue an order resulting from a factual determination with respect to either a single business or with respect to a group of multiple businesses," not "a factual determination with respect to a zip code …").[4]

Finally, this conclusion is confirmed by application of the major questions doctrine, under which courts "expect Congress to speak clearly when authorizing an agency to exercise powers of

---

[4] Additional "strong evidence" for this interpretation is found at 31 U.S.C. § 5326(c), which provides for the confidentiality of GTOs. *See* Cal. PI Order 30–31. The government disregarded that confidentiality provision here, instead proceeding through an "order" that was publicly disclosed in the Federal Register like any other rule of general applicability. "This newfangled execution elucidates just how far GTOs have drifted from Congress's original intention." *Id.* at 33.

vast economic and political significance." *Alabama Ass'n of Realtors v. DHHS*, 594 U.S. 758, 764 (2021) (cleaned up). At a single stroke, FinCEN infringed the privacy interests of hundreds of businesses and their customers across an entire geographic region. Congress certainly did not give FinCEN that power *clearly*. This case is thus like *Biden v. Nebraska*, in which the Supreme Court held that wholesale forgiveness of student loans could not be justified under a provision allowing the government to "waive or modify" student loans. 600 U.S. 477, 496–97 (2023). The Court reasoned that the authority to waive or modify student loans envisioned more modest action: "the words 'waive or modify' do not mean 'completely rewrite.'" *Id.* at 506–07. Likewise here. "Order" does not clearly mean "rule," nor does "business in a geographic area" clearly mean "every MSB in 30 zip codes." Section 5326 does not allow FinCEN to impose a massive financial dragnet across a stretch of California and Texas with over one million people, and even if it might, Congress cannot be assumed to have crammed that elephant into a mousehole in the BSA.

## C.    The GTO is likely arbitrary and capricious.

Both judges also thought the GTO was likely arbitrary and capricious. Tex. PI Order 28–33; Cal. PI Order 35–43. An "agency rule" is "arbitrary and capricious if the agency has … entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). And there are at least five such problems here, any one of which is sufficient and all of which are worse considered in combination.

***There is no reasoned explanation for the $200 reporting threshold.*** FinCEN has not adequately explained its decision to lower the CTR threshold for these businesses by 98% to sweep in vast categories of transactions never before subject to reporting. *See Rest. L. Ctr. v. DOL*, 120 F.4th 163, 176 (5th Cir. 2024) (finding agency action arbitrary and capricious where agency's

approach to line-drawing was illogical and unsupported); *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 125 (D.D.C. 2015) (granting preliminary injunction against FinCEN "special measure" where "the agency's failure to explain its consideration of potentially viable alternatives appears to have run afoul of the APA"). In FinCEN's view, "MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels." March XX Memo at 5. But that does not show that it is necessary to sweep up information about all transactions over $200. $200 is an average amount for a full grocery cart. No one seriously thinks the cartels are laundering $201 at a time. There is no reasoned basis for assuming that information about such small-dollar transactions will lead to cartels. ***FinCEN also did not consider the crushing paperwork burdens imposed by the GTO.*** FinCEN has not explained how those burdens—and destroying MSBs as a result— are warranted. Valuta is dealing with *13 hours* of new paperwork every day. FinCEN has "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Beyond that, there is also ***no reasoned explanation for targeting the 30 zip codes***. FinCEN's March XX Memo (at 9–10) asserts that these border zip codes were selected—as opposed to other zip codes near the border—because they have a high ratio of CTRs (for over-$10,000 transactions) to population. But that makes no sense. An area with a commercial district (or even particular types of commercial establishments) may have high numbers of over-$10,000 cash transactions, relative to population, without indicating anything suspicious. And even if there is something suspicious about those *large-dollar* transactions—which has not been shown—it would not follow that *small-dollar* transactions in the same area bear closer scrutiny. FinCEN's "failure to provide a cogent explanation for the disparate outcomes was arbitrary and capricious." *Kort v. Burwell*, 209 F. Supp. 3d 98, 115 (D.D.C. 2016). ***FinCEN also did not consider that cartels could easily take countermeasure*s,** by using untargeted MSBs that are literally minutes away in other zip codes. San Diego,

for instance, is a Swiss cheese of targeted and non-targeted zip codes. Sanz Decl. Exs. K–L (providing maps of targeted California zip codes). They could also go to Arizona or New Mexico. Or use bitcoin, bulk cash smuggling, or other laundering techniques. Finally, **FinCEN has shown no ability to act on the thousands of new CTRs** it is receiving per day. All this likely renders the GTO arbitrary and capricious.

### D. Notice and comment was likely required.

Lastly for the merits, both judges concluded that the GTO likely required notice and comment. Tex. PI Order 25–28; Cal. PI Order 33–34. Although, as discussed, FinCEN does not have statutory authority to issue a GTO like this as a rule rather than an order, if it did, the GTO would have required APA notice and comment that undisputedly never occurred.

"[W]hen [an] agency seeks to *make substantive law* … notice and comment is required." *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 241 n.5 (5th Cir. 2023). "Substantive rules not subjected to notice and comment may not be enforced against a party." *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019). And, again, the GTO is a rule seeking to make law because it "impose[s] obligations … on private interests." *Id.*. Failure to comply can result in "civil or criminal penalties for violating any of the terms of th[e] Order." 90 Fed. Reg. at 12,108. Whereas an adjudication—the "agency process for the formulation of an order," 5 U.S.C. § 551(7)—typically "resolve[s] disputes among specific individuals in specific cases … rulemaking affects the rights of broad classes of unspecified individuals." *City of Arlington v. FCC*, 668 F.3d 229, 242 (5th Cir. 2012), *aff'd,* 569 U.S. 290 (2013).

The Government may insist for a third time that the GTO is an "order," but saying so just doesn't make it true. As Judges Biery and Sammartino have already done with the GTO, courts reject attempts to pass off "rules" as "orders" to evade notice and comment. *See, e.g.*, *Safari Club Int'l v. Zinke*, 878 F.3d 316, 333 (D.C. Cir. 2017).

## II.      There Are Profound Irreparable Harms.

Without a temporary restraining order, Valuta and Payan's will continue to suffer irreparable harm. Payan's is losing significant revenue and customer base, and Valuta is being outright destroyed. *See*, *e.g.*, Light Decl. ¶ 44, Payan Decl. ¶¶ 23, 42. And though lost revenue can usually be remedied by damages, monetary losses are irreparable when "complying with an agency order later held invalid … because federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (cleaned up). Other irreparable economic harms here include "damage to the goodwill of [Plaintiffs'] customers," *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989), and "reputational injury," *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017).

Plaintiffs will also suffer irreparable harms to their Fourth Amendment interests in being free of searches for private financial information. The "deprivation of a constitutional right" is always irreparable. *E.g.*, *Space Expl. Techs., Corp. v. Bell*, 701 F. Supp. 3d 626, 634 (S.D. Tex. 2023). A loss of privacy in personal information is irreparable, too. That genie can't be put back in the bottle. *See, e.g.*, *Plante v. Gonzalez*, 575 F.2d 1119, 1135 (5th Cir. 1978) ("Privacy of personal matters is an interest … protected constitutionally … and at common law.").

## III.     The Remaining Factors Favor A Restraining Order.

On the Fifth Circuit's "sliding scale," no separate analysis of the public interest or the balance of equities is needed. "[T]he government suffers no injury when a court prevents it from enforcing an unlawful law. Thus, the balance of harms and the public interest weigh in plaintiffs' favor." *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 287 (5th Cir. 2024) (footnote omitted), *cert. granted on other grounds*, 144 S. Ct. 2714 (July 2, 2024); *see also, e.g.*, *Tex. Top Cop Shop, Inc. v. Garland*, 758 F. Supp. 3d 607, 660 (E.D. Tex. 2024) ("neither the Government nor the public has any interest in enforcing a regulation that violates federal law" (cleaned up)).

Moreover, in the real world, preserving the pre-GTO status quo is not going to cause any problems, for the government nor anyone else. There is no urgent law-enforcement need for the GTO. The point is data collection—assembling possibly millions of CTRs that might be examined at some unknown date. That speculative use does not outweigh the certainty of what Plaintiffs are seeking: just a return to the way reporting along the border had been working for decades.

## IV. The Court Can And Should Temporarily Restrain The GTO In Its Entirety.

In the end, Valuta and Payan's have shown that they should benefit from a temporary restraining order, just as ten other MSBs did in Texas, and just as another did in California. But the Court can and should do more than that. If the Court agrees with Plaintiffs, the state of play will be at least a TRO for the two MSBs here, a preliminary injunction for the ten MSBs in front of Judge Biery, and still another PI for about 100 MSBs in California. If this Court issues a TRO to just these two Plaintiffs, however, there will still be well over 40 unprotected MSBs left in Texas. Compl. ¶¶ 133–34. At that point, the looming questions will have to be answered: If three federal judges agree, does it really make sense to have a fourth case? Or a fifth? Or a thirty-fifth? Does it really make sense to have competing MSBs in the same zip codes operating under vastly different legal regimes? When the Federal Rules exist to "secure the just, speedy, and inexpensive determination" of every civil action, the answer has to be "no." Fed. R. Civ. P. 1. The Court should instead temporarily restrain Defendants from enforcing the GTO against all the remaining MSBs.

Not only should the Court restrain the GTO altogether, settled law says that it can. To be sure, there is an ongoing debate, *see, e.g.*, Oral Argument, *Trump v. CASA, Inc.*, Application 24A884 (U.S. May 15, 2025), about the relief that courts can provide to non-parties generally speaking. But the APA is different. Under the APA (which covers bringing constitutional claims via the APA), a reviewing court can "set aside agency action." 5 U.S.C. § 706(2). And in issuing preliminary relief, courts can correspondingly "issue all necessary and appropriate process to

19

postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." *Id.* § 705. The plain meaning of that text is that this Court can temporarily postpone the effective date of the GTO itself, as to *all* the remaining unprotected MSBs. This kind of relief is exactly what Judge Sammartino provided in issuing a PI covering her whole district rather than the one business before her. Cal. PI Order 50.

And to do it, she cited a Fifth Circuit opinion that is, of course, binding on this Court. *Career Colleges & Schools of Texas v. U.S. Department of Education* concerned a challenge to federal regulatory changes about student-loan discharges. The district court there had denied a preliminary injunction to a group of colleges. 98 F.4th 220, 226 (5th Cir. 2024), *cert. granted in part on other grounds*, 145 S. Ct. 1039 (Jan. 10, 2025). On interlocutory appeal of the denial, the Fifth Circuit administratively stayed the changes for just the parties, then explicitly expanded its stay to cover non-parties, *id.* at 233, and then (in a section of its published opinion titled "Relief Should Not Be Party Restricted") directed the district court to enter a preliminary injunction "nationwide." *Id.* at 255–56. Via Judge Jones, the Court unmistakably held "that the scope of preliminary relief under [APA] Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Id.* at 255. *Career Colleges*' square holding is all this Court needs to restrain Defendants from enforcing the GTO against any of the remaining unprotected MSBs. *See also Tex. Top Cop Shop*, 758 F. Supp. 3d. at 663 (applying *Career Colleges* to enjoin federal reporting rule nationwide).[5]

## CONCLUSION

Like two federal courts before it, the Court should enter a TRO.

---

[5] If the Court still does not feel comfortable with non-party relief under the APA, an alternative recently offered by the Solicitor General in *Trump v. CASA* is a class action. If the Court believes that is the appropriate mechanism for providing relief to other MSBs, Plaintiffs will seek class certification. *See* Compl. ¶¶ 127–42 (containing class allegations). In the meantime, the Court should provide temporary relief to the "putative class," as the Supreme Court did two weeks ago in *A.A.R.P. v. Trump*, Application 24A1007 (U.S. May 16, 2025).

Dated: May 30, 2025

Respectfully submitted,

Andrew K. Ward (NY Bar No. 5364393)*
Elizabeth L. Sanz (CA Bar No. 340538)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
ahward@ij.org
bsanz@ij.org

Katrin Marquez (FL Bar No. 1024765)*
INSTITUTE FOR JUSTICE
2 South Biscayne Blvd., Suite 3180
Miami, FL 33131
(305) 721-1600
kmarquez@ij.org

/s/ Christen Mason Hebert
Christen Mason Hebert (TX Bar No. 24099898)
Jeffrey Rowes (TX Bar No. 24104956)*
INSTITUTE FOR JUSTICE
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936
chebert@ij.org
jrowes@ij.org

Robert E. Johnson (DC Bar No. 1013390)*
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
(703) 682-9320
rjohnson@ij.org

\* *Pro Hac Vice* motions to be filed

*Attorneys for Plaintiff*