UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| VALUTA CORPORATION, INC., and PAYAN'S FUEL CENTER, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> FINANCIAL CRIMES ENFORCEMENT NETWORK, *et al.*, <br><br> *Defendants.* | Civil Case No. 3:25-cv-00191-LS |

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR A TEMPORARY RESTRAINING ORDER**

Two courts have already preliminarily enjoined the agency action that is challenged in this case. The government offers no good reason why this Court should not do the same. Moreover, under the plain text of the APA, relief should be as broad as the challenged agency action, *see* 5 U.S.C. § 706(2), meaning the Court can and should issue a TRO as to the entire GTO—affording relief to all businesses still laboring under its unlawful provisions.

**ARGUMENT**

**I.    Plaintiffs Are Likely To Succeed On The Merits.**

**A.    The GTO likely violates the Fourth Amendment.**

The opening brief (at 9-13) explained that the GTO operates as a general warrant, sweeping up information about a broad swathe of transactions without a warrant or probable cause. The government does not attempt to refute that characterization—and certainly does not argue that it has individualized suspicion to support the GTO—but argues that warrantless surveillance is permissible under *California Bankers Association v. Shultz*, 416 U.S. 21 (1974).

However, while the government (at 9) accuses Plaintiffs of giving "short shrift" to *Shultz*,

in fact it is the government that fails to engage with the decision's reasoning. The government reads *Shultz* as if it conferred blanket approval for all reporting requirements, but, to the contrary, *Shultz* held that reporting requirements are valid if "reasonable" and if (among other requirements) the "information [demanded] is sufficiently described and *limited in nature*." 416 U.S. at 67 (emphasis added). Applying that standard, the Court held that the $10,000 threshold was reasonable because it applied to "abnormally large transactions in currency." *Id.*; *see also id.* at 78 (Powell, J., concurring).[1] By contrast, a $200 transaction is not "abnormally large," and the GTO is neither "reasonable" nor "limited in nature."

The government's engagement with the other cases cited in the opening brief is even more unsatisfactory. The opening brief (at 10-11) discussed *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), the primary authority in *Shultz*, and highlighted its recognition that "a governmental investigation into corporate matters may be of *such a sweeping nature* and so *unrelated to the matter properly under inquiry* as to exceed the investigatory power." *Id.* at 652 (emphasis added). Yet the government does not even cite that case. Nor does the government respond to Plaintiffs' explanation (at 11-12) that the GTO imposes an undue burden under the Fourth Amendment standard articulated by the Supreme Court in *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984), for corporate subpoenas. In fact, the government does not cite that case either.

The opening brief (at 11) explained that one way to conceive of the GTO is as a staggeringly overbroad subpoena for business records, and it cited *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467 (S.D.N.Y. 2019), which applied just that reasoning and entered a preliminary injunction against a similarly broad bulk-reporting requirement targeted at short-term rental

---

[1] The government (at 9) vaguely states that *Shultz* also addressed "certain other reports set at lower thresholds." The other reporting requirement addressed in *Shultz* was for international transactions over $5,000, and, there, the fact that the transactions "take place across national boundaries" was of "primary importance." 416 U.S. at 62. That rationale does not apply here.

companies. The government (at 12) points out that *Airbnb* "noted two features of the ordinance that mitigated its impact" and argues that the GTO "shares those two features." But that just confirms Plaintiffs' point, as *Airbnb* enjoined the reporting requirement notwithstanding those features. Beyond that, the government (at 12) argues that the GTO is "limited both temporally and geographically." But a requirement that applies to a vast geographic area, with a population of over one million, for a period of 180 days, is hardly "limited." To the contrary, just in the short time the GTO has been in effect, and notwithstanding multiple TROs and preliminary injunctions, FinCEN reports that 125 targeted businesses have filed over 100,000 reports for transactions under $5,000. Decl. of Andrea Gacki (Doc. 16-3) at ¶¶ 18, 22.[2]

**B.    The GTO is likely *ultra vires*.**

The opening brief (at 13) also explained that the GTO is likely *ultra vires*, as the statute under which FinCEN acted, 31 U.S.C. § 5326, contemplates (in the words of Judge Sammartino) "limited, investigatory tools directed to an identifiable business or group of businesses based on particularized facts," not this type of sweeping regulatory command. Cal. PI Order 20.

The government's response fails to grapple with Judge Sammartino's well-reasoned opinion. Judge Sammartino explained that the use of the word "order" in Section 5326 incorporates

---

[2] The government (at 11) insists that reporting requirements are "routine[ ]," but it does not cite any reporting requirement remotely like this one. Reports of political expenditures are made publicly available to the public in the name of transparency, not collected in a database for access by law enforcement; tax returns are governed by strict confidentiality rules and are collected to verify regulatory compliance, not for the purpose of law enforcement surveillance; and "employment verification" is collected by employers and not necessarily reported at all. Plus, none of those examples require a business to report every transaction over just $200.

Meanwhile, the primary cases that the government relies on (at 12-13) in support of its authority to impose reporting requirements found that warrantless inspection of corporate books and records violated the Fourth Amendment and thus, if anything, support Plaintiffs' claims. *See McLaughlin v. Kings Island, Div. of Taft Broad. Co.*, 849 F.2d 990, 995, 997 (6th Cir. 1988) (Fourth Amendment violated by "an unannounced inspection accompanied by an arbitrary and discretionary demand to inspect company records"); *Brock v. Emerson Elec. Co., Elec. & Space Div.*, 834 F.2d 994, 997 (11th Cir. 1987) (similar).

the meaning of that term as it is used in the APA, as "order" is a "term of art" with a specific meaning in the regulatory context. Cal. PI Order 21-22 (marks and citation omitted). Because an "order" under the APA is a product of an adjudication involving specific parties, Section 5326 contemplates such an action—not the type of broad promulgation adopted here. Rather than engage with this reasoning, the government (at 17) plucks a single sentence out of context from later in the opinion to misleadingly suggest that Judge Sammartino held the opposite, but Judge Sammartino's opinion is clear that under her reasoning the use of the word "order" indicates that Congress "exclusively intended to allow GTOs to issue by 'order' as so understood." Cal PI Order 22. That is why Judge Sammartino found the GTO *ultra vires*.[3]

In addition to the word "order," Judge Sammartino relied on additional textual clues that the government's brief ignores. For one thing, Judge Sammartino relied on statutory language stating that a geographic targeting order should apply to a "domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area." *See* Cal. PI Order 29. For another, Judge Sammartino relied on the statute's provision for confidentiality—a provision the government flouted when it published the GTO in the Federal Register and announced it via press release. *See id.* at 30-31. As Judge Sammartino explained, the government's "newfangled execution" of the GTO "elucidates just how far GTOs have drifted from Congress's original intention—as expressed in the plain language of the statute—for GTOs to be confidentially issued orders covering a business or narrowly tailored group of businesses based on particularized findings of fact." *Id.* at 33.

Rather than grapple with Judge Sammartino's textual analysis, the government (at 16-17)

---

[3] Judge Sammartino observed that the government, in *Novedades*, did not really disagree that "order" was intended to reference that term as used in the APA. Cal. PI Order 22. The same is true here, as the government's argument when it comes to notice-and-comment is premised on the idea that the word "order" in Section 5326 references an "order" under the APA.

chooses instead to take issue with Plaintiffs' invocation of the major questions doctrine. Notably, however, Judge Sammartino agreed with the government that the major questions doctrine does not apply—and *nevertheless* held that the government's statutory interpretation failed under the plain text of the statute. *See* Cal. PI Order 17-19. Plaintiffs, of course, think that the major questions doctrine should apply—as they explained (at 14-15) in their opening brief. But, notwithstanding the government's laser-like focus on the major questions issue, Judge Sammartino's opinion shows that no recourse to the major questions doctrine is required given the clear statutory text.

### C.    The GTO is likely arbitrary and capricious.

The opening brief (at 15-17) also explained that both Judges Biery and Sammartino correctly found the GTO is likely arbitrary and capricious because FinCEN failed to grapple with important questions—including failing to adequately explain the $200 threshold and the choice of the selected counties, as well as failing to address the impact on regulated parties and the limits of the government's ability to even make effective use of such voluminous information.

In response, the government (at 18-22) repeatedly attempts to supplement the administrative record with citations to the declaration of FinCEN's Director Gacki. However, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself," and courts "must disregard any *post hoc* rationalizations." *Texas v. EPA*, 829 F.3d 405, 425 (5th Cir. 2016) (citations omitted). Here, because the internal memorandum containing the agency's rationale is dated "March XX, 2025," it is not clear that the agency articulated *any* contemporaneous rationale for the GTO. *See* Cal. PI Order 36 n.4 (so noting). But if the internal "March XX" memo is dubious, the justification offered in the Gacki declaration is unquestionably the type of *post hoc* rationalization that cannot be considered.

To the extent this Court can consider the undated "March XX" memorandum at all, the

passages that the government relies on here do not provide the reasoned analysis that the APA requires. At most, the cited passages acknowledge the various issues highlighted by Plaintiffs in this litigation and then pronounce—by way of *ipse dixit*—that the government does not see any reason to pause and is going to issue the GTO anyways. But an "agency's recognition of [a problem], without any meaningful discussion of the issue in the context of alternatives" is not sufficient under the APA and instead "points to the agency's failure to 'consider an important aspect of the problem' and 'articulate a satisfactory explanation for its action.'" Cal. PI Order 42-43 (quoting *Nat'l Cmty. Reinvestment Coal. v. Consumer Fin. Prot. Bureau*, No. 20-2074 (BAH), 2022 WL 4447293, at *31 (D.D.C. Sept. 23, 2022) (further citation omitted)).

### D.    Notice and comment was likely required.

The opening brief (at 17) also explained that Judges Biery and Sammartino correctly held that the GTO is likely a rule requiring notice-and-comment under the APA. The government (at 23) argues that the GTO is an order because the agency called it an "order," but, again, saying it does not make it true. The government also argues that Congress in Section 5326 "explicitly authorized the agency to act by order." But that just brings us back around to the *ultra vires* issue: If Congress "authorized the agency to act by order," and if the GTO is instead a "rule," then the GTO exceeds the scope of Congress's authorization.

The government (at 23) half-heartedly argues that the GTO is an order, not a rule, because it is "limited in scope and time and tied to specific findings in its geographic area." But the fact that a rule is limited to a particular time or place does not transform it into an order. Rather, the key question is whether the agency action "resolve[s] disputes among specific individuals in specific cases" (an order) or instead "affects the rights of broad classes of unspecified individuals" (a rule). *City of Arlington v. FCC*, 668 F.3d 229, 242 (5th Cir. 2012), *aff'd,* 569 U.S. 290 (2013).

So, for instance, in *Safari Club International v. Zinke*, a "determination" about importing ivory was a "rule" because it "applied to all potential imports of sport-hunted elephant trophies from Zimbabwe" and did not "adjudicate any dispute between specific parties." 878 F.3d 316, 333 (D.C. Cir. 2017). So too here. The GTO applies to categories, not identified parties, and is a rule.

The government's arguments and cases directly undermine its contrary position. The government (at 23) argues that requiring notice-and-comment would undermine its ability to respond to "dynamic threats and developing financial intelligence." But the *actual* way to respond to "dynamic threats and developing financial intelligence" would be to issue a *confidential* geographic targeting order directed to specific businesses (or a particular group of businesses) that pose a "dynamic threat[ ]" based on particularized "developing financial intelligence." If FinCEN had done that, then its GTO would be an order, not a rule, and would not require notice-and-comment (and would not be *ultra vires*). But that is not what FinCEN did. Meanwhile, the government's own cases (at 24) confirm that "orders" involve individualized adjudications. *Neustar, Inc. v. FCC* was about whether the FCC needed to do notice-and-comment rulemaking to "nam[e] another company to replace Neustar" on competency grounds as the "Local Number Portability Administrator." 857 F.3d 886, 888 (D.C. Cir. 2017). *National Biodiesel Board v. EPA* involved the EPA's approval of a "comprehensive survey program" submitted by the "Argentine Chamber of Biofuels," a trade group. 843 F.3d 1010, 1014 (D.C. Cir. 2016). And *United States v. W. H. Hodges & Co.*, 533 F.2d 276, 278 (5th Cir. 1976), involved an agency investigation into alleged misconduct by particular companies.[4] No rulemaking was required because the cases involved individualized adjudications about specific parties on a particular record.

---

[4] Judge Sammartino also explained that *Hodges* is limited by *U.S. Dep't of Lab. v. Kast Metals Corp.*, 744 F.2d 1145, 1149–50 (5th Cir. 1984), which held that "information-gathering can be the result of a rule." *See* Cal. PI Order 25. Yet the government does not cite that case.

**II.     There Are Profound Irreparable Harms.**

The government (at 24-29) expends significant effort attempting to undermine the conclusion of two separate judges that the GTO will cause irreparable harm. All this is ultimately beside the point, as the GTO is unconstitutional, and "deprivation of a constitutional right" is always irreparable. *E.g.*, *Space Expl. Techs., Corp. v. Bell*, 701 F. Supp. 3d 626, 634 (S.D. Tex. 2023). The GTO is also unquestionably imposing economic costs, which are necessarily irreparable because they cannot be recouped due to the government's sovereign immunity. *E.g.*, *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

In any event, the government's attempts to minimize Plaintiffs' harms amount to nit-picking and misdirection. For instance, the government (at 25) misleadingly argues that Plaintiffs already ask customers for information for "most covered transactions," merely because Plaintiffs ask customers for identification (*see* Light Decl. ¶ 16) or scrutinize checks for marks of fraud (*see* Payan Decl. ¶ 15), ignoring the fact that the information-gathering and reporting required by the GTO is significantly more burdensome than Plaintiffs' preexisting practices. The government also argues (at 27) that Plaintiffs should simply transform their small businesses into larger businesses with more sophisticated automated technology, willfully twisting the fact that Plaintiffs have tried (and largely failed) to implement additional technological systems to suggest that Plaintiffs just have not tried hard enough.[5] And the government (at 26) also argues that since Plaintiffs have managed to continue offering some services they obviously are not being harmed—essentially arguing that since the GTO has not *already* destroyed Plaintiffs' businesses they cannot possibly

---

[5] Notably, the government (at 28) estimates that even the largest companies with the most sophisticated systems take 3.24 minutes to file each CTR. Valuta estimates that under the GTO it must file "over 53 CTRs *per day*." Light Decl. ¶ 18. Even assuming Valuta could somehow achieve a rate of 3.24 minutes per CTR—unrealistic for a small business like Valuta—that would still translate into almost three hours of extra paperwork per day. Three hours of *daily* paperwork is a significant burden for a small business. And of course the actual burdens are far greater.

show irreparable harm. None of this changes the fact that Plaintiffs are drowning in paperwork, losing customers, risking crushing fines, and facing the possible destruction of their businesses.

Lastly, the government (at 28-29) argues that Plaintiffs' allegations of harm should be discredited because they "waited more than two months after the GTO was announced before bringing their own action." But Plaintiffs have not sat on their hands. Both Plaintiffs submitted non-party declarations in the California case. *See Novedades y Servicios v. FinCEN*, No. 25-cv-886, Docs. 22-3, 22-7 (S.D. Cal.). And both Plaintiffs traveled to San Antonio to offer live testimony in the case before Judge Biery. *See TAMSB v. Bondi*, No. 25-cv-344, Doc. 57 (W.D. Tex.). The government's position seems to be that, not only must every plaintiff individually sue to enjoin illegal agency action, but also only those plaintiffs who personally sue within weeks of the action are entitled to relief. That is not the law.[6]

## III.    The Court Should Temporarily Restrain The GTO In Its Entirety.

The opening brief (at 18) cited authority that the balance of equities favors an injunction whenever agency action violates the law, and the government cites no contrary authority. While the government (at 29) invokes the need to combat cartels, it cites no evidence of pressing need for this *particular* information—as opposed to more generalized concern with cartels.

The opening brief (at 19-20) explained that the appropriate remedy under the APA is to enjoin the GTO in its entirety, as the APA states that a court "shall" "hold unlawful and set aside" agency action that violates the constitution, is arbitrary and capricious, is contrary to law, or was

---

[6] *See, e.g.*, *Whole Woman's Health v. Paxton*, 264 F. Supp. 3d 813, 819-20 (W.D. Tex. 2017) (granting TRO over objection that plaintiffs waited six weeks after law's enactment); *Massimo Motor Sports LLC v. Shandong Odes Indus. Co.*, 2022 WL 447078, at *2 n.3 (N.D. Tex. Feb. 14, 2022) (granting TRO for plaintiff that applied after "a mere three weeks").

The government (at 29) also argues that Plaintiffs should have applied to FinCEN for "exemptive relief," but does not cite any procedure that a party could follow to seek an exemption from a geographic targeting order and offers no estimate of the (almost certainly lengthy) timeline that would be required to get a decision on such an application *if* one could be filed.

issued without following necessary procedures. 5 U.S.C. § 706(2). The Fifth Circuit held that broad relief is appropriate under the APA in *Career Colleges & Schools of Texas v. U.S. Department of Education*, 98 F.4th 220, 226 (5th Cir. 2024), but, although Plaintiffs cited that case in the opening brief (at 20) the government does not discuss it. Instead, the government's discussion (at 30) of the APA is limited to a single piece of legislative history. *See* H.R. Rep. No. 79-1980, at 43 (1946). Legislative history cannot override the clear text of the statute, much less the settled understanding of the courts—which have, for decades, always understood that the APA authorizes relief equally as broad as the unlawful agency action. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 830-31, 838 (2024) (Kavanaugh, J., concurring). The government does not acknowledge the settled understanding of the scope of relief under the APA, much less offer any reason why that understanding should not apply here.[7]

Finally, no bond should be required. *See*, *e.g.*, *D. Houston Inc. v. United States Small Bus. Admin.*, 579 F. Supp. 3d 959, 970 (S.D. Tex. 2020). In the government's cited case, *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), a small bond was appropriate because the United States, as a party to a contract, faced actual monetary losses under the injunction. Here, by contrast, the government faces no risk of money harm from not receiving a flurry of CTRs.

## CONCLUSION

For all the foregoing reasons, a temporary restraining order should issue.

---

[7] If the APA did *not* authorize such broad relief, then rule challenges would have to be brought as class actions—something nobody has ever thought required. Out of an abundance of caution, however, Plaintiffs here have also included class claims. *See* Compl. ¶¶ 127-42. The government offers no explanation whatsoever why a TRO could not appropriately issue for that putative class. *See A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1369 (2025) ("[T]his Court may properly issue temporary injunctive relief to the putative class….").

Dated: June 10, 2025

Respectfully submitted,

/s/ Andrew K. Ward

Christen Mason Hebert (TX Bar No. 24099898)
Jeffrey Rowes (TX Bar No. 24104956)*
INSTITUTE FOR JUSTICE
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936
chebert@ij.org
jrowes@ij.org

Andrew K. Ward (NY Bar No. 5364393)*
Elizabeth L. Sanz (CA Bar No. 340538)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
ahward@ij.org
bsanz@ij.org

Katrin Marquez (FL Bar No. 1024765)*
INSTITUTE FOR JUSTICE
2 South Biscayne Blvd., Suite 3180
Miami, FL 33131
(305) 721-1600
kmarquez@ij.org

Robert E. Johnson (DC Bar No. 1013390)*
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
(703) 682-9320
rjohnson@ij.org

* Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on June 10, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will provide electronic service upon all attorneys of record.

/s/ Andrew K. Ward
Andrew K. Ward