### UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

VALUTA CORPORATION, INC. and
PAYAN FUEL CENTER, INC.,

     *Plaintiffs*,

v.

FINANCIAL CRIMES ENFORCEMENT
NETWORK, ANDREA GACKI, in her
official capacity as Director of the Financial
Crimes Enforcement Network; U.S.
DEPARTMENT OF THE TREASURY;
SCOTT BESSENT, in his official capacity as
Secretary of the Treasury; and PAM BONDI,
in her official capacity as Attorney General of
the United States,

     *Defendants*.

Civil Action No. 3:25-cv-191-LS

---

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

### INTRODUCTION

On March 11, 2025, acting pursuant to explicit statutory authority, the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") issued a Geographic Targeting Order ("March 2025 GTO") that requires money services businesses ("MSBs") in certain counties along the southwest border to keep additional records and report additional categories of currency transactions to FinCEN. In support of this Order, the agency found that reasonable grounds exist for concluding that the additional recordkeeping and reporting requirements set forth in the GTO "are necessary to carry out the purposes of the [Bank Secrecy Act ("BSA")] or to prevent evasions" and further "Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States."

Plaintiffs have not shown and cannot show a likelihood of success on the merits. FinCEN is acting pursuant to explicit and well-established statutory authority, and the administrative record shows that FinCEN acted reasonably when exercising that authority. The Administrative Procedure Act ("APA") does not require notice and comment rulemaking for the order issued here. The Supreme Court has already ruled that similar BSA reporting requirements do not run afoul of the Fourth Amendment, and the Constitution does not otherwise protect money services businesses from this sort of recordkeeping regulation.

Plaintiffs have not demonstrated the sort of irreparable injury that justifies extraordinary relief, and the balance of interests tips sharply in Defendants' favor. FinCEN requires the requested information as soon as practicable to address the ongoing threat posed by cartels that launder money through the U.S. financial system, and the record establishes that money service businesses along the southwest border are particularly vulnerable to these types of money-laundering abuses. Plaintiffs' implausible allegations do not support the claim that the GTO will be devastating for money services businesses. If anything, Plaintiffs' own statements and their testimony in prior cases shows the opposite: That they are already complying with the GTO, are in the process of implementing technologies used by other MSBs and financial institutions to make compliance more efficient and less burdensome, and that, well before the GTO issued, they already collected and maintained most of the information now needed to comply with the GTO most categories of covered transactions.

Plaintiffs' claims of irreparable harm rely on implausible speculation about the actions of third parties and exaggerated claims about the burdens of compliance. Plaintiffs' delay in bringing this action and asserting their claim for preliminary injunctive relief weighs against entry of a temporary restraining order. Plaintiff's TRO motion should be denied.

## BACKGROUND

The Currency and Foreign Transactions Reporting Act of 1970, its amendments, and the other statutes relating to the subject matter of that Act, have come to be referred to as the Bank Secrecy Act (BSA). The BSA authorizes the Department of the Treasury to impose reporting and other requirements on financial institutions and other businesses to help detect and prevent money laundering. Generally speaking, these requirements are codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951–60, 31 U.S.C. §§ 5311–5314, 5316–36, and include notes thereto. Among many other requirements and authorities, the BSA and its implementing regulations require financial institutions to file a currency transaction report ("CTR") for transactions in currency greater than $10,000. *See* 31 U.S.C. § 5313 (authorizing the Secretary to impose reporting requirements on transactions in an amount prescribed by the Secretary); 31 C.F.R. § 1010.311 (currency transaction reporting requirements).

In the Anti-Drug-Abuse Act of 1988, Congress amended the BSA to provide additional authority to the Secretary of the Treasury to collect information about certain currency transactions in geographic areas thought to pose particular risks. Pub. L. 100–690, title VI, § 6185(c), 102 Stat. 4355 (Nov. 18, 1988). The original purpose was to grant "the Secretary of [the] Treasury discretionary authority to target a domestic financial institution or a group of institutions located in any specified geographic location where drug trafficking and/or money laundering are prevalent, to obtain, retain and report information." H. Rep. 101-74, at 111 (Nov. 18, 1988). As amended, this statutory provision reads:

> If the Secretary of the Treasury finds, upon the Secretary's own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle or to prevent evasions thereof, the Secretary may issue an order requiring any

3

domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area—

(1) to obtain such information as the Secretary may describe in such order concerning—

(A) any transaction in which such financial institution or nonfinancial trade or business is involved for the payment, receipt, or transfer of funds (as the Secretary may describe in such order), the total amounts or denominations of which are equal to or greater than an amount which the Secretary may prescribe; and

(B) any other person participating in such transaction;

(2) to maintain a record of such information for such period of time as the Secretary may require; and

(3) to file a report with respect to any transaction described in paragraph (1)(A) in the manner and to the extent specified in the order.

31 U.S.C. § 5326(a); *see also* **Exhibit 1**, Declaration of Director Andrea Gacki ("Gacki Decl.").

Thus, the GTO statute authorizes the Secretary of the Treasury to issue a GTO to "obtain information as the Secretary may describe" concerning "any transaction in which such financial institution . . . is involved . . . , the total amounts . . . of which are equal to or greater than an amount which the Secretary may prescribe" and require the financial institutions to maintain records and file reports. *Id.* The primary prerequisite is that the Secretary find "reasonable grounds" to conclude "that additional recordkeeping and reporting requirements are necessary to carry out the purposes of" the BSA, "or to prevent evasions thereof."[1] *Id.* A GTO may then be effective for no more than 180 days unless renewed. 31 U.S.C. § 5326(c). The authority of the Secretary to issue a GTO has been delegated to the Director of FinCEN. *See* Treasury Order 180-01 (Jan. 14, 2020), *available at* https://home.treasury.gov/about/general-information/orders-and-

---

[1] The purposes of this subchapter are codified, and include, for example, requiring certain "highly useful" reports, facilitating the tracking of money sourced from illegal activity, and assessing money laundering risks to financial institutions. *See* 31 U.S.C. § 5311.

directives/treasury-order-180-01. FinCEN has issued regulations which further govern the form

of such GTOs. *See* 31 C.F.R. § 1010.370. Additionally, pursuant to 31 U.S.C. § 5318(a)(7),

FinCEN may "prescribe an appropriate exemption from a requirement under" the BSA and its

implementing regulations, including requirements imposed by a GTO. *See also* 31 C.F.R.

§ 1010.970 (further describing this exemptive authority). FinCEN has repeatedly exercised this

authority. *See* **Exhibit 1**, Gacki Decl. ¶ 7 (collecting multiple examples of past GTOs imposing

temporary recordkeeping and reporting requirements, including at thresholds well below the

usual $10,000 threshold for CTRs); *see also United States v. Oreira*, 29 F.3d 185, 187 (5th Cir.

1994) (describing Houston-area GTO with $100 threshold).

      On March 11, 2025, FinCEN issued the GTO at issue in this case, which covers money

services businesses operating in portions of five counties in Texas and two counties in California

(a total of 30 ZIP codes). *See* Issuance of a Geographic Targeting Order Imposing Additional

Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the

Southwest Border, 90 Fed. Reg. 12106 (published Mar. 14, 2025); AR 000001–03. Money

services businesses ("MSBs") are broadly defined in the BSA regulations and generally include,

for example, check cashers, issuers or sellers of traveler's checks or money orders, and money

transmitters, although there are exclusions from those categories as well. *See generally* 31 CFR

§ 1010.100(ff). The GTO took effect on April 14, 2025. Under this GTO, covered MSBs must

submit currency transaction reports within 15 days for currency transactions involving between

$200 and $10,000. AR 000002. A covered MSB is also required to verify the identity of the

customer. *Id*.

      Defendants have filed the public, non-privileged portions of the certified administrative

record ("AR"). *See* Docket no. 15. The Gacki Declaration provides further information about the

background and context of the GTO and the administrative record. *See* **Exhibit 1**.[2] A sample Currency Transaction Report appears as **Exhibit 2**.

To assist covered businesses, FinCEN published FAQs on their website. *See* FAQs, https://www.fincen.gov/sites/default/files/shared/SWB-MSB-GTO-Order-FINAL508.pdf. Additionally, FinCEN hosted two webinars, collectively attended by several hundred representatives of the affected MSB community, in which both the background and the terms of the GTO were explained, and several questions concerning applicability and reporting were answered. *See* https://www.fincen.gov/news/news-releases/fincen-convenes-fincen-exchange-sessions-provide-stakeholders-information-about. The webinar and the FAQs confirm that, other than the applicable amount and a code unique to the GTO, these required reports generally follow the same form and content as those already required for CTRs submitted for currency transactions exceeding $10,000, and are to be filed in the same way as CTRs. *See, e.g.*, FAQ Items 3, 7; *see also* Gacki Decl. ¶¶ 9, 23. For covered transactions, the MSB must report: information about the MSB, information about the MSB person conducting the transaction, information about type and amount of the transaction, and information about the customers involved in the transactions. *See* Docket no. 5-7; Gacki Decl. ¶ 23. No special software is required to file the report, but covered institutions may choose to use various methods to streamline the process. *Id.* ¶ 25–26. FinCEN continues to engage with the industry to support compliance, and in fact, has begun receiving reports under the GTO—thousands of reports were received from over 50 MSBs before the submission deadline. *Id.* ¶ 19, 23.

---

[2] Courts may consider such background and context declarations. *See, e.g., Manufactured Hous. Inst. v. United States Dep't of Energy*, No. 1:23-CV-00174-DAE, 2024 WL 4795985, at *2 (W.D. Tex. Aug. 25, 2024); *see also Clifford v. Peña*, 77 F.3d 1414, 1418 (D.C. Cir. 1996); *Roe v. Dep't of Def.*, 947 F.3d 207, 223 (4th Cir. 2020).

Financial institutions that meet the regulatory definition of an MSB are subject to a range of legal requirements that pre-date the GTO, including registering with FinCEN, filing CTRs, developing and maintaining an effective anti-money laundering program, filing suspicious activity reports, verifying customer identity for certain transactions, and maintaining detailed records. *See* Information Memorandum for Director Andrea M. Gacki ("AR Mem."), AR 000006–07 (collecting regulations). Other regulations require verification of identity for specific types and amounts of transactions. *See, e.g.*, 31 C.F.R. § 1022.210(d)(1)(i)(A); 10 C.F.R. § 1010.312. Plaintiffs' witnesses testified that they routinely provide all of the collected data to state or federal entities as part of "frequent" audits. *See, e.g.*, *TAMSB, et al. v. Bondi, et al.* PI Hrg. Tr., Docket no. 5-16 at 202 (Ashley Light testimony about "very frequent" audits); 108–12 (Andres Payan testimony about recordkeeping and audits).

On May 30, 2025, Plaintiffs filed the present lawsuit.[3] Plaintiffs assert a claim under the Fourth Amendment, Count I, Docket no. 1 at ¶¶ 147–56; an "arbitrary and capricious" challenge

_____

[3] Prior to bringing this action, Plaintiffs' counsel represented other plaintiffs in two related cases challenging the GTO: *TAMSB, et al. v. Bondi, et al.*, Civil Action No. 25-cv-344-FB ("the *TAMSB* action"), and in *Novedades Y Servicios, Inc. et al. v. FinCEN, et al.*, Civil Action No. 25-cv-886-JLS-DDL, in the Southern District of California, San Diego Division ("the *Novedades* action"). As Plaintiffs' TRO motion notes, both Courts granted some—but not all—of the preliminary injunctive relief that they sought. In the *Novedades* action, the Court enjoined the GTO as to covered MSBs in California only, based on findings that plaintiffs were likely to prevail on some of their APA claims. *See* Docket no. 5-9 at 16–33 (ultra vires claim); 33–34 (notice-and-comment claim); 35–43 (arbitrary-and-capricious claim). The Court rejected plaintiffs' claims under the non-delegation doctrine, *id.* at 13–16; and the major questions doctrine, *id.* at 17–20; and did not reach their Fourth Amendment claim, *id.* at 43. In the *TAMSB* action, the Court enjoined the GTO as to the plaintiff businesses only, finding that they were likely to succeed on their Fourth Amendment and APA claims, *see* Docket no. 5-8 at 19–23 (Fourth Amendment), 23–33 (APA), but declining to reach their ultra vires and nondelegation doctrine claims, *id.* at 33.

under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), Count II, *id.* at ¶¶ 157–65; an

*ultra vires* claim, Count III, *id.* at ¶¶ 166–74; an APA notice-and-comment violation claim,

Count IV, *id.* at ¶¶ 175–82, and a claim that the GTO violates the non-delegation doctrine, Count

V, *id.* at ¶¶ 183–89. Plaintiffs seek entry of a TRO, however, based only on their arguments

about likelihood of success as to the Fourth Amendment (Count I) and APA (Counts II, III, and

IV) claims. Docket no. 5 at 9–17.

## LEGAL STANDARD

Preliminary injunctive relief "is an extraordinary and drastic remedy." *Munaf v. Geren*,

553 U.S. 674, 689–90 (2008); *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023). A

preliminary injunction may only be granted if the movant establishes each of four prerequisites:

(1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant

the injunction will result in irreparable injury; (3) that the threatened injury outweighs any

damage that the injunction may cause the opposing party; and (4) that the injunction will not

disserve the public interest. *See N. Mississippi Med. Ctr., Inc. v. Quartiz Techs.*, No. 23-60483,

2025 WL 980568, at *2 (5th Cir. Apr. 1, 2025); *Ridgely v. Fed. Emergency Mgmt. Agency*, 512

F.3d 727, 734 (5th Cir. 2008); *see also* Fed. R. Civ. P. 65. The last two factors merge when the

government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The movant

"bears the burden of persuasion on all four factors in order to be entitled to the extraordinary

relief of a preliminary injunction." *N. Mississippi Med. Ctr., Inc.*, 2025 WL 980568, at *2.

---

For the reasons detailed below, Defendants respectfully disagree with the *TAMSB* court's
Fourth Amendment reasoning, and with the Courts' findings of likely success on those plaintiffs'
APA claims. And, as explained below, Defendants contend that Plaintiffs are not entitled to any
relief, but agree with the *TAMSB* Court's determination that any relief ordered should be limited
to the named Plaintiffs.

## DISCUSSION

Plaintiffs have failed to carry their burden with respect to any of the TRO factors.

## I.    Plaintiff Has Not Established a Likelihood of Success on the Merits.

Plaintiffs' TRO motion is limited to the Fourth Amendment (Count I) and APA claims (Counts II, III, IV). They have not established a likelihood of success on any claim.

A.    <u>Plaintiff Cannot Show a Likelihood of Success on its Fourth Amendment Claims Because the Supreme Court Has Already Rejected Nearly Identical Claims.</u>

Plaintiffs have not shown a substantial likelihood of success on their Fourth Amendment claim and have not established "serious questions" warranting preliminary injunctive relief. In arguing that the GTO is a "general warrant," Plaintiffs give short shrift to the key precedent on the Fourth Amendment and financial reporting requirements, the Supreme Court's decision in *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974). *Shultz* (like this case) involved a Fourth Amendment challenge to various BSA recordkeeping and reporting requirements, including CTRs (which Treasury required for currency transactions over $10,000) as well as certain other reports set at lower thresholds. *Id*. at 35–41. For each covered transaction, the BSA required the bank to disclose "the name, address, business or profession and social security number of the person conducting the transaction," among other information. *Id*. at 39 n.15. Congress created these "precise and detailed reporting requirements," *id*. at 27, to address "the use of financial institutions, both domestic and foreign, in furtherance of activities designed to evade" U.S. law., *id*. at 38; *see also id*. at 26–27 ("Congress found that the recent growth of financial institutions in the United States had been paralleled by an increase in criminal activity which made use of these institutions.").

The Supreme Court concluded that these BSA reporting requirements were reasonable and fully consistent with the Fourth Amendment. The Court started by connecting its Fourth

Amendment analysis to the specific context of corporate reporting requirements, where it has long been clear "that organizations engaged in commerce c[an] be required by the Government to file reports dealing with particular phases of their activities." *Id.* at 65; *see also id.* at 59 ("Since a statute requiring the filing and subsequent publication of a corporate tax return has been upheld against a Fourth Amendment challenge, reporting requirements are by no means per se violations of the Fourth Amendment." (citation omitted)). As to the BSA's constitutionality, the Court's rationale had two primary components: the information required to be reported was "[1] sufficiently described and limited in nature, and [2] sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce," such that the BSA "d[id] not impose unreasonable reporting requirements" under the Fourth Amendment and did not require a warrant or probable cause. *Id.* at 67.

*Shultz* establishes the proper Fourth Amendment rubric applicable to the GTO, which takes a similar form and arose in similar circumstances. MSBs along the Southwest Border are already engaged in a highly regulated industry subject to extensive recordkeeping and reporting requirements, as well as audits. *See, e.g.*, Docket no. 5-16 at 108–12, 202. Plaintiffs have not shown a reasonable expectation of privacy that would impact reporting requirements like this one.[4] Just like the reporting in *Shultz*, the GTO requires companies to "file reports dealing with particular phases of their activities." 416 U.S. at 65. Like the reporting requirements challenged in *Shultz*, the GTO was motivated by increasing use of covered entities for illicit purposes: "MSBs along the southwest border are particularly at risk for abuse by money launderers for

---

[4]  The fact that financial institutions cannot publicly disclose these business records does not undercut the Government's ability to require confidential reporting under the BSA.

cartels, being in an area where cartels engaged in drug, human, and weapons trafficking intensively operate and need to move illicit cash across the border." *See* AR Mem. at 5.

*Shultz* disproves Plaintiffs' Fourth Amendment claim, as the Supreme Court repeatedly explained that the BSA arose because of "the heavy utilization of our domestic banking system by the minions of organized crime." *Shultz*, 416 U.S. at 30; *see also id.* at 26–27 ("Congress found that the recent growth of financial institutions in the United States had been paralleled by an increase in criminal activity which made use of these institutions."). As the Supreme Court recognized, Congress determined that the BSA's reporting requirements were necessary "in ferreting out criminal activity and desired to strengthen the statutory basis for requiring such reports." *Id.* at 38. Neither a warrant nor probable cause are required in this circumstance. Consistent with *Shultz*, Congress routinely enacts other reporting requirements, including as to information used for law enforcement purposes. *See, e.g.*, 8 U.S.C. § 1324a(b) (employment verification reporting requirements); 52 U.S.C. § 30104 (political campaigns); 26 U.S.C. § 6012 (tax returns). Plaintiffs have identified no authority casting Fourth Amendment doubt on such reporting enactments.[5] Plaintiffs' insistence that a warrant is required, or that the GTO "acts as a general warrant[,]" Docket no. 5 at 15, cannot be squared with *Shultz* or with the many other statutory reporting requirements that have long been understood as constitutional.

---

[5] Rather than pointing to any authority overruling or abrogating *Shultz*, Plaintiffs rely on a negative inference based in part on a concurrence in *Shultz*. Docket no. 5 at 16 & n.2. Similarly, the Court in *TAMSB*, adopting Plaintiffs' arguments, read *Shultz* to support Plaintiffs' Fourth Amendment claim because the higher reporting threshold in that case was found to be reasonable. Docket no. 5-8 at 21. Respectfully, this erroneous reasoning ignores, without authority, the holding of *Shultz*: That, presented with disclosure requirements similar to those at issue here, "[w]e have no difficulty . . . in determining that the Secretary's requirements for the reporting of domestic financial transactions abridge no Fourth Amendment right of the banks themselves." *Shultz*, 416 U.S. at 66.

Plaintiffs' reliance on *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467 (S.D.N.Y. 2019) is similarly misplaced. The city ordinance at issue in *Airbnb* required the subject businesses—services that advertised and accepted bookings for short-term rentals—to submit a monthly report with detailed information about every transaction, with no limitations. After reviewing the relevant Fourth Amendment authorities, the district court noted two features of the ordinance that mitigated its impact: (1) it did not "entail the on-site presence of state officers or any physical entry" into the plaintiffs' businesses and (2) it did not give the government "discretion as to the information that [the business] is required to produce." 373 F. Supp. 3d at 490. The March 2025 GTO shares those two features, which counsel against finding a Fourth Amendment violation. Moreover, in granting a preliminary injunction in *Airbnb*, the district court relied on a factor that is not present here: the ordinance did "not have a temporal sunset" and was "devoid of any tailoring." *Id.* at 491. Here, the March 2025 GTO is limited both temporally and geographically, and those limitations flow directly from FinCEN's regulatory authority under the BSA, as described in detail above.

Here, the GTO also requires reporting of specific information under specific statutory criteria, rather than providing officers with leave to conduct limitless, discretionary searches of Plaintiffs' premises, persons, or files. *See* 31 U.S.C. § 5326; 90 Fed. Reg. at 12107. Like the BSA provisions at issue in *Shultz*, it does not create the risk of pretextual or arbitrary harassment present in some other cases. Indeed, as contrasted with cases involving "an arbitrary and discretionary demand to inspect company records," the Sixth Circuit and others have recognized the permissibility of "a warrantless inspection" in the form of "reporting requirement[s]" like those at issue in *Shultz*. *McLaughlin v. Kings Island, Div. of Taft Broad. Co.*, 849 F.2d 990, 994–95 (6th Cir. 1988); *see also Brock*, 834 F.2d at 996 n.2 (11th Cir. 1987) (observing that in cases

like *Shultz*, "a uniform statutory or regulatory reporting requirement satisfies the Fourth

Amendment concern regarding the potential for arbitrary invasions of privacy"); *Donovan v.*

*Master Printers Ass'n*, 532 F. Supp. 1140, 1153 (N.D. Ill. 1981) (upholding Labor Management

Reporting and Disclosure Act requirements and stating that the Fourth Amendment "simply

requires that the reporting scheme imposed by the statute bear a reasonable relationship to a

permissible subject of governmental inquiry and not place an undue burden on the defendant").

This distinction is present in *Shultz* itself. *See Shultz*, 416 U.S. at 62 (stating that "[u]nlike the

situation in" other cases dealing with defective warrant procedures, the BSA "do[es] not

authorize indiscriminate rummaging among the records of the plaintiffs").

     As to Plaintiffs' privacy argument, Docket no. 5 at 18–19, the Supreme Court already

rejected the argument that the customer of a financial institution can object to a subpoena applied

to that institution, because he "can assert neither ownership nor possession" in the business

records of the financial institution, even where the Government requires those records to be

maintained. *United States v. Miller*, 425 U.S. 435, 440 (1976). The Supreme Court rejected the

argument in *Schultz* that the financial institution has a Fourth Amendment right to avoid

reporting requirements and rejected the argument in *Miller* that the customer has a protected

right to avoid such requirements. These controlling precedents cannot be ignored just because the

reporting threshold at issue in this case is lower.

     Plaintiffs' reliance on *Carpenter v. United States*, 585 U.S. 296 (2018), is also misplaced.

*Carpenter* held *Miller*'s conclusion that a customer lacked an expectation of privacy in financial

records held by a bank (i.e., the third-party doctrine) should not be extended to wireless

customers' location information as transmitted to cell site towers. 585 U.S. at 318. But that type

of stretch is not required here. Whether bank customers have a privacy interest in information

held by a financial institution is precisely the issue here. *Carpenter* did not overrule *Miller*; it expressly recognized that location information differs from bank records of "negotiable instruments to be used in commercial transactions." *Carpenter*, 585 U.S. at 314 (quoting *Miller*, 425 U.S.C. at 442); *see also id.* at 309 ("qualitatively different category"); *id.* at 314 ("world of difference"); *id.* at 315 ("privacy concerns far beyond those considered in . . . *Miller*"). *Miller* controls: individual MSB customers do not have a Fourth Amendment privacy interest in the MSB's records.

B. Plaintiff Cannot Show a Likelihood of Success on their APA Claims

A number of Plaintiffs' arguments purport to sound in the APA, including that the GTO is arbitrary and capricious, that the GTO exceeds FinCEN's statutory authority, and that FinCEN failed to engage in notice-and-comment rulemaking. *See* Compl., Docket no. 1 at ¶¶ 157–82. Plaintiff cannot establish a likelihood of success on any of these claims.

A TRO motion is particularly ill-suited to judicial review of final agency action under the APA. *See* 5 U.S.C. § 706(2)(A). APA review properly takes place at summary judgment based on "the whole [administrative] record" before the agency, "or those parts of it cited by a party." *Id.* § 706. "The APA's arbitrary and capricious standard requires that agency action be reasonable and reasonably explained," and "[j]udicial review under that standard is deferential." *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021). A court "may not consider evidence outside the administrative record," *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 907 (5th Cir. 2021), nor should the court "weigh the evidence in the record pro and con." *Louisiana v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988). Although a court's review is "searching and careful," it ultimately does not "substitute its judgment for that of the agency and should uphold a decision

of less than ideal clarity if the agency's path may reasonably be discerned." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475–76 (5th Cir. 2021).[6]

Here, the AR currently available confirms that FinCEN acted within its statutory authority, acted reasonably, and was not required to engage in notice-and-comment rulemaking.

1.    **Ultra Vires.** Plaintiffs assert an "ultra vires" claim that FinCEN exceeded its statutory authority by issuing the March 2025 GTO, arguing first that the GTO exceeds the scope of FinCEN's statutory authority to issue GTOs under 31 U.S.C. § 5326. But by its plain terms, Section 5326 authorizes this exact type of agency action. Through Section 5326, Congress has authorized FinCEN to impose "additional recordkeeping and reporting requirements" beyond those required by other regulatory provisions. *See* 31 U.S.C. § 5326(a). And it explicitly permits the Secretary to set the reporting threshold without any other limitation on what that threshold might be. *Id*. § 5326(a)(1)(A) ("which the Secretary may prescribe"). The primary prerequisite is a finding that it is necessary to carry out the purposes of the BSA or prevent evasions thereof. In making exactly that finding and setting a lower threshold than that required by other regulations

---

[6] Plaintiffs' constitutional claims, to the extent they are not purely legal, should be reviewed on the basis of the administrative record as well. The focus of judicial review of agency action, including of challenges to agency action "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), "should be the administrative record already in existence, not some new record made initially in the reviewing court." *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). A plaintiff cannot avoid record review by separately pleading a constitutional claim. *See Malone Mortg. Co. Am. v. Martinez*, 2003 WL 23272381, at *2 (N.D. Tex. Jan. 6, 2003) ("The APA's restriction of judicial review to the administrative record would be meaningless if any party seeking review based on statutory or constitutional deficiencies were entitled to broad-ranging discovery."); *Lewis v. United States & United States Army Corps of Eng'rs*, No. CV 18-1838, 2019 WL 13115362, at *6 (E.D. La. Mar. 28, 2019) (same); *KHOLLE Magnolia 2015, LLC v. Vidal*, No. CV H-22-1974, 2024 WL 3371040, at *2 (S.D. Tex. July 9, 2024) (same); *see also Fence Creek Cattle Co. v. U.S. Forest Service*, 602 F.3d 1125, 1131 (9th Cir. 2010); *Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 43 (D.D.C. 2018).

for one category of businesses in portions of seven counties, FinCEN has not exceeded its statutory authority.

In arguing otherwise, Plaintiffs add a requirement absent from Section 5326's plain language: That GTOs must be limited to an "*identified*" business or group of businesses that are a subset of the group of businesses within a geographic area, Docket no. 5 at 20, rather than what Section 5326(a) actually authorizes: Issuance of a GTO as to either (1) "any domestic financial institution or nonfinancial trade or business"; or (2) a "group of domestic financial institutions or nonfinancial trades or businesses in a geographic area." To support their proposed modification of the statutory text, Plaintiffs rely on the "major questions doctrine." Docket no. 5 at 20–21. But the plain statutory language controls, and in any event this case lacks the hallmarks of the major questions decisions that Plaintiffs invoke, all of which grounded their analysis in the text, structure, and context of the relevant statutes. Here, FinCEN is not asserting regulatory power that is "markedly different" from the type of authority that Congress expressly identified in the relevant provision, *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) (per curiam) (cited in the TRO Motion at 21) or claiming "an unheralded power representing a transformative expansion in [its] regulatory authority" that Congress has conspicuously and repeatedly declined to enact," *West Virginia v. EPA*, 597 U.S. 697, 723–24 (2022) (quotation marks omitted). Nor is this a case where an agency responsible for public health has attempted to regulate something far afield from its core expertise, such as "the landlord-tenant relationship." *Ala. Ass'n*, 594 U.S. at 764. Nor has the agency enacted a "novel and fundamentally different" program pursuant modest statutory language authorization modification of existing provisions. *See Biden v. Nebraska*, 600 U.S. 477, 496 (2023) (cited in the TRO Motion at 21). Instead, here, the federal agency responsible for financial reporting has issued a temporary modification to long-existing

requirements for financial reporting. There is nothing "breathtaking," *Ala. Ass'n*, 594 U.S. at 764, or "extravagant," *Util. Air*, 573 U.S. at 324, about FinCEN's temporary, geographically limited modification of an existing reporting requirement, and injunctive relief based on the "major questions" doctrine would be unwarranted. Plaintiffs' exaggerated allegations of harm would not create a major question even if those allegations were wholly accurate, because the statutory language is clear and FinCEN acted well within it.

Nor does the APA provide a basis for adding limitations that are absent from Section 5326's plain text, as Plaintiffs argue, Docket no. 5 at 13–15, and the *Novedades* Court reasoned, Docket no. 5-9 at 21 (reasoning that "ordinary meaning takes a backseat when 'context requires a different result.'" (quoting *Gonzales v. Carhart*, 550 U.S. 124, 152 (2007)). Under this reasoning, the plain language of Section 5326, authorizing issuance of a GTO by order, does not mean what it says, because the action described by Section 5326—"an order" directed to "any . . . group of domestic financial institutions or nonfinancial trades or businesses in a geographic area"—is inconsistent with the APA's usage of "order."[7] According to Plaintiffs, to qualify as an "order" under the APA, an agency action must result from an adjudication involving specific individuals or entities—so those requirements, absent from the text of Section 5326, must be inferred. Docket no. 5 at 14. But the *Novedades* Court also found that Section 5326 "indicates that Congress intended to abrogate the APA's notice-and-comment requirements," since characterizing the GTO as a rule subject to notice-and-comment requirements cannot be reconciled with Section 5326's limitations on public disclosure of GTOs. Docket no. 5-9 at 34

---

[7] This premise is itself erroneous with respect to the GTO, which is not exclusively legislative in nature as explained below, *see, infra*, discussion of *U.S. v. W. H. Hodges & Co., Inc.*, 533 F.2d 276, 278 (5th Cir. 1976).

(quoting *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1145 (6th Cir. 2022) (citing

*Lockhart v. United States*, 546 U.S. 142, 145–46 (2005))). Yet despite this finding that Section

5326 represents an abrogation of APA requirements, Plaintiffs nonetheless maintain that the

GTO is unauthorized by Section 5326—for failure to follow APA requirements.

      **2.**      **Arbitrary and Capricious.** FinCEN acted reasonably and considered all relevant

factors when issuing the GTO. The Order itself reflects the agency's reasonable finding that the

additional recordkeeping and reporting requirements set forth in the GTO "are necessary to carry

out the purposes of the BSA or to prevent evasions" and further "Treasury's efforts to combat

illicit finance by drug cartels and other illicit actors along the southwest border of United States."

AR 000002. The AR confirms this finding. Surveying available intelligence and data, FinCEN

found that MSBs along the southwest border are uniquely vulnerable to money laundering

activities by drug cartels that use both witting and unwitting MSBs as part of various illegal

schemes to transport and launder drug money. *See* AR 000007–12. "FinCEN assesses that cash

remittances conducted by MSBs along the southwest border are an important avenue for this

illicit activity, particularly since cartels also engage in bulk cash smuggling along the border, and

so collect cash near border crossings." AR 000011–12; *see also* Gacki Decl. ¶ 11. For example,

the AR provides examples where MSBs are targeted for funneling operations (where money is

funneled to MSBs near the border from locations all over the country in smaller amounts, then

cashed out or changed to pesos before being smuggled across the border), *see* AR000009–10

n.24 (citing AR 000286, AR 000300), or targeted for the purpose of disguising illicit gains as

remittances, transmitted across the border in smaller amounts, AR 000011–12 & n.32 (citing AR

000403–08). And of course, on some occasions, MSBs have become witting partners of Drug

Trafficking Organizations ("DTOs") trying to move or launder money. *See* AR 000010 (citing examples at AR 000323–402).

FinCEN further found that, "[b]y lowering the CTR threshold, the information reported under this GTO would help . . . identify cartel-related, money laundering and to conduct targeted investigations and prosecutions of suppliers and facilitators that enable the flow of deadly drugs such as fentanyl into the United States" in part because the reports "are expected to generate new leads and identify new and related subjects in ongoing cases." AR 000010. FinCEN further noted that the reduced dollar reporting threshold "will help make structuring more difficult, thereby increasing the cost of doing business for cartels" and "help law enforcement identify cases in which MSBs are used to receive cash from funneled to one location from multiple sources, as with the use of money mules." *Id.*[8] The AR Memorandum explains that these specific ZIP codes were selected "based on risk factors that include their proximity to the border and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes." *Id.* at 000012–16 (surveying information about selected counties, and explaining why some other counties were excluded); *see also* Gacki Decl. ¶¶ 11–17 (describing how and why the agency chose these ZIP codes). Finally, the AR Memorandum explains that the "$200 threshold is proposed because it would include nearly all cash transactions vulnerable to abuse by drug

---

[8] "[A] person structures a transaction if that person, acting alone, or in conjunction with, or on behalf of, other persons, conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements under [31 C.F.R.] §§ 1010.311, 1010.313, 1020.315, 1021.311 and 1021.313 . . . ." 31 C.F.R. § 1010.100(xx). This includes "the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions at or below $10,000 . . . ." *Id.*

cartels through structuring payments to avoid CTRs, while excluding clearly de minimis amounts . . . " and would "provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Areas, allowing FinCEN to more fully understand the money laundering risks related to MSBs and cross-border cash remittances." AR 000016–17; Gacki Decl. ¶¶ 18–21.

First, Plaintiff challenges the $200 threshold itself, arguing that there is no "reasoned explanation" for that number and that FinCEN failed to consider the impact of that $200 threshold. Docket no. 5 at 21–22. These arguments fail because FinCEN considered all relevant factors and engaged in reasoned decisionmaking. The AR Memorandum explicitly acknowledges that the GTO may place an increased burden on "covered businesses." FinCEN reasoned that the GTO, however, "is merely a reporting obligation and does not alter their obligations with respect to AML/CFT programs" and "does not expect these Covered Businesses to materially alter typical fees charged for cash services, given that the reporting period is temporary, and the Covered Businesses will face continued competition from banks and other financial institutions offering similar services." AR 000017. Plaintiffs may disagree with that conclusion but there is no doubt the agency considered the relevant factors.[9]

Nor was the number chosen arbitrary. The AR Memorandum explains that the "$200 threshold is proposed because it would include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly de minimis

---

[9] As discussed in further detail below, FinCEN has internal estimates of the time burden imposed by CTRs; those burdens vary by type of institution and type of filing software used (and logically will vary by transaction as well), but the average burden is about 8 minutes per CTR, with many institutions (including nondepository institutions) coming in much lower. *See* 85 Fed. Reg. 29022, 29029 (May 14, 2020), 89 Fed. Reg. 7767, 7768 (Feb. 5, 2024).

amounts . . ." AR 000016. Plaintiffs do not seriously dispute that the $200 threshold would realistically include all transactions vulnerable to illicit activity; they just argue that it also includes licit activity. FinCEN never claimed, however, that all such activity was illicit or even suspicious; rather, the comprehensive data is necessary to "provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Areas, allowing FinCEN to more fully understand the money laundering risks related to MSBs and cross-border cash remittances." *Id*. As Director Gacki explains, "FinCEN assesses that the $200 threshold is low enough both to prevent the successful structuring of transactions to avoid the reporting requirements and to increase the cost of doing business for drug cartels." Gacki Decl. ¶ 18.

Plaintiff argues that there is "no reasoned explanation for targeting the 30 zip codes." Docket no. 5 at 22. The AR Memorandum explains that these specific ZIP codes were selected "based on risk factors that include their proximity to the border and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes," *id.* at 9–10, and the administrative record includes the specific data relied upon to reach those conclusions, AR 000013–16, 000413–43. Logically, these locations in general are likely to be targeted by cartels because they "are nearer to the entry points for drugs and human beings smuggled into the United States and to the exit points for bulk physical cash." Gacki Decl. at ¶ 11. FinCEN sees a "high volume of cash transactions" near these locations already known to be targeted by cartels, AR 000013, and reasonably assessed that additional reporting would further the purposes of the Bank Secrecy Act, such as assessing money laundering risks. AR 000019; see also Gacki Decl. ¶¶ 10, 27–32.

Plaintiffs speculate about FinCEN's ability to utilize the data collected under the GTO. But the administrative record explains how a full picture of MSB activity in the region will help to identify illicit activity. *See* AR at 000013–14 (comprehensive "snapshot" of MSB activity of a "significant sample" will help FinCEN assess money laundering risks). FinCEN reasonably found that imposing this reporting requirement through the GTO would provide a fuller picture of money laundering risks along the southwest border and make structuring more difficult, while producing new investigatory leads. AR 000011–12; Gacki Decl. ¶ 18. MSBs in these seven counties are particularly vulnerable to abuse, and gathering data about MSB transactions will provide a fuller picture to law enforcement and further the purposes of the BSA. It will generate information about previously unsuspected money laundering activity (e.g., uncovering possible funneling activity to a network of suspected DTO associates operating in the region, previously undetected because of the lower amounts or because operating through multiple unwitting MSBs), and generate leads useful for current cases (e.g., new identifying information or possibly suspicious financial activity related to a current subject of investigation).

Plaintiffs' claim that FinCEN did not consider countermeasures by cartels or other money launderers, Docket no. 5 at 22–23, is both inaccurate and immaterial. It is inaccurate because the AR Memorandum plainly considers exactly that possibility, noting that the ability of FinCEN and its law enforcement partners to "monitor shifts in activity, including any decreases in the flow of funds through Covered Businesses and any increases in activity at MSBs in areas near to the counties covered by this GTO[,]" numbers among the benefits of the GTO. AR 000017. And it is immaterial because a reporting obligation need not address every possible variety of illicit evasion to be reasonable.

The GTO is reasonable, and there is no basis to conclude that FinCEN's decision was arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A).

**3.      Notice-and-Comment Rulemaking**. Plaintiffs argue that FinCEN should have engaged in notice-and-comment rulemaking before issuing the order authorized by 31 U.S.C. § 5326(a). TRO Motion, Docket no. 5 at 23. But the challenged agency action is an order, not a rule, and therefore not subject to the rulemaking requirements of the APA. *See* 90 Fed. Reg. 12106. The APA defines an "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). Here, Congress specifically authorized the agency to act by "order" rather than by rule. That is in sharp contrast to the statutory provision governing CTRs, which generally requires the Secretary to set the reporting threshold "by regulation" rather than by order outside of the GTO context. *Compare* 31 U.S.C. § 5313(a) (requiring the Secretary to set reporting threshold "by regulation") *with* 31 U.S.C. § 5326 (authorizing the Secretary to act by order, including setting the applicable amount of reportable transactions in a GTO). Even if Congress had not explicitly authorized the agency to act by order, the GTO is not a legislative rule because it is not legislative in nature; it is limited in scope and time and tied to specific findings in this geographic area. *Cf. U. S. v. W. H. Hodges & Co., Inc.*, 533 F.2d 276, 278 (5th Cir. 1976) (finding that order to provide reports to Secretary of Agriculture was not subject to rulemaking requirements because investigatory in nature).

This reading of the statute is buttressed by the purposes of a GTO—to target specific threatened geographic area for a time-limited period. GTOs last only for 180 days absent renewal; if notice-and-comment rulemaking were required, it would likely take longer than the duration of a GTO to issue a GTO and they could not be used effectively to respond to dynamic

threats and developing financial intelligence.[10] Finally, notice-and-comment rulemaking is not required simply because the GTO affects a group of businesses. *See Neustar, Inc. v. Fed. Commc'ns Comm'n*, 857 F.3d 886, 894 (D.C. Cir. 2017) (that an order "'may affect agency policy and have general prospective application,' does not make it rulemaking subject to APA section 553 notice and comment."); *Nat'l Biodiesel Bd. v. Env't Prot. Agency*, 843 F.3d 1010, 1018 (D.C. Cir. 2016) (internal citation omitted) ("[T]he fact that an agency action applies to a 'large number of [parties]' 'carr[ies] [little] weight' in [the Court's] analysis."). In any event, the Supreme Court has repeatedly reaffirmed that the APA does not permit the courts to impose additional procedural requirements beyond those required by Congress. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc*., 435 U.S. 519, 549 (1978); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015).

## II.    Plaintiffs Have Not Established Irreparable Injury

Plaintiffs seeking preliminary relief must demonstrate that "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against the claim of irreparable harm." *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975). Generally speaking, a bare assertion of irreparable harm, or even a possibility of irreparable harm, is not sufficient, because "a possibility of irreparable harm is inconsistent with

---

[10]   In the original 1988 law, a GTO lasted only 60 days, subject to renewal. 102 Stat. 4355. When Congress extended the duration of a GTO, it does not appear to have imposed any additional procedural requirements, and under current law, Congress continues to authorize issuance of GTOs by "order." 31 U.S.C. § 5326(a).

[the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Plaintiffs' own declaration statements in this case, as well as their testimony in related litigation, demonstrate why they cannot show irreparable harm. First, both Plaintiffs acknowledge that, well before the GTO took effect, they already routinely asked customers for most of the information required to complete a CTR for most covered transactions. *See, e.g.*, Light Decl., Docket no. 5-1 at ¶ 16 (noting policy to record customer identification for money orders above $900, for all money transfers, for all check-cashing transactions, and for currency exchanges above $1,000). In the *TAMSB* action, Light testified that did not know of any customer who had refused to provide customer identifying information, including Social Security numbers, when required—rather, "[t]hey were fine with that." Docket no. 5-16 at 215–17 ("**Q.** But even for those smaller dollar transactions, you collected customer identifying information? . . . **A.** Yes. . . . **Q.** Yeah. Did people ever refuse? **A.** I don't know. I don't think so. **THE COURT:** But included Social Security number, address, all of that? **THE WITNESS:** Typically. Typically."). Indeed, while Payan professes to fear "new levels of risk," customer backlash, and long lines caused by requests for additional information from customers, he has also given the following description of Payan's existing check cashing process: "We scrutinize the check, the identification, and the customer. We ask questions as we feel necessary, such as where they got the check, what it's for, the name of their boss, etc. . . . [and] we make a note of the customer's identification number[.]" Docket no. 5-3 at ¶ 15. And, for transactions where they "don't know the check," Payan's undertakes additional vetting: "we'll look up the information on the state comptroller's web page or on the city, or we'll Google the address, you know, on Maps"). Docket no. 5-16 at 97 ("I don't want to take a bad check.").

Both Light and Payan make exaggerated claims about the impact of the GTO to their businesses. Light claims that the burden of submitting reports under the GTO required Valuta to stop offering certain services for a period after the GTO took effect, docket no. 5-1 at ¶ 18—but then acknowledges that this was based on a misunderstanding between Valuta and MoneyGram, which was in fact already submitting reports for money order and money transfer transactions conducted at Valuta. *Id* at ¶¶ 38–39 ("we discovered that while we were filing CTRs on our money orders and money transfers, MoneyGram was filing CTRs on those same transactions."). Payan similarly states in his declaration that Payan's was forced to stop cashing checks with values over $200 "because we cannot keep up with all the CTR filings." Docket no. 5-3 at ¶ 17. But he testified in the *TAMSB* action that the backlog coincided with both "check cashing season" (the period beginning in mid-February when "Treasury will start issuing [income tax] refunds to people who get, you know, big refunds[,]" Docket no. 5-16 at 111) and also that pause occurred because he "had to take a leave for paternity" Docket no. 5-16 at 107—but also that his mother and sister continued to process at least some check-cashing transactions for amounts over $200, triggering additional CTRs. *Id.* at 113 ("they continued cashing some more checks, and then they got more backed up.").

Plaintiffs' claims about the projected impact of the GTO on their businesses are difficult to square with their testimony elsewhere. Payan states in his declaration that "[i]f the GTO remains in place for 6 months, I expect Payan's will lose about 20–25% of its net revenue[,]" which he states will threaten the business's viability. But he testified in the *TAMSB* action that the portion of Payan's net income that comes from check cashing—its only category of transaction that is subject to the GTO—is "1.5 percent per month." Docket no. 5-16 at 106. Light herself attributes Valuta's financial difficulties, at least in part, to factors not traceable to

Defendants, such as overall economic difficulties and "an increasingly digital world," noting that "[t]his year so far, business is generally slower, even for the slow season[,]" Docket no. 5-1 at ¶¶ 11, 18; *see also* Docket no. 5-16 at 211–12 ("As an example, like, the weekends, people would come shopping downtown quite a bit. But now you don't see the weekends as busy."). Payan, similarly, testified that his business was impacted by the recent closure of the nearby international bridge between El Paso and Juarez, Docket no. 5-16 at 105.

And significantly, both Plaintiffs have already taken steps toward implementing technology, already in use at other covered MSBs and financial institutions, that will allow more efficient submission of CTRs. Light testified that—although she has difficulty understanding how it works—Valuta's database administrator, Clear View Systems, has already begun work on establishing a secure file transfer protocol that would enable batch submission of reports required by the GTO.[11] Docket no. 5-16 at 222–23. Light also testified that she has not investigated commercial software platforms used by some other MSBs to facilitate submission. *Id.* at 223 ("I've just checked with the system we have. I haven't gone outside to check."). And Payan has testified that his business has already purchased a computer system and software—at a cost of $3,500 plus a recurring monthly charge of "up to about $500"—although he has not yet set up the new system. Docket no. 5-3 at ¶ 33; Docket no. 5-16 at 118 ("it's a computer and a software . . . it has a chip reader and an optical reader").

Speculation that customers might prefer to go to banks to avoid ID requirements is implausible. *See, e.g.*, AR 000017 (generally higher fees at banks); Gacki Decl ¶ 19 (most banks

---

[11]  However (as Light's declaration also seems to reference) she testified that Clear View Systems is "hitting roadblocks because their company is actually based out of Canada." Docket no. 5-16 at 222–23.

will not perform certain services for non-account-holders and tend to check identification regardless). The Gacki Declaration demonstrates that many covered businesses started filing reports responsive to the GTO even before they were required under the GTO. And the Paperwork Reduction Act (PRA) notice cited by Plaintiffs estimates that each Currency Transaction Report takes eight minutes to complete, an average of ranges from 3.24 minutes to over 20 minutes per CTR depending on filing method. *See* 85 Fed. Reg. 29022, 29029 (May 14, 2020), 89 Fed. Reg. 7767, 7768 (Feb. 5, 2024). Many nondepository institutions like MSBs use automated batch filing, and for them, the average time per CTR is estimated at 4.76 minutes per CTR. The PRA estimate is facially quite conservative for discrete, non-automated filers, and Plaintiffs' submissions estimating 25–30 minutes or more per CTR do not appear to take into account the types of transactions they do, the types of information and paperwork they already have, or other relevant factors.

Finally, Plaintiffs' failure to pursue other options and their delay in bringing suit militates against a finding of irreparable harm. "A party who faces an existential threat to its mission and survival—as Plaintiffs claim to face here—will presumably spring into action and seek relief as soon as practicable after discovering that threat," and an "unexplained delay before seeking a TRO . . . implies a lack of urgency and irreparable harm." *See Las Americas Immigrant Advocacy Ctr. v. Paxton*, No. EP-24-CV-00352-DCG, 2024 WL 4430542, at *5 (W.D. Tex. Sept. 27, 2024). Thus, "whenever a plaintiff could have brought [a] TRO motion earlier, but instead s[eeks] a TRO at the eleventh hour, giving [the d]efendants no real opportunity to respond, that delay discredits [the plaintiff's] argument that irreparable injury will result if th[e] Court does not issue the requested TRO." *Id.* (internal quotation marks omitted). Here, the GTO was issued March 11 and took effect on April 14, but Plaintiffs waited more than two months

after the GTO was announced before bringing their own action and moving for a TRO to enjoin

reporting obligations that have been in effect for more than six weeks. During the more than six

weeks since the GTO took effect, Valuta has not investigated available commercial solutions to

the administrative burden that Plaintiffs nonetheless characterize as "crushing." Docket no. 5 at

7; 5-16 at 223. They did not, however, seek exemptive relief from FinCEN. A plaintiff facing

"existential threats" might reasonably be expected to run immediately to court. Plaintiffs did not

seek administrative or judicial relief expeditiously and continue to not treat the GTO as an

existential threat. The Court could and should deny the motion for that reason alone.

### III.    The Balance of Interests Tips in Favor of Defendants.

The balance of equities and the public interest factors "merge when the Government is

the opposing party." *Nken*, 556 U.S. at 435. Moreover, when assessing whether to grant a

preliminary injunction before the merits have been adjudicated, courts "should pay particular

regard for the public consequences in employing the extraordinary remedy of injunction."

*Winter*, 555 U.S. at 24 (citation omitted). Any preliminary relief should be carefully tailored to

address only the harms that plaintiffs have established. 11A Wright et al., FPP § 2947 (3d ed.)).

In the face of Plaintiffs' weak evidence of harm to a few MSBs that have not yet explored

alternatives, the agency's finding that these recordkeeping requirements are necessary to address

money-laundering and cartel activities along the southwest border should carry the day. It is in

the public interest for the Government to act swiftly on these issues, particularly in light of the

ongoing fentanyl crisis and evidence that drug cartels are using MSBs to further their criminal

activity. *See* AR 000011–12; Gacki Decl. ¶ 29 ("The information collected from the SW Border

GTO will not only aid in disrupting this illicit flow of money by, for example, making

structuring more difficult, but it will also assist Treasury and law enforcement partners in

identifying and combatting cartel-related money laundering."). The Gacki Declaration further explains that "given the profound national security, homeland security, terrorist financing, and money laundering threats inherent in the operation of these DTOs along the border, FinCEN determined that the potential benefits of the GTO outweigh the potential burdens the GTO may impose on covered MSBs." *Id.* ¶ 31. And an injunction "would cause significant harm to U.S. anti-money laundering efforts and the broader AML/CFT regime and thereby to the U.S. financial system as a whole." *Id.* at ¶ 32.

Were the Court nonetheless to grant Plaintiffs' motion, the Court should not, as Plaintiff suggests, vacate the GTO as to all MSBs or all MSBs located within covered areas in Texas, or purport to enjoin the GTO as to a "putative class." "A plaintiff's remedy must be tailored to redress *the plaintiff's* particular injury," *Gill v. Whitford*, 585 U.S. 48, 72–73 (2018) (emphasis added), and that equitable relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Any broader relief is inconsistent with Article III's judicial power, which "exists *only* to redress or otherwise protect against injury to the complaining party." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (emphasis added). It is also inconsistent with traditional equitable principles premised on "providing equitable relief only to parties." *Trump v. Hawaii*, 585 U.S. 667, 718 (2018) (Thomas, J., concurring); *cf. Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring).

The APA's § 705 likewise explicitly incorporates the constitutional and equitable limitations on non-party relief. *See* 5 U.S.C. § 705 (permitting a court to stay agency action only "to the extent necessary to prevent irreparable injury"); *cf.* H.R. Rep. No. 79-1980, at 43 (1946) (recognizing § 705 relief "would normally, if not always, be limited to the parties complainant").

Plaintiffs have not established irreparable harm to each Plaintiff, much less more broadly, and no injunction should issue at all. Were the Court to do so, however, any relief granted should be limited to identified Plaintiffs.

Finally, under Federal Rule of Civil Procedure 65(c), the Court may issue such relief "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiff to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

## CONCLUSION

For these reasons, the Court should deny the TRO motion.

Dated: June 9, 2025                                Respectfully submitted,

**Justin R. Simmons**
United States Attorney

By:        */s/ Robert Green*
**Robert D. Green**
Texas Bar No. 24087626
Assistant United States Attorney
U.S. Attorney's Office
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7362 (phone)
(210) 384-7312 (fax)
robert.green3@usdoj.gov

***Attorneys for Defendant***