## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| VALUTA CORPORATION, INC. and PAYAN FUEL CENTER, INC., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 3:25-cv-191-LS |
| FINANCIAL CRIMES ENFORCEMENT NETWORK; ANDREA GACKI, in her official capacity as Director of the Financial Crimes Enforcement Network; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; and PAM BONDI, in her official capacity as Attorney General of the United States, | |
| *Defendants*. | |

## <u>DECLARATION OF ANDREA GACKI</u>

I, Andrea Gacki, declare the following to be a true and correct statement of facts:

1.      I am the Director of the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the U.S. Department of the Treasury ("Treasury"). I have held this position since September 2023. I previously served in several other leadership roles within Treasury. Prior to joining FinCEN, I served as the Director of the Office of Foreign Assets Control, another component of Treasury (within Treasury's Office of Terrorism and Financial Intelligence) for approximately five years and, from January 2021 to December 2021, I performed the duties of the Under Secretary for Terrorism and Financial Intelligence. In my official capacity as the Director of FinCEN, I supervise all aspects of FinCEN's operations, including FinCEN's implementation

1

of the Bank Secrecy Act ("BSA").

2.      Due to the nature of my official duties, I am familiar with FinCEN's implementation of the BSA's requirements, including FinCEN's issuance of orders pursuant to 31 U.S.C. § 5326.

3.      I make this declaration in support of Defendants' opposition to Plaintiffs' Motion for a Temporary Restraining Order and Stay of Agency Action Under 5 U.S.C. § 705. The statements I make in this declaration are based on my personal knowledge, on information made available to me in my official capacity, and on conclusions reached and determinations made in accordance therewith.

4.      FinCEN was created in 1990 and became a bureau of Treasury by virtue of the USA PATRIOT Act of 2001, Pub. L. 107–56. The Director of FinCEN is appointed by the Secretary of the Treasury and reports to Treasury's Under Secretary for Terrorism and Financial Intelligence.

5.      FinCEN's mission is to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence. FinCEN primarily exercises regulatory functions under the legislative framework commonly referred to as the BSA,[1] which includes the Currency and Foreign Transactions Reporting Act of 1970, as amended by Title III of the USA PATRIOT Act of 2001, the Anti-Money Laundering Act of 2020, and other legislation. The BSA is the nation's first and

---

[1] The BSA is codified at 12 U.S.C. §§ 1829b, 1951–1960 and 31 U.S.C. §§ 5311–5314, 5316–5336, including notes thereto. Regulations implementing the BSA appear at 31 C.F.R. Chapter X.

most comprehensive federal anti-money laundering and countering the financing of terrorism

("AML/CFT") statute. The Secretary of the Treasury has delegated to the Director of FinCEN the

authority to implement, administer, and enforce compliance with the BSA and associated

regulations. *See* Treasury, Treasury Directive 180-01 (Jan. 14, 2020).

6.      In the Anti-Drug Abuse Act of 1988, Congress amended the BSA to provide

additional authority to the Secretary of the Treasury to collect information about certain currency

transactions in geographic areas thought to pose particular money laundering risks. Pub. L. 100–

690, title VI, § 6185(c), 102 Stat. 4355 (Nov. 19, 1988). The original purpose was to grant "the

Secretary of Treasury discretionary authority to target a domestic financial institution or a group

of institutions located in any specified geographic location where drug trafficking and/or money

laundering are prevalent, to obtain, retain and report information." H. Rep. 101–74, at 111 (Nov.

18, 1988). As amended and codified at 31 U.S.C. § 5326, the Secretary of the Treasury may

issue an order requiring any domestic business in a geographic area to keep additional records or

file additional reports upon finding that reasonable grounds exist for concluding that such

additional requirements are necessary to carry out the purposes of the BSA or to prevent evasions

thereof. 31 U.S.C. § 5326(a). Orders issued under this authority are referred to as "geographic

targeting orders" or "GTOs". The statute further authorizes the Secretary of the Treasury to obtain

information as described in a GTO concerning any transaction in which a business is involved

and the applicable recordkeeping and/or reporting dollar thresholds of such transactions. *Id.* A

GTO may be effective for no more than 180 days, unless renewed. 31 U.S.C. § 5326(d). FinCEN

has issued a regulation that further governs the form of a GTO. 31 C.F.R.§ 1010.370.

Additionally, FinCEN may prescribe an appropriate exemption from a requirement imposed

under the BSA, including any requirement imposed by a GTO. 31 U.S.C. § 5318(a)(7).

7.    FinCEN has issued several GTOs in the past that required a great number of businesses in certain geographic areas to report on cash transactions at dollar thresholds far below existing BSA reporting thresholds. For example, in the late 1990s, FinCEN issued GTOs in the New York City metropolitan area (the "New York GTOs") that required certain money transmitters and over 3,000 of their agents to obtain and report identifying information about the sender and recipient of all cash-purchased remittances to Colombia and the Dominican Republic in the amount of $750 or more. *See* https://www.fincen.gov/news/news-releases/treasury-acts-against-flow-dirty-money-colombia; https://www.fincen.gov/news/news-releases/treasury-cracks-down-remittances-dominican-republic. The dollar threshold for reporting cash transactions under the BSA was (and still is) over $10,000. *See* 31 C.F.R. § 1010.311 (current currency transaction report rule). The New York GTOs were issued to disrupt the flow of narcotics proceeds from the targeted money transmitters to Colombia and the Dominican Republic. In addition, in 2014, FinCEN issued a GTO requiring over 2,000 businesses in the Los Angeles fashion district ("LA GTO") to report cash transactions of $3,000 or more. *See* https://www.fincen.gov/news/news-releases/fincen-issues-geographic-targeting-order-covering-los-angeles-fashion-district. The LA GTO was issued to address the use of the targeted businesses in trade-based money laundering schemes in which drug money in the United States is converted into goods that are shipped to countries, such as Mexico, where the goods are then sold and the money—now in the form of local currency—goes to the drug trafficking organizations. Moreover, in 2015, FinCEN issued a GTO requiring about 700 businesses (primarily electronics exporters) in the Miami, Florida area ("Miami GTO") to report cash transactions of $3000 or more. *See* http://www.fincen/gov/news/news-releases/fincen-targets-money-laundering-infrastructure-geographic-targeting-order-miami. The Miami GTO, like the LA GTO, was issued to address

4

trade-based money laundering risks associated with the targeted businesses.

### The SW Border GTO: Basics and Scope

8.      On March 11, 2025, FinCEN issued the GTO at issue in this case, which covers

money services businesses ("MSBs") in 30 ZIP codes located in two counties in California—

Imperial and San Diego—and five counties in Texas—Cameron, El Paso, Hidalgo, Maverick,

and Webb (the "SW Border GTO"). An MSB is defined in the BSA regulations as certain non-

bank financial institutions, including but not limited to check cashers, currency exchangers, and

money transmitters. 31 C.F.R. § 1010.100(ff). The BSA regulations require MSBs to file

currency transaction reports ("CTRs") on transactions in currency of more than $10,000. 31

C.F.R. § 1010.311.

9.      The SW Border GTO imposes the additional requirements on covered MSBs to

report transactions in currency between $200 and $10,000, and to verify the identity of those

persons conducting such transactions. The reports required under the SW Border GTO must be

filed in the same manner as those reports filed for transactions involving more than $10,000. For

example, a covered MSB must file a report within 15 days after receipt of more than $200 in

currency. The SW Border GTO took effect on April 14, 2025, and will expire, unless renewed,

on September 9, 2025. FinCEN issued the SW Border GTO to address cash-based money

laundering along the southwest border, including by Mexican drug cartels—particularly cartels

linked to illicit opioid trafficking.

### The SW Border GTO: Justification

10.     FinCEN issued the SW Border GTO to address cash-based money laundering

along the southwest border, including by Mexican drug cartels—including cartels linked to

illicit opioid trafficking. The SW Border GTO will collect data that is expected to be highly useful to law enforcement for case generation, ongoing investigations, and prosecutions targeting Mexican drug cartels—which are drug trafficking organizations ("DTOs") and, in some cases, also foreign terrorist organizations ("FTOs"). The SW Border GTO will assist FinCEN and law enforcement in identifying the extent to which these actors are exploiting MSBs to launder the proceeds of their crimes, thereby perpetuating the synthetic opioid crisis in the United States.

11.    FinCEN does not believe that southwest border-based MSBs are the only MSBs vulnerable to exploitation by cartels. Southwest border-based MSBs, however, do have some unique vulnerabilities, as they are nearer to the entry points for drugs and human beings smuggled into the United States and to the exit points for bulk physical cash.

12.    In addition, FinCEN has worked with law enforcement in California on this issue, and law enforcement has identified problems in some of the areas covered by this GTO.

13.    FinCEN limited the GTO to those ZIP codes that are the highest risk for illicit actors in order to maintain the effectiveness of the GTO while limiting its overall burden on industry.

14.    In reaching that decision, FinCEN examined the total number of CTRs filed along border counties in all four states and found that overall filings in Arizona and New Mexico were significantly lower than in Texas and California. AR000012-16. Based on this finding, combined with the fact that Texas and California contain all the most significant U.S.-Mexico border crossings, FinCEN decided not to cover any counties or ZIP codes in Arizona and New Mexico in this GTO. *Id.*

15.    In an effort to further reduce the burden, FinCEN covered only 30 ZIP codes in

California and Texas. To choose these ZIP codes, FinCEN looked at the number of CTRs filed

relative to the population in border ZIP codes in Texas and California and emphasized those with

higher numbers of filings per capita, as well as areas containing or close to border crossings, in its

choice of covered ZIP codes. *Id.*

16.    FinCEN did not cover certain ZIP codes that appeared to have a very high number of

CTR filings relative to the population, but for which the volume could be explained by some of the

businesses located there. For example, FinCEN did not cover one ZIP code that had a high number

of CTR filings due to the fact that it contains a location for Brink's, a cash handling service.

17.    FinCEN recognizes that MSBs all along the southwest border are uniquely vulnerable

due to their location, and ultimately settled on these 30 ZIP codes to limit burden as FinCEN

gathered information to address cash-based money laundering along the southwest border,

including by Mexican drug cartels, and thus, carry out the purposes of the BSA and prevent

evasion thereof. AR000008-9, AR000013.

18.    FinCEN assesses that the $200 threshold is low enough both to prevent the

successful structuring of transactions to avoid the reporting requirements and to increase the cost

of doing business for drug cartels. AR000016-17. The filing threshold was set to ensure that

FinCEN collects highly useful information about violations and evasions of the BSA, while

excluding clearly *de minimis* amounts that are more likely to be legitimate. *Id.* Results from the

GTO queried on June 4, 2025, indicate that nearly 149,000 reports required under the SW Border

GTO have been filed thus far. Of that amount, 105,952 are reports filed for cash in transactions

under $5,000, and 54,156 are reports filed for cash out transactions under $5,000.[2]

19.     Further, FinCEN does not anticipate that illicit activities will switch to banks in the covered geographic areas as a result of this GTO for several reasons. First, banks usually deny services to non-customers, and for those that do offer services, banks usually impose higher fees, limit the types of services available, and impose low dollar thresholds on services provided to non-customers. Second, banks are subject to more stringent customer identification and due diligence obligations, regardless of CTR requirements. *See* AR000017.

20.     FinCEN similarly does not expect illicit activity to easily move to exchanges in Mexico. Regardless, the southwest border presents particularized risks of money laundering due to its proximity to Mexico, and it is those that the SW Border GTO seeks to address by significantly curtailing the ability of illicit actors to move money anonymously through MSBs in the GTO's covered geographic areas.

21.     Any effort by illicit actors to evade the SW Border GTO's reporting requirements imposes additional costs to those actors, raising the cost of their money laundering operations. For example, illicit funds may be transmitted from a financial institution elsewhere in the United States to an MSB covered by this GTO, where the funds are cashed out before being physically moved across the border. If the funds were instead transmitted directly to a Mexican MSB, we assessed that the transaction would be higher risk, likely inviting higher scrutiny from the U.S. financial institution, and would have higher fees.

---

[2] As many reports provide both a cash in and cash out amount (especially currency exchanges), the total of cash in and cash out transactions is higher than the total number of filings FinCEN has received as of June 4, 2025.

## SW Border GTO: Technical Compliance and Burden

22.    As of June 4, 2025, FinCEN has identified 73 unique filers of CTR forms using the keyword "MSB0325GTO," as required by the GTO. FinCEN also previously identified 52 additional filers who were filing CTR forms for transactions below $10,000 but not including the keyword.

23.    As noted earlier, the CTR is the form used to report certain cash transactions to FinCEN—namely, transactions in currency of more than $10,000. 31 C.F.R. § 1010.311. The CTR form is completed online and contains fields corresponding to information that MSBs may often already collect or necessarily have for certain types of transactions, including information about relevant financial institutions, relevant financial institution employee(s), the customer, and the type and amount of the cash transaction. For example, MSBs have a general requirement to verify customer identification and specific requirements to obtain identifying information about a customer above certain dollar thresholds for certain transactions. For instance, certain funds transfers and purchases of bank checks and drafts, cashier's checks, money orders, and traveler's checks with currency at $3,000 or more require the collection of customer identification information. 31 C.F.R. § 1010.410 and 31 C.F.R. § 1010.415. Additionally, dealers in foreign exchange, under 31 C.F.R. § 1022.410, are required to collect identifying information for customers involved in transactions in excess of $1,000. The MSB also has information about itself and its employees. This is all information that MSBs collect or maintain as part of their normal business practice.

24.    FinCEN does not require filers to have any specific software in order to file CTRs. Filers simply need to create an account with FinCEN's BSA E-Filing system, which takes 5–10

minutes at most. Further, with the U.S. government platform login.gov, filers will be able to submit their filing.

25.     FinCEN makes its Secure File Transfer Protocol—which enables a direct encrypted connection with FinCEN's servers without any specialized software required—available to filers to help facilitate the filing of individual CTRs or the batch filing of CTRs, if the filer chooses to file multiple CTRs at the same time. FinCEN does not charge filers to use this protocol. When batch filing CTRs, FinCEN has previously estimated that the typical burden for a non-depository institution filing each CTR ranges between approximately 4.76 minutes per CTR (if batch filing) and over 20 minutes per CTR (if filing individually and depending on degree of automation). 85 Fed. Reg. 29022, 29029 (May 14, 2020). Filing many CTRs on an individual basis generally is more burdensome than batch filing many CTRs at the same time. However, MSBs are free to choose whichever filing method works best for them.

26.     None of the Plaintiffs has requested exemptive relief from FinCEN through an administrative ruling request or a help desk request via the Regulatory Support Section (RSS).

### Harm to Treasury's Anti-Money Laundering and Countering Fentanyl Efforts and the U.S. AML/CFT Regime from the Court's Order

27.     If Plaintiffs are granted a temporary restraining order in this case and Defendants are enjoined from enforcing, implementing, or otherwise giving effect to the SW Border GTO, both FinCEN and the public interest will be harmed.

28.     DTOs are responsible for the fentanyl crisis that is the leading cause of death for individuals aged 18 to 45 in the United States. Sixty eight percent of all drug poisoning deaths in 2022 and 2023—216,294 in total—were caused by synthetic opioids, primarily fentanyl.

29.    To address this illicit opioid epidemic, it is necessary to disrupt the flow of money conducted by these DTOs across the southwest border. The information collected from the SW Border GTO will not only aid in disrupting this illicit flow of money by, for example, making structuring more difficult, but it will also assist Treasury and law enforcement partners in identifying and combatting cartel-related money laundering.

30.    Moreover, some of the DTOs may also be designated Foreign Terrorist Organizations, and disrupting their supply of money directly supports Treasury's—and the whole of government's—efforts to counter the financing of terrorism.

31.    Thus, given the profound national security, homeland security, terrorist financing, and money laundering threats inherent in the operation of these DTOs along the border, FinCEN determined that the potential benefits of the GTO outweigh the potential burdens the GTO may impose on covered MSBs.

32.    In sum, the SW Border GTO is a critical component of FinCEN's efforts to combat money laundering, terrorist financing, and other criminal activities. If Plaintiffs are granted the temporary restraining order, Defendants' ability to carry out the purposes of the BSA—by collecting data that is expected to be highly useful to law enforcement for case generation, ongoing investigations, and prosecutions targeting Mexico-based drug cartels—would be significantly hampered. In FinCEN's judgment, a preliminary injunction enjoining the SW Border GTO would cause significant harm to U.S. anti-money laundering efforts and the broader AML/CFT regime and thereby to the U.S. financial system as a whole.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

11

United States of America that the foregoing is true and correct.

Executed on June 6, 2025.

Andrea Gacki
Director
Financial Crimes Enforcement Network (FinCEN)