# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| VALUTA CORPORATION, INC., and PAYAN'S FUEL CENTER, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> FINANCIAL CRIMES ENFORCEMENT NETWORK; ANDREA GACKI, in her official capacity as Director of the Financial Crimes Enforcement Network; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; and PAM BONDI, in her official capacity as the Attorney General of the United States, <br><br> *Defendants*. | Civil Case No. 3:25-cv-00191-LS |

## PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT, FOR ENTRY OF FINAL JUDGMENT UNDER RULE 65(a)(2), AND FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................... iii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ......................................................................................3

    A.  Statutory and Regulatory Background....................................................3

        1.  Currency Transaction Reports.........................................................3

        2.  Money Services Businesses .............................................................5

        3.  Geographic Targeting Orders..........................................................6

    B.  The Challenged Border GTO...................................................................7

    C.  The Covered Businesses ..........................................................................8

LEGAL STANDARD ............................................................................................10

ARGUMENT .........................................................................................................11

I.  The Border GTO Is Unlawful In At Least Four Different Ways .......................11

    A.  The Border GTO Is Arbitrary And Capricious .....................................11

        1.  There is no reasoned explanation of the benefits...........................12

        2.  There is no reasoned explanation of the costs ...............................14

    B.  The Border GTO Is *Ultra Vires* .........................................................15

    C.  The Border GTO Required Notice And Comment .................................19

    D.  The Border GTO Violates The Fourth Amendment...............................21

II.  The Court Can—And Should—Grant Relief Barring Any Further Enforcement
    Of The Border GTO ........................................................................... 26

    A.  Plaintiffs Are Entitled To Final Judgment Vacating The Border GTO,
        As The Record Is Complete And The Facts Are Not Disputed .............26

        1.  Under the APA, the appropriate final remedy is vacatur ...............26

        2.  Plaintiffs are entitled to summary judgment...................................27

3.  Alternatively, the Court may consolidate the preliminary-injunction hearing with a trial on the merits ...................................................28

B.  Plaintiffs Are Entitled To A Preliminary Injunction Both For Themselves And For Other MSBs ...........................................................................28

1.  Plaintiffs and other members of the putative class face irreparable harm, and other equitable factors also favor relief ...........................................29

2.  Any preliminary injunction should cover the entire putative class.................30

CONCLUSION........................................................................................................................30

CERTIFICATE OF SERVICE ...............................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AARP v. Trump,*
    145 S. Ct. 1364 (2025) .................................................................................................30

*Airbnb, Inc. v. City of New York,*
    373 F. Supp. 3d 467 (S.D.N.Y. 2019) ..........................................................................23

*Air Line Pilots Ass'n, Int'l v. Quesada,*
    276 F.2d 892 (2d Cir. 1960) .......................................................................................16

*Ala. Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021) ....................................................................................................18

*Am. Airlines v. DOT,*
    202 F.3d 788 (5th Cir. 2000) ......................................................................................21

*In re Application for Historical Cell Site Data,*
    724 F.3d 600 (5th Cir. 2013) ......................................................................................25

*In re Application for Historical Cell Site Data,*
    747 F. Supp. 2d 827 (S.D. Tex. 2010) ........................................................................24

*Biden v. Nebraska,*
    600 U.S. 477 (2023) ....................................................................................................18

*California Bankers Ass'n v. Shultz,*
    416 U.S. 21 (1974) ..........................................................................................21, 22, 23

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.,*
    98 F.4th 220 (5th Cir. 2024) .......................................................................................30

*Cargill v. Garland,*
    57 F.4th 447 (5th Cir. 2023) .......................................................................................18

*Carpenter v. United States,*
    585 U.S. 296 (2018) ...............................................................................................24, 25

*Chamber of Com. v. SEC,*
    85 F.4th 760 (5th Cir. 2023) .......................................................................................15

*City of Arlington v. FCC,*
    668 F.3d 229 (5th Cir. 2012) ......................................................................................20

*Clean Air Carolina v. DOT,*
    No. 17-cv-5779, 2017 WL 5157469 (S.D.N.Y. Sept. 14, 2017) .................................27

*Craig v. Boren*,
    429 U.S. 190 (1976) ........................................................................................................24

*Data Mktg. P'ship, LP v. DOL*,
    45 F.4th 846 (5th Cir. 2022) ....................................................................................12, 26

*Donovan v. Lone Steer, Inc.*,
    464 U.S. 408 (1984) ................................................................................................22, 24

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ........................................................................................................13

*FBME Bank Ltd. v. Lew*,
    125 F. Supp. 3d 109 (D.D.C. 2015) ..............................................................................15

*FHFA v. SFR Invs. Pool 1, LLC*,
    No. 2:17-cv-914, 2018 WL 1524440 (D. Nev. Mar. 27, 2018) ......................................24

*In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461 et seq.*,
    706 F. Supp. 2d 11 (D.D.C. 2009) ................................................................................24

*Michigan v. EPA*,
    576 U.S. 743 (2015) ........................................................................................................15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ....................................................................................................11, 13

*Nat'l Ass'n for Gun Rts., Inc. v. Garland*,
    741 F. Supp. 3d 568 (N.D. Tex. 2024) ....................................................................10, 27

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................................10

*Novedades y Servicios, Inc. v. FinCEN*,
    No. 3:25-cv-00886, 2025 WL 1501936, (S.D. Cal. May 21, 2025) ............................... *passim*

*Rest. L. Ctr. v. DOL*,
    120 F.4th 163 (5th Cir. 2024) ........................................................................................15

*Riley v. California*,
    573 U.S. 373 (2014) ........................................................................................................25

*Safari Club International v. Zinke*,
    878 F.3d 316 (D.C. Cir. 2017) ......................................................................................20

*Space Expl. Techs., Corp. v. Bell*,
    701 F. Supp. 3d 626 (S.D. Tex. 2023) ..........................................................................29

*Tex. Ass'n for Money Servs. Bus. v. Bondi*,
   No. 5:25-cv-00344, 2025 WL 1540621 (W.D. Tex. May 19, 2025) .............................. *passim*

*Texas v. Garland*,
   719 F. Supp. 3d 521 (N.D. Tex. 2024) ...................................................................................28

*Texas Med. Ass'n v. HHS*,
   110 F.4th 762 (5th Cir. 2024) ..............................................................................................27

*Texas v. United States*,
   126 F.4th 392 (5th Cir. 2025) ..............................................................................................26

*Trump v. CASA, Inc.*,
   __ S. Ct. __, 2025 WL 1773631 (June 27, 2025) ...............................................................3, 27

*United States v. Miller*,
   425 U.S. 435 (1976)...............................................................................................................25

*United States v. Morton Salt Co.*,
   338 U.S. 632 (1950)...............................................................................................................23

*United States v. Smith*,
   110 F.4th 817 (5th Cir. 2024) ..........................................................................................24, 25

*United Steel v. Mine Safety & Health Admin.*,
   925 F.3d 1279 (D.C. Cir. 2019)............................................................................................26

*Wages & White Lion Invs., LLC v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) ..........................................................................................11, 29

*W & T Offshore, Inc. v. Bernhardt*,
   946 F.3d 227 (5th Cir. 2019) ...........................................................................................19, 20

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008)...................................................................................................................10

**Constitutional Provisions**

U.S. Const. amend. IV ...................................................................................................................21

**Statutes**

5 U.S.C. § 551.............................................................................................................6, 11, 16, 17

5 U.S.C. § 552.....................................................................................................................17, 18

5 U.S.C. § 553..............................................................................................................................19

5 U.S.C. § 705..............................................................................................................................10

5 U.S.C. § 706 ............................................................................................................... *passim*

31 U.S.C. § 310 .............................................................................................................. 4

31 U.S.C. § 5313 ..................................................................................................... 3, 6, 16

31 U.S.C. § 5326 ............................................................................................... 6, 15, 16, 17

Pub. L. 404, 60 Stat. 237 (1946) .................................................................................... 16

Pub. L. 100-690, 102 Stat. 4181 (1988) ........................................................................... 6

**Rules and Regulations**

16 C.F.R. § 313.3 .......................................................................................................... 25

31 C.F.R. 1010.100 ................................................................................................... 5, 7, 8

31 C.F.R. § 1010.306 ...................................................................................................... 4

31 C.F.R. § 1010.311 .................................................................................................. 3, 5

31 C.F.R. § 1010.370 ...................................................................................................... 6

31 C.F.R. § 1010.410 ...................................................................................................... 5

31 C.F.R. § 1022.210 ...................................................................................................... 5

31 C.F.R. § 1022.320 ...................................................................................................... 5

31 C.F.R. § 1022.380 ...................................................................................................... 5

31 C.F.R. § 1022.410 ...................................................................................................... 5

Fed. R. Civ. P. 56 ............................................................................................. 1, 10, 26, 27

Fed. R. Civ. P. 65 ................................................................................................ 1, 26, 28

**Federal Register Publications**

*Financial Recordkeeping and Reporting of Currency and Foreign Transactions*,
   37 Fed. Reg. 6912 (Apr. 5, 1972) ............................................................................... 3

*Amendment to the Bank Secrecy Act Regulations Relating to Geographic
   Reporting of Certain Domestic Currency Transactions*, 54 Fed. Reg. 33675
   (Aug. 16, 1989) ................................................................................................. 6, 7, 12

*Amendment to the Bank Secrecy Act Regulations—Definitions Relating to, and
   Registration of, Money Services Businesses*, 64 Fed. Reg. 45438 (Aug. 20, 1999) ............... 5

*Agency Information Collection Activities; Proposed Renewal; Comment Request;*
*Renewal Without Change of Reports of Transactions in Currency Regulations*
*and FinCEN Form 112—Currency Transaction Report*, 85 Fed. Reg. 29022
(May 14, 2020)......................................................................................................4, 14

*Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping*
*and Reporting Requirements on Certain Money Services Businesses Along the*
*Southwest Border*, 90 Fed. Reg. 12106 (Mar. 14, 2025) ...........................................7

**Other Authorities**

*FinCEN, Year in Review for FY 2023* (2024),
*available at* https://www.fincen.gov/sites/default/files/shared/FinCEN_Infographic_
Public_508FINAL_2024_June_7.pdf. ..................................................................4, 5

*GAO, Currency Transaction Reports: Improvements Could Reduce Filer Burden*
*While Still Providing Useful Information to Law Enforcement* (Dec. 2024),
*available at* https://www.gao.gov/assets/gao-25-106500.pdf....................................4

Both on their own behalf and on behalf of the putative class, Plaintiffs hereby move for summary judgment under Fed. R. Civ. P. 56, for final judgment under Fed. R. Civ. P. 65(a)(2), and for a preliminary injunction under Fed. R. Civ. P. 65(a)(1). Plaintiffs are asking the Court to enter final judgment—as well as a preliminary injunction—because the issues are purely issues of law, there are no disputed facts, and there is no reasonable dispute that the appropriate *final* remedy under the Administrative Procedure Act is vacatur—rendering the Border GTO a nullity. *See* 5 U.S.C. § 706; *see also* Fed. R. Civ. P. 56(b) (party can move for summary judgment "at any time"); Fed. R. Civ. P. 65(a)(2) (court may combine preliminary injunction with final merits).

## INTRODUCTION

At the TRO stage, this Court found that the Border GTO is likely arbitrary and capricious because "the administrative record reflects that the government either failed to consider or offered an unsubstantiated conclusion on at least two important aspects of the problem." Doc. 31 (TRO Order) at 1–2. Two other courts have found a likelihood of success on that and other grounds. *See Tex. Ass'n for Money Servs. Bus. v. Bondi*, No. 5:25-cv-00344, 2025 WL 1540621 (W.D. Tex. May 19, 2025) ("*TAMSB*"); *Novedades y Servicios, Inc. v. FinCEN*, No. 3:25-cv-00886, 2025 WL 1501936 (S.D. Cal. May 21, 2025). Yet, although three courts have found the Border GTO likely unlawful, the scope of relief to date means there are still businesses required to comply. If the TRO expires without an injunction in place, Plaintiffs, too, will once again have to shoulder the massive burdens imposed by the Border GTO. To prevent that from happening, Plaintiffs bring this motion to convert the TRO into more lasting relief for their own businesses, and to secure relief for other businesses still subject to this unlawful agency action.

The Border GTO is unlawful for the reasons articulated by this Court at the TRO stage, for the reasons articulated by Judges Biery and Sammartino, and for the reasons below. It is arbitrary and capricious, as it adopts a nonsensical policy without adequate explanation or adequate

1

consideration of costs. *Infra* Part I.A. It is *ultra vires*, as multiple features of the statute (including the word "order") show that Congress authorized only more limited information-gathering measures directed at specific businesses based on particularized facts giving rise to an articulable need for information from those businesses. *Infra* Part I.B. For largely parallel reasons, it was issued without following procedures required under the APA: Under black letter case law looking to substance rather than labels, the Border GTO is a "rule," not an "order," and therefore required notice and comment. *Infra* Part I.C. That Congress authorized FinCEN to act by "order" confirms this result rather than undermines it. That term of art is a *limitation* under the APA, not subtle authorization for FinCEN to cast a dragnet along 1,000 miles of the border.

The Border GTO also violates the Fourth Amendment. *Infra* Part I.D. When it comes to demands for business records, the Supreme Court has held that the Fourth Amendment touchstone is reasonableness. The Supreme Court has upheld general reporting obligations targeted at "abnormally large" cash transactions, and the Supreme Court has upheld information demands targeted at specific businesses based on particularized facts. But the Court has never upheld anything like the sweeping obligation here. Nor would it. The Border GTO operates as a general warrant directed at all money services businesses in an area home to 1.2 million people, sweeping up massive amounts of information without individualized probable cause. It involves precisely the type of suspicionless investigation the Fourth Amendment is intended to prohibit. Plus, these Fourth Amendment concerns dovetail with the features of the Border GTO that make it *ultra vires*, meaning the constitutional and statutory arguments go hand-in-hand.

The Court has authority—indeed, has a duty—to end this unlawful agency action. The final remedy under the APA is vacatur: a reviewing court "shall" "hold unlawful and set aside" unlawful agency action, 5 U.S.C. § 706. As the Fifth Circuit has repeatedly reaffirmed, that means the

Border GTO ceases to exist for anyone, party to the case or not. *Infra* Part II.A. Preliminary relief

under the APA is no less broad. *Infra* Part II.B. The Supreme Court's recent decision on nationwide

injunctions casts no doubt on these principles, as the decision recognizes that the APA is different,

*see Trump v. CASA, Inc.*, __ S. Ct. __, 2025 WL 1773631, at *8 n.10 (June 27, 2025), and recog-

nizes the continued availability of class relief, *see id.* at *10. Plaintiffs need this Court's interven-

tion to prevent irreparable harm, and the putative class needs this Court's intervention, too.[1]

**STATEMENT OF FACTS**

### A.  Statutory and Regulatory Background

#### 1.  Currency Transaction Reports

The Bank Secrecy Act of 1970, as amended, authorizes the Secretary of the Treasury to

require "a domestic financial institution" to file reports on transactions in U.S. currency "in an

amount, denomination, or amount and denomination, or under circumstances the Secretary pre-

scribes by regulation." 31 U.S.C. § 5313. In 1972, following notice-and-comment procedures, the

Secretary of the Treasury exercised this authority to promulgate a rule requiring financial institu-

tions to report cash transactions over $10,000. *See* 37 Fed. Reg. 6912, 6912 (Apr. 5, 1972) (final

rule release for $10,000 reporting requirement explaining that notice was published in Federal

Register and comments were received).

The rule requiring reports for over-$10,000 transactions (today referred to as "Currency

Transaction Reports," or "CTRs") remains on the books. *See* 31 C.F.R. § 1010.311. CTRs are filed

---

[1] While the government has now appealed the preliminary injunction entered by Judge Biery, and the plaintiffs there have cross-appealed the scope of the preliminary injunction, that in no way lessens the urgency of this motion. For one thing, the TRO will expire unless converted to more lasting injunctive relief. For another, the interests of the putative class remain unprotected. Under the schedule proposed by the government in the Fifth Circuit, briefing will not conclude until mid-October. *See* No. 25-50481, Doc. 15 (5th Cir.). Plaintiffs respectfully suggest that the most efficient way forward would be for this Court to enter final judgment, and, to the extent that does not simply moot the existing appeal, for the Fifth Circuit to consolidate any GTO-related appeals.

with the Financial Crimes Enforcement Network, or FinCEN, which is an agency within the Treasury Department. *See id.* § 1010.306(a)(3) (directing that reports be filed with FinCEN); 31 U.S.C. § 310 (establishing FinCEN as a bureau within Treasury). The Director of FinCEN is charged by statute to "[a]nalyze and disseminate" these reports to "identify possible criminal activity" and to "support ongoing criminal financial investigations and prosecutions." *Id.* § 310(b)(2)(C). FinCEN maintains a searchable database of Currency Transaction Reports, and it provides access to local, state, federal, and foreign law enforcement. *See* Doc. 17-2 at 37 (Fenchel Decl.) ¶¶ 24–27.

To comply with another federal statute, the Paperwork Reduction Act, FinCEN has estimated the time required to file Currency Transaction Reports. *See* 85 Fed. Reg. 29022 (May 14, 2020). FinCEN has estimated that each CTR takes eight minutes to complete, but that is an average that includes large firms using automated processes to generate the reports. FinCEN has estimated that non-bank filers without automated processes require 23.93 minutes. *Id.* at 29029.

Because the $10,000 threshold has not been adjusted for inflation since it was adopted in the 1970s, the number of Currency Transaction Reports filed every year has ballooned—with FinCEN receiving over *20 million* CTRs in 2023. *See FinCEN, Year in Review for FY 2023*, at 3 (2024).[2] The volume of reports is so vast that nearly all go unread: A recent report from the Government Accountability Office found that, from 2014 through 2023, only 5.4 percent of CTRs were ever accessed. *See GAO, Currency Transaction Reports: Improvements Could Reduce Filer Burden While Still Providing Useful Information to Law Enforcement*, at 1 (Dec. 2024).[3] In response,

---

[2] *Available at* https://www.fincen.gov/sites/default/files/shared/FinCEN_Infographic_Public_508FINAL_2024_June_7.pdf.

[3] *Available at* https://www.gao.gov/assets/gao-25-106500.pdf. The GAO report explains that if the $10,000 threshold were adjusted for inflation it would be over $72,000 today, and raising the reporting threshold to that level would reduce the number of CTRs by at least 90 percent. *Id.*

FinCEN stated that it agreed with the report's recommendation to reduce the number of CTRs being filed, "such as by raising the threshold." *Id.* at 99. But that has not happened.

### 2. *Money Services Businesses*

In 1999, after again following notice-and-comment procedures, FinCEN promulgated a rule defining a new category of businesses subject to the Bank Secrecy Act called "money services businesses." 64 Fed. Reg. 45438 (Aug. 20, 1999). The agency explained, "[t]he term 'money services business' refers to five distinct types of financial services providers: currency dealers or exchangers; check cashers; issuers of traveler's checks, money orders, or stored value; sellers or redeemers of traveler's checks, money orders, or stored value; and money transmitters." *Id.* at 45439. Today, the definition of Money Services Business is codified at 31 C.F.R. § 1010.100(ff).

By regulation, Money Services Businesses are required to file CTRs for cash transactions over $10,000. *See* 31 C.F.R. § 1010.311 ("financial institution" must file CTRs); *id.* § 1010.100(t)(3) (defining "financial institution" to include MSBs). Money Services Businesses are also subject to other obligations under the Bank Secrecy Act and its implementing regulations. They are required to register with FinCEN. *See* 31 C.F.R. § 1022.380. They must maintain an effective anti-money laundering program. *Id.* § 1022.210. And, like banks and many other financial institutions, they also are required to file reports of suspicious transactions—including transactions that are structured to evade the CTR requirement. *See id.* § 1022.320.

Still, under this regulatory regime, Money Services Businesses conduct many transactions without reporting or even recording *any* customer information. For currency exchange, FinCEN does not require an MSB to record customer information unless the transaction is over $1,000. 31 C.F.R. § 1022.410(b)(3). For other transactions, the threshold is $3,000. *Id.* § 1010.410(e), .415(a). And even then, these thresholds are for recordkeeping, not reporting. Typically, except for

unusual transactions that trigger the obligation to report suspicious transactions, transactions need not be *reported* to FinCEN unless they are over $10,000.

### 3. Geographic Targeting Orders

While the provision of the Bank Secrecy Act authorizing CTRs requires that the Secretary of the Treasury impose reporting requirements "by regulation," 31 U.S.C. § 5313, Congress in 1988 enacted another provision authorizing the Secretary of the Treasury to require reports by "order," Pub. L. 100-690, tit. VI, § 6185(c), 102 Stat. 4181, 4355 (1988). The term "order" is defined by the APA as the "final disposition … in a matter other than a rulemaking," and an "adjudication" is defined as "agency process for the formulation of an order." 5 U.S.C. § 551(6), (7).

The provision authorizing these orders is codified at 31 U.S.C. § 5326 and provides that the Secretary of the Treasury may "issue an order requiring any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area" to collect information and file reports on financial transactions. By law, the existence of such an order is confidential: subject entities may not "disclose the existence of, or terms of, the order to any person." *Id.* § 5326(c). Although the term does not appear in the statute, these orders have come to be referred to as "geographic targeting orders," or GTOs.

The Treasury Department has promulgated regulations for the issuance of GTOs. *See* 31 C.F.R. § 1010.370. Like the statute, the regulations provide for confidentiality. *Id.* § 1010.370(e). The regulations provide that an "order … shall be directed to the Chief Executive Officer of the financial institution or nonfinancial trade or business" and should require reports of transactions "by, through or to such financial institution specified in the order." *Id.* § 1010.370(b). The 1989 release promulgating these regulations reported the agency's understanding that, under the then-new grant of statutory authority, "geographic targeting orders would not be published in the Federal Register, but would be issued only to the affected financial institutions." 54 Fed. Reg.

33675, 33676 (Aug. 16, 1989). The agency stated, "Ordinarily, Treasury will serve a targeting order by sending it by certified or registered mail, return receipt requested" and will also "contact the institution a few days after it has been sent." *Id.* at 33677. The agency explained exactly why geographic targeting orders should be treated as confidential, stating that "once criminals learn of the enhanced reporting requirements and where they are applicable, criminals merely will move on to another non-targeted branch." *Id.* at 33678.

### B.  The Challenged Border GTO

On March 14, 2025, FinCEN published a document that it described as a "geographic tar-geting order." *See Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border*, 90 Fed. Reg. 12106 (Mar. 14, 2025) (the "Border GTO"). Contrary to the statutory requirement that geographic targeting orders be confidential—and contrary to the agency's earlier expectation that geographic targeting orders "would not be published in the Federal Register," 54 Fed. Reg. at 33676—the Border GTO was published in the Federal Register.

Rather than identify the specific businesses subject to the Border GTO, the release defines a *category* of "Covered Businesses": any "money services business, as defined in 31 C.F.R. 1010.100(ff), located in the Covered Geographic Area." 90 Fed. Reg. at 12107. The "Covered Geographic Area," in turn, consists of 30 zip codes in California and Texas along the border. *Id.* No New Mexico or Arizona zip codes are included, and the targeted zip codes are not all contigu-ous. Some targeted zip codes are surrounded by untargeted zip codes. For "Covered Businesses" in the "Covered Geographic Area," the Border GTO lowers the Currency Transaction threshold from $10,000 to $200.

After Covered Businesses sued to challenge the Border GTO, the government produced an internal memorandum containing its rationale for issuing the Border GTO. *See* Doc. 5-6 (March

XX Memo) at 4. The memo is dated "March XX," so it is impossible to tell whether it was finalized before or after the March 14 publication of the Border GTO. *Id.* Beyond this March XX memo, the government has also produced an "administrative record" that appears to consist of the documents that are cited in the memo. *See* Doc. 15-3 (Admin. R.) at 21–503.

### C. The Covered Businesses

Notwithstanding multiple TROs and PIs, FinCEN reports that about 125 businesses have filed CTRs required by the Border GTO. Doc. 20-1 (Gacki Decl.) ¶ 22. The Plaintiffs are two of those businesses, and they have sued on behalf of a putative class defined to include all Covered Businesses not already benefiting from preliminary relief in other cases. *See* Compl. ¶ 134.

Plaintiff Valuta is a Money Services Business with a single storefront in southern El Paso. Doc. 5-1 (Light Decl.) ¶¶ 4, 5, 10. Its owner, Ashley Light, is an American citizen whose parents opened Valuta 41 years ago to provide financial services, primarily currency exchange, to the El Paso community. *Id.* ¶¶ 1, 9–10. Valuta holds Texas MSB license number 1, and half of its nine-person staff have worked for Valuta for over 30 years. *Id.* ¶¶ 9–10. El Paso is, of course, a border city, where regular people cross between the U.S. and Mexico every day for normal legal reasons, such as tourism, family visits, and work. *Id.* ¶ 13. Currency exchange is a common and vital service in El Paso, and it's normal that there's a lot of it. *Id*. Beyond currency exchange, Valuta also provides other money services to regular people, many of whom do not use banks. *Id.* ¶¶ 8, 16.c.

Because it provides those services, Valuta is a federally registered MSB. *See* 31 C.F.R. § 1010.100(ff). Currency exchange is a straight trade of one currency for another, and Valuta offers 12 to 16 currencies. Light Decl. ¶ 16.d. A money order is a prepaid form of payment: A customer gives Valuta cash and Valuta provides a document that is good for that cash, which a recipient can redeem. *Id.* ¶ 16.a. Customers often use money orders to pay rent or bills. *See id.* ¶¶ 16.a, 39. For a money transfer, Valuta acts as an agent for a service called MoneyGram that enables someone to

present money at location X so that a recipient can pick up the money at location Y. *See id.* ¶ 16.b. Finally, check cashing is simple: Valuta turns a check into cash, minus a fee. *Id.* ¶ 16.c.

Payan's Fuel Center, Inc. is a family-owned, one-location gas station and convenience store that has been serving El Paso since 1982. Doc. 5-3 (Payan Decl.) ¶¶ 2, 4. All four members of the family—Mr. and Mrs. Payan, son Andres Payan, Jr., and daughter Samantha—make their livings working for Payan's. *Id.* ¶ 8. Payan's is an MSB because, in addition to selling gas, snacks, and beverages, it cashes checks. *Id.* ¶¶ 6, 11. Payan's earns revenue from the check cashing service through commissions and fees. *Id.* ¶ 11. And because Payan's also offers convenience store prod-ucts, Payan's also earns revenue on sales that happen alongside the check cashing. *Id.* For these reasons, check cashing is central to the business. *Id.* ¶ 12. Ordinarily, nearly all these transactions at Valuta and Payan's take just a few minutes. *See* Light Decl. ¶ 16.c; Payan Decl. ¶ 15.

The Border GTO will likely destroy, or at least seriously wound, Valuta, Payan's, and other MSBs. They cannot realistically comply with the tidal wave of paperwork or withstand the loss of privacy. Take the paperwork. In all of 2024, Plaintiff Valuta filed about 123 CTRs, nearly all of which were for its own bulk purchases of currency. *See* Light Decl. ¶ 17. In the first month of the Border GTO, it filed about 1,600 CTRs and had a backlog of over 700. *Id.* ¶¶ 18, 22. That is over 53 CTRs per day. *Id.* ¶ 18. It is filing CTRs one at a time, and each takes about 15 to 20 minutes to do, which amounts to at least 13 hours per day filling out forms. *Id.* ¶¶ 21, 27. The burden on Payan's is also severe. Payan Decl. ¶ 17. Before the Border GTO, Payan's had never filed a CTR; before this Court entered a TRO, it was filing a CTR for about 87% of its cashed checks. *Id.* ¶¶ 13, 17. It got so out of control that after just two weeks of the Border GTO, Payan's had to stop cashing checks over $200 for a whole week, just to catch up on CTRs. *Id.* ¶ 17.

Where the Border GTO is in effect, people are also taking their business elsewhere to

preserve their privacy. Payan's check cashing services, for example, involve modest amounts that working-class people make in their paychecks. Payan Decl. ¶¶ 9–10, 14. And there are many MSBs in nearby zip codes that are not covered by the Border GTO, meaning people can take their business there without invasive surveillance. *See* Light Decl. ¶ 40; Payan Decl. ¶ 22. At best, targeted MSBs face a devastating combination of lost business and compliance costs. At worst, targeted MSBs will stop offering covered services, close locations, or go out of business altogether.

## LEGAL STANDARD

In cases challenging agency action under the APA, summary judgment "serves as the mechanism for deciding whether the action is supported by the administrative record and otherwise consistent with the APA standard of review." *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 741 F. Supp. 3d 568, 597 (N.D. Tex. 2024) (cleaned up). Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The APA, meanwhile, provides that a reviewing court "shall" "hold unlawful and set aside agency action" that is, among other things, "arbitrary, capricious, [or] an abuse of discretion," "in excess of statutory jurisdiction, authority, or limitations," "without observance of procedure required by law," or "contrary to constitutional right." 5 U.S.C. § 706.

Separately, as relevant to preliminary relief, a "reviewing court … may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). When, as here, the government is the opposing party, the last two factors (equities and public interest) "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

ARGUMENT

## I.    The Border GTO Is Unlawful In At Least Four Different Ways.

Plaintiffs' claims here all challenge the Border GTO as unlawful "agency action" under the APA. *See* 5 U.S.C. § 706. An "agency" is an "authority of the Government of the United States," and "agency action" is "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(1), (13). So, regardless of whether the Border GTO is a "rule" or an "order," it is subject to judicial review under the APA. It fails that review for four reasons: It is arbitrary and capricious, it is unauthorized by statute, it was promulgated without notice and comment, and it violates the Fourth Amendment.

### A.  The Border GTO Is Arbitrary And Capricious.

Three federal judges have now concluded that the Border GTO is likely arbitrary and capricious. TRO Order at 1–2; *TAMSB*, 2025 WL 1540621, at \*13–15; *Novedades*, 2025 WL 1501936, at \*18–22. It is. An "agency rule" is "arbitrary and capricious if the agency has … entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). This review has "serious bite." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021). And the Border GTO cannot survive this review: The purpose of the Border GTO is supposedly to fight "Mexican drug cartels." Doc. 5-6 (March XX Memo) at 1. FinCEN, however, offered no reasoned explanation why the Border GTO would actually help fight the cartels, nor did it offer a reasoned explanation of how the benefits could offset the obvious costs of compliance.[4]

---

[4] Given the lack of date on the March XX memo, it is not clear that the memo was finalized before the rule was adopted, or that the memo can properly be considered; the agency cannot justify

11

### 1.  *There is no reasoned explanation of the benefits.*

On the benefits side, FinCEN failed to explain its way through three obvious reasons the Border GTO will not work. The first is that the targeted zip codes are a checkerboard. As the Court observed, "a cartel member … could simply cross Yarbrough Drive … to avoid the Border GTO's reporting requirements." TRO Order at 2; *see also* Docs. 5-10, 5-11, 5-12, 5-13, 5-14, 5-15 (maps of targeted zip codes).[5] This problem is not just self-evident; it is the government's own view. The Treasury Department itself has previously acknowledged that the reason (real) geographic-targeting orders are confidential is that "once criminals learn of the enhanced reporting requirements and where they are applicable, criminals merely will move on to another non-targeted branch." 54 Fed. Reg. at 33678. And the relevant criminals here are, again in FinCEN's own description, "transnational criminal organizations," Admin. R. 134, that "adapt rapidly to changes in the regulatory … environment in the United States," *id.* at 141. In other words, FinCEN is targeting cartels capable of using virtual currencies to buy fentanyl precursors from China, *id.* at 141, and yet somehow assuming they will not avoid the Border GTO by walking across the street. FinCEN's complete response to this glaring flaw is a sentence saying it will keep an eye on things. *See* March XX Memo at 14. That is beyond arbitrary and capricious. Frankly, it is ludicrous. The agency had a duty to explain why its prior reasoning about the need for confidentiality did not apply here. *See,*

---

an action by pointing to "*post hoc* rationalizations." *Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 856 (5th Cir. 2022); *see also Novedades*, 2025 WL 1501936, at *18 n.4 (noting the "shaky" "assumption" that the March XX memo pre-dates the Border GTO). The prohibition on post hoc rationalizations also renders irrelevant the declaration of FinCEN Director Andrea Gacki. *See* Doc. 20-1. Indeed, the very "fact that an agency provided [this] *post hoc* rationalization is relevant evidence that the action is arbitrary and capricious." *Data Mktg. P'ship*, 45 F.4th at 856.

   [5] *See also* Doc. 5-16 (testimony that "someone can drive for two or three minutes … and go to a location where the GTO doesn't apply" and that "people do, in fact, drive a few minutes to a different location"). Although Plaintiffs can win whether or not the Court considers facts like these that are outside the administrative record, Plaintiffs have explained in separate briefing why the Court can consider their additional evidence for the merits of their claims, and not just for the equities of an injunction. *See* Pls' Mot. to Supplement the Admin. Record, Doc. 39.

*e.g., Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (describing an agency's responsibility to provide reasoned explanations for changing its former positions). Yet it did not meaningfully explain its thinking on this point at all. *See Motor Vehicle Mfrs.*, 463 U.S. at 43 (explaining that agency explanations cannot "run[] counter to the evidence before the agency").

Second, on this administrative record, there is no reasonable explanation for targeting these 30 zip codes. Essentially, FinCEN looked at counties near major border crossings in Texas and California and then chose zip codes based on criteria like "sixth highest CTR to population ratio" in El Paso County. March XX Memo at 12; *id.* at 9–10. FinCEN never explains why such a "ratio" would reveal anything at all about the need for the Border GTO. And, perhaps more fundamentally, FinCEN seems to be trying to get at physical cash smuggling across border crossings, when FinCEN's own sources suggest illicit transfers are primarily electronic. *Id.* at 5–6 (relying on citations about remittances and money transfers to China). That is why the record says a "majority of DEA investigations" involve "Chinese money laundering organizations" using digital currency. Admin. R. 160–61 (quoting a "senior Drug Enforcement Agency official") (marks omitted). Which makes perfect sense. The record suggests that "millions are laundered without a single dollar ever crossing into Mexico using Chinese money launderers" almost certainly *because* "it would take approximately 2,564 deposits of the average $390 remittance to move a million dollars across the border." *Id.* at 160. The cases in the record that do involve MSBs, in Georgia and Northern California, are likewise unrelated to the border. *Id.* at 323–402, 444–503. No one seriously thinks that the cartels are crossing the border carrying currency they received from MSBs a few hundred dollars at a time. Yet that is the theory of the Border GTO.

Third, even if the cartels were doing that, and even if they kept doing it rather than go one zip code over, there still would be no reasoned basis to believe that FinCEN could act on the extra

reports. Again, FinCEN's own statements affirmatively disprove it. FinCEN gets 20 million of these reports each year. Law enforcement only looks at 5.4 percent—and that's at the $10,000 level. In 2023, the FBI used 0.1%. FinCEN's official position—for 30 years—has been that it wants *fewer* CTRs. *See supra* p. 4–5; *see also* Doc. 17-2 (MSBA Amicus Br.) at 3–5 (collecting other public citations). Yet the Border GTO will result in a flood of additional CTRs for even smaller-dollar amounts. Perhaps those reports really would, as FinCEN put it, "likely result in information highly useful in money laundering investigations." March XX Memo at 8. But, under the circumstances, FinCEN needed a real explanation of why these reports would be any different than the *hundreds of millions* it has already ignored. *See* MSBA Amicus Br. at 3–5.[6]

### 2. There is no reasoned explanation of the costs.

It is bad enough that benefits are speculative, but, as the Court recognized in the TRO, FinCEN also offered no reasoned thoughts about the cost of compliance. TRO Order at 2. The March XX Memo's discussion of compliance costs reads, in full, "While the GTO would place a higher burden on Covered Businesses due to the increased volume of CTRs that would result, it is merely a reporting obligation and does not alter their obligations with respect to [anti-money-laundering] programs." March XX Memo at 14. Merely? Again, not according to FinCEN's own information. CTRs, on their face, report a "recordkeeping burden … estimated to average 40 minutes per response." Doc. 5-7 (Sample CTR) at 1. FinCEN's most recent estimate for small businesses without sophisticated software is 24 minutes. 85 Fed. Reg. at 29029.[7] FinCEN also knows that a $200 threshold is well below the $390 average remittance transaction at MSBs.

---

[6] For this reason, a former FinCEN official has submitted a declaration predicting that the Border GTO will "result in more BSA Reports, that are less useful to law enforcement, while increasing burdens on financial institutions." Doc. 17-2 at 43 (Fenchel Decl.) ¶ 45.

[7] The testimony reflects similar numbers. Doc. 5-16 (*TAMSB* Tr.) at 55:12–19 (45 minutes), 102:10–14 (13 to 15 minutes), 140:7–18 (20 to 25 minutes), 180:14–23 (15 minutes), 196:5 (20 minutes).

Admin. R. at 160. So FinCEN should have known that it was imposing around 24 minutes of new paperwork for most transactions at many MSBs—adding up to hours of new compliance work each day.[8] FinCEN swept all this under the word "merely." *See Rest. L. Ctr. v. DOL*, 120 F.4th 163, 176 (5th Cir. 2024) (finding agency action arbitrary and capricious where agency's approach to line-drawing was illogical and unsupported); *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 125 (D.D.C. 2015) (granting PI against FinCEN "special measure" where "the agency's failure to explain its consideration of potentially viable alternatives appears to have run afoul of the APA").

In sum, FinCEN did not reasonably explain how the Border GTO would actually benefit FinCEN, and it did not reasonably explain the cost of the Border GTO to covered MSBs. It of course did not take the final step either: weighing the speculative benefit to law enforcement against the concrete harm to the work of MSBs—most of which, according to FinCEN itself, is "legitimate and essential." March XX Memo at 4. That means the Border GTO is arbitrary and capricious. *See Chamber of Com. v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023) (requiring agencies to "consider[] the costs and benefits associated with the regulation"); *see also Michigan v. EPA*, 576 U.S. 743, 759 (2015). Had FinCEN done the weighing, it would have recognized the obvious: There is no conceivable crime-fighting interest in burying small businesses under a mountain of paperwork, just to generate reports about lawful activity that no one is going to read.

### B.  The Border GTO Is *Ultra Vires*.

The Border GTO is also "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), because it does not fit within the statute that FinCEN invoked. Section 5326 authorizes FinCEN to issue an "order" to either a "business" or "group" of businesses. 31 U.S.C. § 5326. That language, as Judge Sammartino concluded, contemplates "limited, investigatory tools

---

[8] The predictable result is what the owner of Plaintiff Valuta described: a backlog of around 700 CTRs that she was dealing with until "2:00 in the morning." *TAMSB* Tr. at 195:3–196:8.

directed to an identifiable business or group of businesses based on particularized facts." *Novedades*, 2025 WL 1501936, at *10. But here, FinCEN promulgated a rule that defined a *category* of businesses, applicable across a vast geographic area, and required every unidentified business that might fit within that category to identify *itself* and comply. That type of regulatory command does not fit within the statutory language. Five arguments confirm this interpretation.

**First**, Section 5326 contemplates that FinCEN will act via "order," which is a term of art in the APA. The APA distinguishes between rules, which are produced through notice and comment, and "orders," which are the product of adjudication. *See* 5 U.S.C. §§ 551(4), (6), (7). When Section 5326 was enacted in 1988, these definitions had been in the law for decades,[9] and the distinction between the two was well understood: Rules have "the character of legislative enactment carried out on an administrative level," while orders are produced through adjudication involving "the application of a statute or other legal standard to a given fact situation involving particular individuals." *Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 896 (2d Cir. 1960). When Congress authorized an "order," it authorized a measure directed to particular businesses based on particular facts through an adjudicatory process.

The use of the word "order" was particularly significant because Treasury *already* had authority, under the original Bank Secrecy Act of 1970 (31 U.S.C. § 5313(a)), to require reports from financial institutions via "regulation." The primary difference between the already-existing provision of the Bank Secrecy Act and this new authority under Section 5326, was that the provision for GTOs gave the agency authority to act only via "order." *Compare* 31 U.S.C. § 5313(a), *with id.* § 5326. The new provision gave the agency a new tool in its toolbox—which, before, had been

---

[9] The original APA, enacted in 1946, defined both "rule and rule making" and "order" right at the very front—in sections 2(c) and 2(d) of the Act. *See* Pub. L. 404, 60 Stat. 237, 237 (1946).

limited to requiring reports via regulation—but, in using that new tool, Congress directed the agency to act through adjudication directed at specific identified businesses.

**Second**, Section 5326(a) specifies that a GTO should apply to a "domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area." That language confirms that GTOs are directed to an *identified* business or group of businesses, not a *category* of businesses such as "MSBs" that applies to everyone meeting certain regulatory criteria. *See Novedades*, 2025 WL 1501936, at *15 ("The most natural way to read this provision, in context, is that FinCEN may issue an order resulting from a factual determination with respect to either a single business or with respect to a group of multiple businesses," not "a factual determination with respect to a zip code[.]").

**Third**, additional "strong evidence" for this interpretation is found at 31 U.S.C. § 5326(c), which provides for confidentiality of GTOs—a provision the government entirely disregarded when it adopted the Border GTO. *See Novedades*, 2025 WL 1501936, at *15, *17. An order directed at a particular business (or group of businesses) can be kept confidential because it can be served directly on that business; indeed, that is precisely the procedure that the agency itself first contemplated, one year after the enactment of Section 5326, when it promulgated a regulation (still in effect today) providing that GTOs would be served on the chief executive officers of targeted companies. *See supra* pp. 6–7. By contrast, a rule that establishes standards for categories of businesses by its very nature cannot be held confidential, as it must be publicized so that businesses can themselves read it and determine whether they must comply; for that reason, rules are typically published openly in the Federal Register.[10] Congress's provision for confidentiality confirms that

---

[10] By law, agencies must publish "substantive rules of general applicability adopted as authorized by law" in the Federal Register. 5 U.S.C. § 552(a)(1)(D). Orders in adjudications, on the other

Congress anticipated that the agency would act through narrow orders, directed to particular businesses, that could be served directly on those businesses without broader publication. That FinCEN instead published the Border GTO in the Federal Register, and publicized it via press release, "elucidates just how far GTOs have drifted from Congress's original intention." *Novedades*, 2025 WL 1501936, at *17.

**Fourth**, this conclusion is confirmed by application of the major questions doctrine, under which courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (cleaned up). At a single stroke, FinCEN infringed the privacy interests of more than a hundred businesses and their customers from Brownsville to San Diego. Congress certainly did not give FinCEN that power *clearly*. This case is thus like *Biden v. Nebraska*, in which the Supreme Court held that wholesale forgiveness of student loans could not be justified under a provision allowing the government to "waive or modify" student loans. 600 U.S. 477, 496–97 (2023). The Court reasoned that the authority to waive or modify student loans envisioned more modest action: "the words 'waive or modify' do not mean 'completely rewrite.'" *Id.* at 506–07. Likewise here. "Order" does not clearly mean "rule," nor does "business in a geographic area" clearly mean "every MSB in 30 zip codes." Section 5326 does not allow FinCEN to impose a massive financial dragnet, and even if it might, Congress cannot be thought to have crammed that elephant into a mousehole in the Bank Secrecy Act.

**Finally**, more confirmation comes from the canon of constitutional avoidance, which cautions courts to construe statutes to avoid serious constitutional problems. *See, e.g.*, *Cargill v.*

---

hand, are typically not published in the Federal Register but are (if not confidential) available at the agency for public inspection upon request. *Id.* § 552(a)(2)(A).

*Garland*, 57 F.4th 447, 471 (5th Cir. 2023). As explained below, *infra* Part I.D, the Border GTO raises serious questions under the Fourth Amendment in part because it is much broader and more sweeping than a typical subpoena, and, also unlike a typical subpoena, is not based on any individualized facts. Construing Section 5326 as limited to "orders" directed to particular businesses, or groups of businesses, based on particular individualized facts, brings Section 5326 into line with traditional agency subpoena practice and ameliorates these constitutional issues.

### C.  The Border GTO Required Notice And Comment.

For similar reasons, the Border GTO is also unlawful because it was promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D); *see Novedades*, 2025 WL 1501936, at *17; *TAMSB*, 2025 WL 1540621, at *12–13. Under the APA, regulations must be promulgated following notice-and-comment procedures, under which "notice of proposed rule making shall be published in the Federal Register" and "the agency shall give interested persons an opportunity to participate in the rule making" through submission of written comments. 5 U.S.C. §§ 553(b), (c). The agency did not follow that procedure here because—although the *final* Border GTO was published in the Federal Register—the agency published no advance notice of the Border GTO and provided no opportunity for comment. Because the Border GTO is a rule, not an order, that procedural defect requires vacatur.[11]

That the government *calls* the Border GTO an "order" is not controlling. Take, for instance, the Fifth Circuit's decision in *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019). In that case, an agency had issued commands that it denominated "orders" requiring regulated entities to pay money to make up for shortfalls in natural gas deliveries. *Id.* at 231. The plaintiffs sued under the APA, claiming that the "requirement of a cash payment to resolve delivery shortfalls

---

[11] The notice-and-comment procedure exists for a reason. FinCEN likely would not have issued such an arbitrary and capricious rule if it had heard from MSBs along the border first.

is a new substantive rule that should have been subject to notice and comment." *Id.* at 236. The government responded that the requirement was "not a rule at all, but rather an adjudicative order." *Id.* To resolve that dispute, the Fifth Circuit looked at the *substance* of the requirement, to determine whether it was in fact an order or a rule. *See id.* at 237 (explaining that while the court "may" give "some deference" to the agency's characterization, "this deference is minimal—courts focus primarily on the actual characteristics of the agency action" (cleaned up)). The Fifth Circuit held that, whatever the label, the agency had in fact imposed a rule. *Id.* at 239.

Here, the Border GTO is a rule, and not an order, because it creates general obligations that apply to a *category* of unidentified businesses, rather than imposing obligations on *particular* businesses based on *individualized* facts from an adjudication. The Fifth Circuit has explained that an adjudication (leading to an order) typically "resolve[s] disputes among specific individuals in specific cases," whereas "rulemaking affects the rights of broad classes of unspecified individuals." *City of Arlington v. FCC*, 668 F.3d 229, 242 (5th Cir. 2012), *aff'd,* 569 U.S. 290 (2013). For instance, in *Bernhardt*, the "order" was in fact a rule because it involved the "creation and uniform application of a new methodology." 946 F.3d at 239. Likewise, in *Safari Club International v. Zinke*, a "determination" about importing ivory was a "rule" because it "applied to all potential imports of sport-hunted elephant trophies from Zimbabwe" and did not "adjudicate any dispute between specific parties." 878 F.3d 316, 333 (D.C. Cir. 2017). Here, too, the Border GTO is a rule because it sets general obligations for all businesses that meet a regulatory definition, rather than imposing particular obligations on particular businesses on the basis of particular facts identified through an adjudicatory process.[12] Put simply, on April 14, more than a hundred business owners

---

[12] While different types of agency adjudications can follow different types of procedures, a common throughline is that an agency adjudication generally must provide for notice and an

in Texas and California woke up to major new legal obligations, backed up by major criminal penalties, because of something that happened in Washington. There is no way to describe that as anything other than a new rule of law.

The government has consistently argued that the Border GTO must be an "order" because Section 5326 allows it to impose GTOs via "order." But, as explained in Part I.B, above, that just makes the Border GTO *ultra vires*—Section 5326 does not define "order"; the APA does, and under the well-understood definition in the APA, the Border GTO is not an order. Congress' use of the term was not a quiet redefinition away from what "order" had meant for decades but rather a *limitation* on the way FinCEN could target businesses. So the Border GTO is a rule that FinCEN lacked authority to issue, *and even ignoring that problem*, it is an invalid rule because all rules must be preceded by notice and comment.

### D.  The Border GTO Violates The Fourth Amendment.

Finally, the Border GTO is also "contrary to constitutional right," 5 U.S.C. § 706(2)(B), because it violates the Fourth Amendment. *See TAMSB*, 2025 WL 1540621, at *9–11. The Border GTO infringes on two separate privacy interests: the privacy interests of the targeted businesses— which have an interest in the privacy of information concerning transactions at their businesses— and the privacy interests of their customers, on whom the targeted businesses are forced to spy.

*First*, the Border GTO infringes on the privacy of the targeted businesses by forcing businesses to report on most transactions in their business. For searches of businesses, the Supreme Court has held that the constitutional touchstone is reasonableness. *See* U.S. Const. amend. IV (prohibiting "unreasonable" searches and seizures). In *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), for instance, the Supreme Court assessed a constitutional challenge brought by a trade

---

opportunity to be heard. *See, e.g.*, *Am. Airlines v. DOT*, 202 F.3d 788, 797 (5th Cir. 2000). FinCEN provided nothing of the sort before (or after) issuing the Border GTO.

association for banks to the requirement to report over-$10,000 cash transactions, and the Court stated that the relevant question was whether the reporting requirement was "reasonable," including whether the "information is sufficiently described and *limited in nature*." 416 U.S. at 67 (emphasis added). In the subpoena context, meanwhile, the Supreme Court has held under the Fourth Amendment that a subpoena for corporate records must be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984).

Lowering the threshold for CTRs from $10,000 to $200 is patently unreasonable. This much is obvious from *Shultz*, the opinion that upheld the $10,000 reporting requirement. *See* 416 U.S. at 67. *Shultz* stated that a reporting requirement is reasonable if it is "limited in nature," *id.*, and it specifically focused the $10,000 threshold, which after inflation is equivalent to $70,000 today. That very high threshold limited reporting to "abnormally large transactions in currency," and so was "reasonable" compared to business privacy interests because it intruded on few transactions. *Id.*; *see also id.* at 78 (Powell, J., concurring) (relying on $10,000 threshold and stating that "[a] significant extension of the regulations' reporting requirements, however, would pose substantial and difficult constitutional questions").[13] By contrast, the Border GTO sets the threshold at $200, which would have been about $30 in 1974. It's the cost of a full grocery cart—over *300 times* smaller than the threshold the Supreme Court considered. It intrudes on *most* transactions, obliterating financial privacy. That is not reasonable. If it is, there is no limit, and FinCEN could equally demand information on $50 transactions, or $5 transactions, or all transactions.

---

[13] Justice Powell's concurrence was joined by Justice Blackmun. 416 U.S. at 78. With three Justices dissenting, *see id.* at 79, 91, 93, the concurring Justices provided necessary votes for the decision.

The limits of *Shultz* are confirmed by *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), the primary authority cited in *Shultz*. *See TAMSB*, 2025 WL 1540621, at *10. That decision addressed an agency order directing 20 companies and a trade association to file reports verifying compliance with an FTC cease-and-desist order. 338 U.S. at 634–36. The Court upheld the reporting requirement because it was sufficiently related to the FTC's need to ensure compliance with its prior orders, but the Court also explained that authority to require reports is limited by the Fourth Amendment—which "is not confined literally to searches and seizures as such, but extends as well to the orderly taking [of information] under compulsion of process." *Id.* at 651–52. The Court emphasized that "a governmental investigation into corporate matters may be of *such a sweeping nature* and so *unrelated to the matter properly under inquiry* as to exceed the investigatory power." *Id.* at 652 (emphasis added). The $200 GTO is precisely the kind of "sweeping" requirement *Morton Salt* condemned.

In this regard, one way to think about the Border GTO is as a (staggeringly) overbroad subpoena for corporate records. A federal district court adopted precisely that framing in *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 472, 474–75 (S.D.N.Y. 2019), which applied the Fourth Amendment to grant a preliminary injunction against an ordinance that required short-term rental companies to file "monthly transaction reports" with "voluminous data regarding customers who use their platforms." The court in *Airbnb* analogized the bulk reporting requirement to a vastly overbroad subpoena, explaining that, unlike a typical subpoena, the reporting obligation "applies across-the-board" without any need for individualized suspicion. *Id.* at 491. The *Airbnb* court explained that, historically, "[a]n attempt … to compel an entire industry monthly to copy and produce its records as to all local customers would have been unthinkable under the Fourth Amendment." *Id.* at 494. That's exactly what is happening here.

Further, under the Fourth Amendment standards for agency subpoenas, the Border GTO is unreasonable because it is immensely burdensome. *See TAMSB*, 2025 WL 1540621, at *10; *see also Donovan*, 464 U.S. at 415 (subpoena for corporate records should not be "unreasonably burdensome"). Before the entry of the TRO, Plaintiffs were spending hours every day complying with these obligations; they were pausing transactions to clear out paperwork backlogs; and they were losing significant revenue and even facing the potential destruction of their businesses. *See* Light Decl. ¶ 38; Payan Decl. ¶¶ 17, 23. An obligation of that scope "unduly disrupt[s]" and "seriously hinder[s] normal operations of a business." *FHFA v. SFR Invs. Pool 1, LLC*, No. 2:17-cv-914, 2018 WL 1524440, at *7 (D. Nev. Mar. 27, 2018).

**Second**, the Border GTO also forces the targeted businesses to intrude on the privacy of their customers. *See TAMSB*, 2025 WL 1540621, at *10–11.[14] The Supreme Court has held that, when government subpoenas corporate records, "a warrant is required in the rare case where the suspect has a legitimate privacy interest in records held by a third party." *Carpenter v. United States*, 585 U.S. 296, 319 (2018); *see also United States v. Smith*, 110 F.4th 817, 838 (5th Cir. 2024). That rule applies here, as Plaintiffs' customers have a legitimate expectation of privacy in these records of their ordinary, everyday financial transactions. This expectation is reflected in federal law, which protects the privacy of information in MSB transactions. *See In re Application for Historical Cell Site Data*, 747 F. Supp. 2d 827, 841–42 (S.D. Tex. 2010) (explaining, in context of cellphone location data, that "an act of Congress affecting proprietary interest in a thing is

---

[14] Plaintiffs may raise the privacy interests of their customers when challenging a subpoena for Plaintiffs' own books and records. *See, e.g.*, *In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461 et seq.*, 706 F. Supp. 2d 11, 17 n.3 (D.D.C. 2009); *see also Craig v. Boren*, 429 U.S. 190, 196 (1976) (explaining that a party subject to a legal restriction has "standing to defend the privacy interests of third parties" affected by that legal restriction).

undeniably relevant to the legitimate-expectation-of-privacy inquiry").[15] Federal law imposes privacy obligations on any "institution that is significantly engaged in financial activities," 16 C.F.R. § 313.3(k)(1), which includes entities that provide services covered by the Border GTO. These regulations confirm that this information is private and that this expectation of privacy is one that society considers reasonable.[16]

Putting the interests of the company and its customers together, the bottom line is that the Border GTO is a drastic, novel method of criminal investigation that functions as "reviled 'general warrants' … which allowed … an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014); *see also Smith*, 110 F.4th at 838 (invalidating general search of Google phone data for thousands of customers); *TAMSB*, 2025 WL 1540621, at *9. Requiring a CTR for every transaction over $200 covers a majority of transactions at Plaintiffs' businesses. *See* Payan Decl. ¶ 13 (87%); Light Decl. ¶ 14 (65%). Moreover, the CTR is strictly a tool for criminal investigation, not civil regulation. The whole point of the Border GTO is to give criminal law enforcement "a snapshot in time of a significant sample of cash transactions" along the border. March XX Memo at 13. Essentially, FinCEN is treating every customer and MSB as a potential criminal and forcing them to disclose personal information as part of a general campaign to fight

---

[15] The decision in *Historical Cell Site Data* was overturned on appeal, *see* 724 F.3d 600 (5th Cir. 2013), but its analysis was ultimately vindicated by the U.S. Supreme Court in *Carpenter*.

[16] *United States v. Miller*, 425 U.S. 435 (1976), is not to the contrary. For one thing, *Miller* held that customers generally do not have standing to challenge a subpoena for the books and records of their bank, and it therefore has no application here where a challenge is brought by the targeted companies on their own behalf. For another, *Miller* must be read in conjunction with *Carpenter*, which explains that the third-party doctrine does not apply when customers *do* have a legitimate privacy interest in corporate records. Addressing *Miller*, the Court in *Carpenter* warned that courts should not "uncritically extend existing precedents" to new contexts, including the "novel" context of digital cell site location data. 585 U.S. at 309, 318. Here, the Court likewise should not uncritically extend a case about reporting of abnormally large transactions to a vastly broader requirement that encompasses ordinary, everyday transactions over $200.

cartels. Without probable cause. Without a neutral magistrate. Without a warrant. It turns the usual

rules of criminal investigation on their head, and in doing so, it violates the Fourth Amendment.

## II.    The Court Can—And Should—Grant Relief Barring Any Further Enforcement Of The Border GTO.

After this Court's TRO decision, three federal courts have found the Border GTO likely

unlawful. The remainder of this brief addresses why the Court should grant relief not just for these

individual plaintiffs but also for the putative class, either via vacatur at final judgment or through

broader, class-wide injunctive relief.

### A.    Plaintiffs Are Entitled To Final Judgment Vacating The Border GTO, As The Record Is Complete And The Facts Are Not Disputed.

The straightforward way to resolve this case is to enter final judgment vacating the Border

GTO under the APA, which unambiguously provides that, at final judgment, unlawful agency ac-

tion "shall" be "set aside." 5 U.S.C. § 706. This Court has two routes to final judgment: The Court

can enter summary judgment under Rule 56, as no facts are in dispute and the case involves pure

issues of law, or the Court can consolidate the PI with the final merits under Rule 65(a)(2). Either

is appropriate, and Plaintiffs ask for both.

### 1.    Under the APA, the appropriate final remedy is vacatur.

Under the APA, a reviewing court "shall" "hold unlawful and set aside agency action" that

is arbitrary and capricious, that is contrary to law, that does not follow necessary procedures, or

that violates the Constitution. 5 U.S.C. § 706. This provision "empowers courts to 'set aside'—

*i.e.*, formally nullify and revoke—an unlawful agency action." *Data Mktg. P'ship, LP v. DOL*,

45 F.4th 846, 859 (5th Cir. 2022) (cleaned up). Vacatur is therefore the standard remedy under the

APA. *See id.* ("The default rule is that vacatur is the appropriate remedy."); *Texas v. United States*,

126 F.4th 392, 418 (5th Cir. 2025) ("Vacatur is the default remedy."); *see also United Steel v. Mine*

*Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate

unlawful agency action."); *Texas Med. Ass'n v. HHS*, 110 F.4th 762, 779 (5th Cir. 2024) ("[I]n this court, the APA empowers and commands courts to 'set aside' unlawful agency actions, allowing a district court's vacatur to render a challenged agency action 'void.'" (cleaned up)). All the claims set forth in Part I, above, fit within this judicial review provision, and the Border GTO requires vacatur for all those reasons.

The Supreme Court's recent nationwide injunction decision is not to the contrary. That case was not brought under the APA, and the Court specifically stated that nothing in the decision was intended to address the availability of broad relief under the APA. *See CASA, Inc.*, 2025 WL 1773631, at *8. Decades of law recognize the availability of vacatur under the APA, and that law remains just as binding in this Court today as it was before the Supreme Court decided *CASA*.

### 2. *Plaintiffs are entitled to summary judgment.*

Summary judgment is the typical mechanism to resolve cases under the APA: "In APA cases challenging agency action, summary judgment serves as the mechanism for deciding whether the action is supported by the administrative record and otherwise consistent with the APA standard of review." *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 741 F. Supp. 3d 568, 597 (N.D. Tex. 2024) (cleaned up). APA cases are resolved based on the administrative record, and, at summary judgment, "the district court applies the APA standards of review to determine whether, as a matter of law, the evidence in the administrative record permitted the agency to make the decision it did." *Id.* (cleaned up).

A party can move for summary judgment "at any time." Fed. R. Civ. P. 56(b). Outside the APA context, early summary judgment is often inappropriate because it cuts off the parties' ability to conduct discovery and build a record. But because APA review is almost entirely based on the administrative record, "early summary judgment motion practice is routine in APA cases." *Clean Air Carolina v. DOT*, No. 17-cv-5779, 2017 WL 5157469, at *1 (S.D.N.Y. Sept. 14, 2017).

"Although most civil cases require fact discovery, making early summary judgment improper, district courts reviewing agency action 'do not resolve factual issues,'" and "summary judgment will generally be appropriate." *Id.* That course is appropriate here because all the claims set forth in Part I, above, can be decided in Plaintiffs' favor on the face of the administrative record.[17]

### 3. Alternatively, the Court may consolidate the preliminary-injunction hearing with a trial on the merits.

Entry of final judgment is also separately appropriate under Federal Rule of Civil Procedure 65(a)(2), which allows a court to consolidate a hearing on a preliminary injunction with a trial on the merits. To be sure, the Court must provide "clear and unambiguous notice [of the court's intent to consolidate the trial and the hearing] either before the hearing commences or at a time which will still afford the parties a full opportunity to present their cases," *Texas v. Garland*, 719 F. Supp. 3d 521, 548 (N.D. Tex. 2024), but the Court can provide that notice at any time before the preliminary injunction hearing or even at its start. Consolidation with the merits in a "paper trial" is particularly appropriate here, for largely the same reason that Plaintiffs are entitled to summary judgment: where "no material fact issues remain and there is indeed nothing left to be tried, [a court] should not hesitate to afford the prevailing party final relief." *Id.* at 548 (cleaned up).

## B. Plaintiffs Are Entitled To A Preliminary Injunction Both For Themselves And For Other MSBs.

Because there are no factual issues to be decided, the best route forward would be to enter final judgment. If the Court does not reach the ultimate merits, however, at a minimum, the TRO entered for Valuta and Payan's should be renewed as a preliminary injunction with the same scope.

---

[17] Along with this motion, Plaintiffs have filed a Motion to Supplement the Administrative Record, so that the Court can consider additional declarations and testimony when deciding the merits. *See also supra* n.5. The government has never suggested that the facts set out in any of those materials are subject to dispute. In any event, Plaintiffs believe that the case can be decided in their favor even apart from that motion based on just the current administrative record.

But the Court can—and should—provide preliminary injunctive relief for the members of the putative class, too. Otherwise, those class members are left in limbo. *Three* federal courts have found the Border GTO likely unlawful, yet those absent class members *still* must comply.

### 1. Plaintiffs and other members of the putative class face irreparable harm, and other equitable factors also favor relief.

Issuing a TRO, this Court held that "Plaintiffs showed that they will suffer immediate and irreparable harm absent emergency injunctive relief, including the threat of business closure, reputational injury, and loss of customers and goodwill." TRO Order at 3. Two other judges agree. *See Novedades*, 2025 WL 1501936, at *23–24; *TAMSB*, 2025 WL 1540621, at *16. At the preliminary injunction stage, Plaintiffs of course still face the same irreparable harm. *See* Light Decl. ¶ 44; Payan Decl. ¶¶ 23, 42. And other members of the putative class are suffering irreparable harm, too. Every member of the putative class must spend resources to comply with the Border GTO, which, after all, vastly lowers the CTR threshold for *everyone* subject to its requirements and thus forces businesses to either suspend services (losing revenue) or otherwise shoulder significantly increased compliance costs. *See* Doc. 36-5 (Carpio Decl.) ¶¶ 11–15; Doc. 36-6 (Ruiz Decl.) ¶¶ 12–13, 15–17. These types of economic losses are irreparable in cases involving agency action because "federal agencies generally enjoy sovereign immunity for any monetary damages." *White Lion*, 16 F.4th at 1142 (cleaned up); *see also id.* ("complying with an agency order later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs" (cleaned up)). Plus, all members of the putative class are facing the same Fourth Amendment violation, and the "deprivation of a constitutional right" is always irreparable harm. *E.g.*, *Space Expl. Techs., Corp. v. Bell*, 701 F. Supp. 3d 626, 634 (S.D. Tex. 2023).

Finally, both for these individual Plaintiffs and the putative class, the other two *Winters* factors favor a PI for the same reason they favored a TRO. *See* TRO Order at 3 ("the requested

relief merely preserves the status quo pending further judicial review, while Defendants will suffer no cognizable prejudice"); *id.* ("[t]he public interest is served by maintaining lawful operations of regulated financial institutions and preventing unlawful agency action").

### 2. Any preliminary injunction should cover the entire putative class.

Letting these injuries of the putative class go on would contradict settled law. *See Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 226 (5th Cir. 2024), *cert. granted in part on other grounds*, 145 S. Ct. 1039 (Jan. 10, 2025). In *Career Colleges*, a district court denied a preliminary injunction to a group of colleges challenging federal regulatory changes to student-loan discharges. On an interlocutory appeal of that denial, the Fifth Circuit administratively stayed the changes for just the parties, then explicitly expanded its stay to cover non-parties, *id.* at 233, and then (in a section of its published opinion titled "Relief Should Not Be Party Restricted") directed the district court to enter pre-liminary relief "nationwide." *Id.* at 255–56. Via Judge Jones, the Court unmistakably held "that the scope of preliminary relief under [APA] Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Id.* at 255. That square holding is binding on this Court and requires broad relief.

And if there is any doubt on that score, it is erased by Plaintiffs' suing for a putative class. The same Term that the Supreme Court decided its opinion on nationwide injunctions, it also reaffirmed that a court "may properly issue temporary injunctive relief to [a] putative class." *AARP v. Trump*, 145 S. Ct. 1364, 1369 (2025). Although the best path is under the APA, the Court could follow that path too.

### CONCLUSION

The Court should enter final judgment vacating the Border GTO. At a minimum, the Court should enter a preliminary injunction for the benefit of the individual Plaintiffs and the putative class.

Dated: July 3, 2025

Respectfully submitted,

/s/ Robert Johnson

Andrew K. Ward (NY Bar No. 5364393)*
Elizabeth L. Sanz (CA Bar No. 340538)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
ahward@ij.org
bsanz@ij.org

Katrin Marquez (FL Bar No. 1024765)*
INSTITUTE FOR JUSTICE
2 South Biscayne Blvd., Suite 3180
Miami, FL 33131
(305) 721-1600
kmarquez@ij.org

* Admitted *pro hac vice*

*Attorneys for Plaintiffs*

Christen Mason Hebert (TX Bar No. 24099898)
Jeffrey Rowes (TX Bar No. 24104956)*
INSTITUTE FOR JUSTICE
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936
chebert@ij.org
jrowes@ij.org

Robert E. Johnson (DC Bar No. 1013390)*
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
(703) 682-9320
rjohnson@ij.org

**CERTIFICATE OF SERVICE**

I certify that on July 3, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will provide electronic service upon all attorneys of record.

/s/ Robert Johnson