# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| VALUTA CORPORATION, INC. and PAYAN FUEL CENTER, INC., *Plaintiffs*, <br><br> v. <br><br> FINANCIAL CRIMES ENFORCEMENT NETWORK, ANDREA GACKI, in her official capacity as Director of the Financial Crimes Enforcement Network; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; and PAM BONDI, in her official capacity as Attorney General of the United States, *Defendants*. | Civil Action No. 3:25-cv-191-LS |

## RESPONSE OPPOSING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND FOR SUMMARY JUDGMENT

### INTRODUCTION

On March 11, 2025, acting pursuant to explicit statutory authority, the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") issued a Geographic Targeting Order ("March 2025 GTO") that requires money services businesses ("MSBs") in certain counties along the southwest border to keep additional records and report additional categories of currency transactions to FinCEN. 31 U.S.C. § 5326. Plaintiffs raise APA and Fourth Amendment challenges to the March 2025 GTO, but those challenges lack merit for the reasons set forth below. In particular, the GTO is not arbitrary and capricious, even if it is susceptible to evasion by some illicit actors (as is virtually every legal obligation or prohibition). In fact, the Administrative Record confirms that FinCEN considered that very possibility, finding that such evasions can be monitored and can inform expansions or modifications of this or future GTOs. In

some cases, such efforts at evasion might even drive illicit actors to subject their transactions to "more stringent reporting and recordkeeping obligations" that would, in turn, "inform FinCEN of new suspicious activity." AR 000017. Likewise, the Administrative Record confirms that FinCEN provided a reasoned analysis of the costs of compliance, finding that the temporary recordkeeping and reporting obligation imposed by the GTO was not unreasonable given the "highly useful" information it would yield for law enforcement. *See* AR at 000013–14, 000017, Gacki Decl., Docket no. 20-1 at ¶¶ 11, 18–21, 27–32.

On both points, Plaintiffs dispute the wisdom of FinCEN's analysis—but where the Administrative Record confirms that the agency engaged in a reasoned analysis of the relevant factors, disagreement with the agency's conclusions is insufficient to show arbitrary and capricious agency action. Rather, the "narrow" scope of APA review asks whether the agency "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made"—neither courts nor plaintiffs "substitute their own judgment for that of the agency." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 917 (2025); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (court "should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" (internal citations and quotation marks omitted)).

Plaintiffs' implausible allegations do not support the claim that the March 2025 GTO will be devastating. If anything, Plaintiffs' own statements show the opposite: That they are already complying with the GTO, are in the process of implementing technologies used by other MSBs and financial institutions to make compliance more efficient and less burdensome, and that, well before the March 2025 GTO issued, they already collected and maintained most of the information now needed to comply with the GTO for most categories of covered transactions.

Take the claims raised by the owner of Plaintiff Valuta, Ashley Light. She previously testified about a backlog of GTO filings that required her to work late at night and Plaintiffs' preliminary injunction motion laments the "potential destruction of [her] business[]" because of the GTO. Docket no. 41 at 23 n.7, 32. But since initiating this lawsuit, she has discovered that, for most categories of covered transactions, Valuta is not required to submit GTO reports to FinCEN at all. Light Declaration, Docket no. 5-1 at ¶ 38–39 ("we discovered that while we were filing CTRs on our money orders and money transfers, MoneyGram was filing CTRs on those same transactions."). And Andres Payan, Jr., manager of the other named Plaintiff in this action, Payan's Fuel Center, Inc., has testified that his business has already purchased a computer system—which includes "a chip reader and an optical reader"—to facilitate the submissions of GTO reports for check cashing transactions, the only GTO-covered category of transactions his business engages in. Docket no. 5-3 at ¶ 33; Docket no. 5-16 at 118.

Nonetheless, Plaintiffs now seek relief not only for themselves, but for all GTO-covered MSBs, who they argue face the same threats of "business closure, reputational injury, and loss of customers and goodwill" as Valuta and Payan's. Docket no. 41 at 37. But it is telling that, four months after the GTO was announced and three months after it took effect, those other entities have not come to the Court for relief. *Cf. Las Americas Immigrant Advocacy Ctr. v. Paxton*, No. EP-24-CV-00352-DCG, 2024 WL 4430542, at *5 (W.D. Tex. Sept. 27, 2024) ("unexplained delay . . . implies a lack of urgency and  irreparable harm").

The Court should deny Plaintiffs' motion for preliminary injunction—and should certainly not entertain Plaintiffs' suggestions to rush to final judgment or otherwise extend relief to non-parties. Rather, the Court should decide the ultimate merits based on orderly briefing not subject to any artificially imposed deadline.

**BACKGROUND**

On March 11, 2025, acting pursuant to its authority under 31 U.S.C. § 5326,[1] FinCEN

issued the GTO at issue in this case, which covers MSBs[2] operating in portions of five counties

in Texas and two counties in California (a total of 30 ZIP codes). *See* Issuance of a Geographic

Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain

Money Services Businesses Along the Southwest Border, 90 Fed. Reg. 12106 (published Mar.

14, 2025); AR 000001–03. The GTO took effect on April 14, 2025. To assist covered businesses,

FinCEN published FAQs on their website, and hosted two webinars collectively attended by

several hundred representatives of the affected MSB community.[3] The webinar and the FAQs

confirm that, other than the applicable amount and a code unique to the GTO, these required

reports generally follow the same form and content as those already required for CTRs and are

filed in the same way. *See, e.g.*, FAQ Items 3, 7; *see also* Gacki Decl., Docket no. 20-1 at ¶¶ 9,

23. For covered transactions, the MSB must report: information about the MSB, information

about the MSB person conducting the transaction, information about type and amount of the

transaction, and information about the customers involved in the transactions. *See* Docket nos. 5-

---

[1] The language now codified at Section 5326 was added by the Anti-Drug-Abuse Act of 1988, Pub. L. 100–690, title VI, § 6185(c), 102 Stat. 4355 (Nov. 18, 1988). This provision, together with the Currency and Foreign Transactions Reporting Act of 1970, its amendments, and the other statutes relating to the subject matter of the 1970 Act have come to be referred to as the Bank Secrecy Act (BSA). Additional statutory background is set forth in Defendants' prior filings. Docket no. 20 at 3–5.

[2] MSBs are broadly defined in the BSA regulations and generally include, for example, check cashers, issuers or sellers of traveler's checks or money orders, and money transmitters, although there are exclusions from those categories as well. *See generally* 31 CFR § 1010.100(ff).

[3] *See* FAQs, https://www.fincen.gov/sites/default/files/shared/SWB-MSB-GTO-Order-FINAL508.pdf. Additionally, FinCEN hosted two webinars about the GTO, *See* https://www.fincen.gov/news/news-releases/fincen-convenes-fincen-exchange-sessions-provide-stakeholders-information-about.

---

7; 20 at ¶ 23. No special software is required, though covered institutions may streamline the process in various ways. *Id*. ¶ 25–26.

Financial institutions that meet the regulatory definition of an MSB are subject to a range of legal requirements that pre-date the GTO, including registering with FinCEN, filing CTRs, developing and maintaining an effective anti-money laundering program, filing suspicious activity reports, verifying customer identity for certain transactions, and maintaining detailed records. *See* Information Memorandum for Director Andrea M. Gacki ("AR Mem."), AR 000006–07 (collecting regulations).[4] Other regulations require verification of identity for specific types and amounts of transactions. *See, e.g.*, 31 C.F.R. § 1022.210(d)(1)(i)(A); 10 C.F.R. § 1010.312. Plaintiffs' witnesses testified that they routinely provide all of the collected data to state or federal entities as part of "frequent" audits. *See, e.g.*, *TAMSB, et al. v. Bondi, et al.* PI Hrg. Tr., Docket nos. 5-16 at 202 (Ashley Light testimony about "very frequent" audits); 108–12 (Andres Payan testimony about recordkeeping and audits).

On May 30, 2025, Plaintiffs filed the present lawsuit. Plaintiffs assert a claim under the Fourth Amendment, Count I, Docket no. 1 at ¶¶ 147–56; an "arbitrary and capricious" challenge under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), Count II, *id.* at ¶¶ 157–65; an *ultra vires* claim, Count III, *id.* at ¶¶ 166–74; an APA notice-and-comment violation claim, Count IV, *id.* at ¶¶ 175–82, and a claim that the GTO violates the non-delegation doctrine, Count V, *id.* at ¶¶ 183–89. Defendants have filed the public, non-privileged portions of the certified

---

[4] As Plaintiffs note, the Information Memorandum is dated "March XX"—a clear clerical error. Plaintiffs suggest that "it is impossible to tell whether it was finalized before or after the March 14 publication of the Border GTO[,]" docket no. 41 at 16—but Defendants have already certified to the Court that the Administrative Record—including the Information Memorandum—"constitute a true, correct, and complete copy of the non-privileged documents that were directly or indirectly considered in connection with FinCEN's March 2025 decision to issue the GTO." Docket no. 15-1 at ¶ 4.

administrative record ("AR"). *See* Docket no. 15. The Gacki Declaration provides further information about the background and context of the GTO and the administrative record. *See* Docket no. 20-1.[5] A sample Currency Transaction Report appears at Docket no. 20-2.

Following a hearing, the Court granted Plaintiffs' motion for a Temporary Restraining Order, later extended by an additional 14 days. Docket nos. 31, 37. The TRO enjoins enforcement of the GTO "as to Plaintiffs Valuta Corporation, Inc., and Payan's Fuel Center, Inc." Docket no. 31 at 3. The TRO is set to expire on July 22, 2025. Docket no. 37. Plaintiffs have now moved for entry of a Preliminary Injunction. Docket no. 41. And, seeking to broaden the Court's relief, Plaintiffs join their preliminary injunction motion with an early Motion for Summary Judgment and a request that the Court "advance the trial on the merits and consolidate it with the [preliminary injunction] hearing" under Rule 65(a)(2). Docket no. 41 at 26–30.

Separately, Plaintiffs have also moved the Court for certification of a class, pursuant to Rule 23, of all MSBs "that are doing or will do business" in the Texas ZIP codes covered by the GTO except for those already named as Plaintiffs in *Texas Association for Money Services Businesses v. Bondi*, No. 5:25-cv-00344 (W.D. Tex.). Docket no. 36 at 4. As an alternative to early entry of final judgment, Plaintiffs request that preliminary injunctive relief be extended to this putative class. Docket no. 41 at 38.

## LEGAL STANDARD

Preliminary injunctive relief "is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023). A

---

[5]  Courts may consider such background and context declarations. *See, e.g., Manufactured Hous. Inst. v. United States Dep't of Energy*, No. 1:23-CV-00174-DAE, 2024 WL 4795985, at *2 (W.D. Tex. Aug. 25, 2024); *see also Clifford v. Peña*, 77 F.3d 1414, 1418 (D.C. Cir. 1996); *Roe v. Dep't of Def.*, 947 F.3d 207, 223 (4th Cir. 2020).

preliminary injunction may only be granted if the movant establishes each of four prerequisites: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. *See N. Mississippi Med. Ctr., Inc. v. Quartiz Techs.*, No. 23-60483, 2025 WL 980568, at *2 (5th Cir. Apr. 1, 2025); *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008); *see also* Fed. R. Civ. P. 65. The last two factors merge when the government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The movant "bears the burden of persuasion on all four factors in order to be entitled to the extraordinary relief of a preliminary injunction." *N. Mississippi Med. Ctr., Inc.*, 2025 WL 980568, at *2.

The APA prescribes a "narrow standard of review" under which a Court assesses whether an agency's decision was 'based on a consideration of the relevant factors and whether there has been a clear error of judgment[.]'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16,  (2020) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009)). In carrying out this review, Courts "must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 917 (2025).

## ARGUMENT

### A.  Plaintiffs Cannot Show Likely Success on their APA Claims

**1.    Arbitrary and Capricious.** Plaintiffs now condense their arbitrary and capricious arguments into two: That FinCEN failed to provide a reasoned explanation of the benefits of the March 2025 GTO, Docket no. 41 at 12–14; and that FinCEN failed to provide a reasoned explanation of its costs, *id.* at 14–15. But the Administrative Record and the GTO itself reflect

FinCEN's reasonable findings about the GTO's anticipated benefits. *See, e.g.*, AR 000011–12 ("Anticipated Benefits of the GTO"). Its additional recordkeeping and reporting requirements "are necessary to carry out the purposes of the BSA or to prevent evasions" of the BSA and further "Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States." AR 000002. Surveying available intelligence and data, FinCEN found that MSBs along the southwest border are uniquely vulnerable to money laundering activities by drug cartels that use both witting and unwitting MSBs as part of various illegal schemes to transport and launder drug money. *See* AR 000007–12. "FinCEN assesses that cash remittances conducted by MSBs along the southwest border are an important avenue for this illicit activity, particularly since cartels also engage in bulk cash smuggling along the border, and so collect cash near border crossings." AR 000011–12; *see also* Gacki Decl. ¶ 11. For example, the AR provides examples where MSBs are targeted for funneling operations (where money is funneled to MSBs near the border from locations all over the country in smaller amounts, then cashed out or changed to pesos before being smuggled across the border), *see* AR000009–10 n.24 (citing AR 000286, AR 000300), or targeted for the purpose of disguising illicit gains as remittances, transmitted across the border in smaller amounts, AR 000011–12 & n.32 (citing AR 000403–08). And of course, on some occasions, MSBs have become witting partners of Drug Trafficking Organizations ("DTOs") trying to move or launder money. *See* AR 000010 (citing examples at AR 000323–402).

Of course, the GTO will not detect or prevent all evasions of the BSA—FinCEN has never claimed otherwise. But the possibility that some illicit actors might take steps to evade the GTO does not negate its benefits or render it invalid under the APA. And in fact, the possibility of such evasions was anticipated and considered by the agency, which found that "due to its

deterrent effect, this GTO may encourage illicit actors to adopt new methods or patterns of activity." AR 000017. But, as FinCEN explained, data about shifts in activity associated with possible evasions of the GTO is itself useful, since it can inform expansions or modifications of this or future GTOs. And to the extent that some illicit actors might seek to avoid the GTO's heightened reporting requirements by resorting to banks, that too would prove beneficial, both by subjecting those transactions to banks' "more stringent reporting and recordkeeping obligations" and by "inform[ing] FinCEN of new suspicious activity." AR 000017.

Plaintiffs characterize FinCEN's decision to publicly announce the GTO as a "change in position" that requires a "reasoned explanation." Docket no. 41 at 12–13 (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)). This argument, first of all, ignores that FinCEN *did* explain its thinking about how a public announcement of the GTO would impact its efficacy. *See* AR 000017. Moreover, there is no inconsistency between the Treasury Department's 1989 conclusion that "generally" it would request covered institutions not to disclose the existence and specifics of GTOs; the statutory and regulatory prohibitions against such disclosure "except as prescribed by the Secretary[,]" 31 U.S.C. § 5326(c), 31 C.F.R. § 1010.370(e); and FinCEN's decision in this instance to issue the GTO publicly.[6]

Plaintiffs claim that the Administrative Record provided "no reasonable explanation for targeting these 30 zip codes." Docket no. 41 at 21. But the AR Memorandum explains that these specific ZIP codes were selected "based on risk factors that include their proximity to the border

---

[6] This argument—that the GTO is invalid under the APA because statute and regulation required it to be confidential—is at odds with Plaintiffs' "notice and comment" argument, that the GTO is invalid under the APA because FinCEN did not publicly announce it and solicit public comments before it issued. *Compare, e.g.*, Docket no. 41 at 14–15 (arguing that "Like the statute, the regulations provide for confidentiality. . . . geographic targeting orders should be treated as confidential") *with id.* at 19 (arguing that the GTO must be vacated because "the agency published no advance notice of the Border GTO and provided no opportunity for comment").

---

Response Opposing Motion for Preliminary Injunction and for Summary Judgment          9

and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes." *Id.* at 000012–16 (surveying information about selected counties and explaining why some other counties were excluded); *see also* Gacki Decl. ¶¶ 11–17 (describing how and why the agency chose these ZIP codes). Logically, these locations in general are likely to be targeted by cartels because they "are nearer to the entry points for drugs and human beings smuggled into the United States and to the exit points for bulk physical cash." Gacki Decl. at ¶ 11. FinCEN sees a "high volume of cash transactions" near these locations already known to be targeted by cartels, AR 000013, and reasonably assessed that additional reporting would further the purposes of the BSA, such as assessing money laundering risks. AR 000019; *see also* Gacki Decl. ¶¶ 10, 27–32. Plaintiffs' disagreement with this reasoning does not show that it is arbitrary and capricious. *Wages & White Lion Invs.*, 145 S. Ct. at 917; *Fox Television Stations*, 556 U.S. at 513.

Next, Plaintiffs argue that the GTO should fail APA review because FinCEN has previously concurred with a GAO recommendation to "take[] steps to reduce the number of CTRs filed that are not used by law enforcement . . . by analy[zing] . . . the characteristics of CTRs that have been less likely to be accessed by law enforcement." Docket no. 41 at 13–14 (citing GAO, Currency Transaction Reports: Improvements Could Reduce Filer Burden While Still Providing Useful Information to Law Enforcement, at 99 (Dec. 2024), *available at* https://www.gao.gov/assets/gao-25-106500.pdf (last visited July 7, 2025). This argument ignores that the GAO report itself found that CTRs filed by MSBs were more frequently useful to law enforcement than those filed by depository institutions. GAO, *Currency Transaction Reports* at

43.[7] More importantly, this argument ignores that the Administrative Record *does* explain why the reports generated by the GTO are expected to be "highly useful" to law enforcement. A full picture of MSB activity in the region will help to identify illicit activity. *See* AR at 000013–14 (comprehensive "snapshot" of MSB activity of a "significant sample" will help FinCEN assess money laundering risks). FinCEN reasonably found that imposing this reporting requirement through the GTO would provide a fuller picture of money laundering risks along the southwest border and make structuring more difficult, while producing new investigatory leads. AR 000011–12; Gacki Decl. ¶ 18. MSBs in these seven counties are particularly vulnerable to abuse, and gathering data about MSB transactions will provide a fuller picture to law enforcement and further the purposes of the BSA. It will generate information about previously unsuspected money laundering activity (e.g., uncovering possible funneling activity to a network of suspected DTO associates operating in the region, previously undetected because of the lower amounts or because operating through multiple unwitting MSBs), and generate leads useful for current cases (e.g., new identifying information or possibly suspicious financial activity related to a current subject of investigation). All of these are benefits that FinCEN found "bear a rational relationship to the . . . costs imposed" by the GTO, *Chamber of Com. of United States v. United States Sec. & Exch. Comm'n*, 85 F.4th 760, 777 (5th Cir. 2023).

---

[7]    Plaintiffs exaggerate the import of the GAO report in other ways as well. Most significantly, the 5.4 percent figure that Plaintiffs repeat throughout their motion "does not include CTRs accessed on the internal systems" of agencies whose systems are integrated with FinCEN's such as IRS-CI, OCDETF, CBP, FBI, ICE, and others. GAO, *Currency Transaction Reports* at 37 n.84. And that figure "do[es] not reflect CTRs that law enforcement obtained directly from a financial institution through legal process, such as a subpoena." *Ibid.* And it is based on FinCEN audit logs that "do not track user views of summary query results in BSA Portal[,]" only instances in which a CTR was "opened, downloaded, or exported." *Id.* at 37 n.83.

Plaintiffs argue that FinCEN failed to adequately consider the costs of GTO compliance to covered entities. But the Administrative Record confirms that FinCEN did offer a reasoned analysis of the costs of compliance. The AR Memorandum explicitly acknowledges that the GTO may place an increased burden on "covered businesses." FinCEN reasoned that the GTO, however, "is merely a reporting obligation and does not alter their obligations with respect to AML/CFT programs" and "does not expect these Covered Businesses to materially alter typical fees charged for cash services, given that the reporting period is temporary, and the Covered Businesses will face continued competition from banks and other financial institutions offering similar services."[8] AR 000017. Plaintiffs may disagree with that conclusion but there is no doubt the agency considered the relevant factors.

Plaintiffs cite *Rest. L. Ctr. v. United States Dep't of Lab.*, 120 F.4th 163, 177 (5th Cir. 2024), for the proposition that an "illogical and unsupported" approach to line-drawing is arbitrary and capricious.[9] But the issue in that case was line-drawing "based on impermissible considerations and contrary to the statutory scheme enacted by Congress." *Rest. L. Ctr.*, 120 F.4th at 177. The Administrative Record confirms that FinCEN here did consider the statutory factors enumerated in 31 U.S.C. §§ 5326 and 5311. Those statutory factors do not include the burden of compliance for covered entities—but FinCEN considered this as well. AR 000017. Here, again, the issue is not that FinCEN failed to consider the burden on covered businesses, but

---

[8]  And elsewhere, FinCEN has considered the time burden imposed by CTRs, finding an average of 8 minutes per CTR, although that varies by type of institution and type of filing software used (and logically will vary by transaction as well). Many institutions (including nondepository institutions) come in much lower. *See* 85 Fed. Reg. 29022, 29029 (May 14, 2020), 89 Fed. Reg. 7767, 7768 (Feb. 5, 2024).

[9]  Aside from a passing mention to the $200 reporting threshold, Plaintiffs do not repeat their earlier argument that the reporting threshold itself is arbitrary and capricious. *See* Docket no. 41 at 22–23. To the extent Plaintiffs have not abandoned this argument, it lacks merit for the reasons explained in Defendants' TRO opposition. Docket no. 20 at 20–21.

that Plaintiffs disagree with the significance that FinCEN placed on that factor. But disagreement is not a basis for finding the GTO arbitrary and capricious: "[A] review of the agency's cost-benefit analysis with the benefit of hindsight can produce costs not considered or not thoroughly considered by the agency[,]" but this "does not automatically render a rule unreasonable." *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Consumer Fin. Prot. Bureau*, 558 F. Supp. 3d 350, 363 (W.D. Tex. 2021) ("The Bureau responds that it is only required to consider important aspect[s] of the problem before it. It is not required to consider every single possible cost. The court agrees." (internal citations and quotation marks omitted)), *aff'd in part, rev'd in part on other grounds,* 51 F.4th 616 (5th Cir. 2022), *rev'd and remanded,* 601 U.S. 416 (2024), and *reinstated in part by* 104 F.4th 930 (5th Cir. 2024), and *aff'd,* 104 F.4th 930 (5th Cir. 2024).

The GTO is reasonable, and there is no basis to conclude that FinCEN's decision was arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A).

**2.    Ultra Vires.** Plaintiffs assert an "ultra vires" claim that FinCEN exceeded its statutory authority, arguing first that the GTO exceeds the scope of FinCEN's statutory authority under 31 U.S.C. § 5326. But by its plain terms, Section 5326 authorizes this exact type of agency action. Through Section 5326, Congress has authorized FinCEN to impose "additional recordkeeping and reporting requirements" beyond those required by other regulatory provisions. *See* 31 U.S.C. § 5326(a). And it explicitly permits the Secretary to set the reporting threshold without any other limitation on what that threshold might be. *Id.* § 5326(a)(1)(A) ("which the Secretary may prescribe"). The primary prerequisite is a finding that it is necessary to carry out the purposes of the BSA or prevent evasions thereof. In making exactly that finding and setting a lower threshold than that required by other regulations for one category of businesses in portions of seven counties, FinCEN acted squarely within its statutory authority.

In arguing otherwise, Plaintiffs propose to add requirements found nowhere in Section 5326's plain text: That GTOs must be directed to "an identifiable business or group of businesses" that are a subset of the group of businesses within a geographic area, Docket no. 41 at 24 (quoting *Novedades*, 2025 WL 1501936, at *10), rather than what Section 5326(a) actually authorizes: Issuance of a GTO as to either (1) "any domestic financial institution or nonfinancial trade or business"; or (2) a "group of domestic financial institutions or nonfinancial trades or businesses" in a geographic area. 31 U.S.C. § 5326(a).

To support their proposed modification of the statutory text, Plaintiffs rely on five arguments. First, they argue that Congress's use of the word "order" amounted to a silent amendment of the rest of Section 5326. But the APA does not provide a basis for adding limitations that are absent from Section 5326's plain text.  Plaintiffs reason that the plain language of Section 5326, authorizing issuance of a GTO by order, does not mean what it says, because the action described by Section 5326—"an order" directed to "any . . . group of domestic financial institutions or nonfinancial trades or businesses in a geographic area"—is inconsistent with the APA's usage of "order."[10] According to Plaintiffs, to qualify as an "order" under the APA, an agency action must result from an adjudication involving specific individuals or entities—so those requirements, absent from the text of Section 5326, must be inferred. Docket no. 41 at 24–25. But the *Novedades* Court also found that Section 5326 "indicates that Congress intended to abrogate the APA's notice-and-comment requirements," since characterizing the GTO as a rule subject to notice-and-comment requirements cannot be reconciled with Section 5326's limitations on public disclosure of GTOs. Docket no. 5-9 at 34

---

[10]   This premise is itself erroneous with respect to the GTO, which is not exclusively legislative in nature as explained below, *see, infra*, discussion of *U.S. v. W. H. Hodges & Co., Inc.*, 533 F.2d 276, 278 (5th Cir. 1976).

(quoting *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1145 (6th Cir. 2022) (citing

*Lockhart v. United States*, 546 U.S. 142, 145–46 (2005))). Yet despite this finding that Section

5326 represents an abrogation of APA requirements, Plaintiffs nonetheless maintain that the

GTO is unauthorized by Section 5326—for failure to follow APA requirements.

 Second, Plaintiffs contend that Section 5326's plain text "confirms that GTOs are

directed to an *identified* business or group of businesses," not a category of such businesses

encompassed within a geographic area. But the qualifier Plaintiffs add—"identified"—appears

nowhere in the statutory text, which plainly authorizes the issuance of a GTO to a "group of

domestic financial institutions . . . in a geographic area[.]" 31 U.S.C. § 5326(a).

 Third, Plaintiffs claim "strong evidence" that the GTO exceeded the authority provided

by Section 5326 because FinCEN decided not to issue it confidentially. This argument, too, fails

based on the plain language of Section 5326, which on its face provides for the confidentiality of

GTOs "except as prescribed by the Secretary." 31 U.S.C. § 5326.

 Fourth, Plaintiffs turn to the major questions doctrine. Docket no. 41 at 26. But the plain

statutory language controls, and in any event this case lacks the hallmarks of the major questions

decisions that Plaintiffs invoke, all of which grounded their analysis in the text, structure, and

context of the relevant statutes. Here, FinCEN is not asserting regulatory power that is "markedly

different" from the type of authority that Congress expressly identified in the relevant provision,

*Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021), or claiming "an unheralded power

representing a transformative expansion in [its] regulatory authority" that Congress has

conspicuously and repeatedly declined to enact," *West Virginia v. EPA*, 597 U.S. 697, 723–24

(2022) (quotation marks omitted). There is nothing "breathtaking," *Ala. Ass'n*, 594 U.S. at 764,

or "extravagant," *Util. Air*, 573 U.S. at 324, about FinCEN's temporary, geographically limited

reporting requirement, and injunctive relief based on the "major questions" doctrine would be unwarranted. Plaintiffs' exaggerated allegations of harm would not create a major question even if wholly accurate, because the statutory language is clear and FinCEN acted well within it.

Fifth, Plaintiffs argue that their preferred reinterpretation of Section 5326 is required by the canon of constitutional avoidance. Docket no. 41 at 28–29. The canon of constitutional avoidance provides that a court will avoid otherwise acceptable constructions of a statute if they "raise serious constitutional problems[,]" unless doing so "is plainly contrary to the intent of Congress." *Cargill v. Garland*, 57 F.4th 447, 471 (5th Cir. 2024). But the time-limited and geographically limited reporting obligations imposed by the GTO raise no such "serious constitutional problems" for the reasons discussed below, so the canon of constitutional avoidance is not implicated.

**3.    Notice-and-Comment Rulemaking**. Plaintiffs argue that FinCEN should have engaged in notice-and-comment rulemaking before issuing the order authorized by 31 U.S.C. § 5326(a). Docket no. 41 at 19–21. But the challenged agency action is an order, not a rule, and therefore not subject to APA rulemaking requirements. *See* 90 Fed. Reg. 12106. The APA defines an "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). Here, Congress specifically authorized the agency to act by "order" rather than by rule. That is in sharp contrast to the statutory provision governing CTRs, which generally requires the Secretary to set the reporting threshold "by regulation[.]" *Compare* 31 U.S.C. § 5313(a) (requiring the Secretary to set reporting threshold "by regulation") *with* 31 U.S.C. § 5326 (authorizing the Secretary to act by order, including setting the applicable amount of reportable transactions in a GTO). Even if Congress had not explicitly authorized the agency

to act by order, the March 2025 GTO is not a legislative rule because it is not solely legislative in nature; it is limited in scope and time and tied to specific findings in this geographic area. *Cf. U.S. v. W. H. Hodges & Co., Inc.*, 533 F.2d 276, 278 (5th Cir. 1976).

Plaintiffs argue that the Court should not defer to the agency's characterization of the GTO as an "order." Docket no. 41 at 19 (citing *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019)). But the characterization is Congress's, not FinCEN's: By its plain language, 31 U.S.C. § 5326 authorizes FinCEN to "issue an order" to give effect to a GTO. 31 U.S.C. § 5326(a). Plaintiffs have cite no authority for the proposition that a Court may invalidate agency action by rejecting *Congress*'s characterization of that action as order or rule.

This reading of the statute is buttressed by the purposes of a GTO—to target a specific geographic area for a limited period of time. GTOs last only for 180 days absent renewal; if notice-and-comment rulemaking were required, it would likely take longer than the duration of a GTO to issue a GTO, and they could not be used effectively to respond to dynamic threats and developing financial intelligence.[11] Finally, notice-and-comment rulemaking is not required simply because the March 2025 GTO affects a group of businesses. *See Neustar, Inc. v. Fed. Commc'ns Comm'n*, 857 F.3d 886, 894 (D.C. Cir. 2017) (that an order "'may affect agency policy and have general prospective application,' does not make it rulemaking subject to APA section 553 notice and comment."); *Nat'l Biodiesel Bd. v. Env't Prot. Agency*, 843 F.3d 1010, 1018 (D.C. Cir. 2016). In any event, the Supreme Court has repeatedly reaffirmed that the APA does not permit the courts to impose additional procedural requirements beyond those required

---

[11] In the original 1988 law, a GTO lasted only 60 days, subject to renewal. 102 Stat. 4355. When Congress extended the duration of a GTO, Congress did not impose any additional procedural requirements, and under current law, Congress continues to authorize issuance of GTOs by "order." 31 U.S.C. § 5326(a).

by Congress. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 549 (1978); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015).

### B.  The GTO Does Not Violate the Fourth Amendment

Plaintiffs have not shown a substantial likelihood of success on their Fourth Amendment claim and have not established "serious questions" warranting preliminary injunctive relief.

Plaintiffs attempt to cast *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), as supporting their argument that the GTO constitutes a search or seizure that is "unreasonable." Docket no. 41 at 29–30. But this argument ignores the actual holding of *Shulz*, in which the Court "ha[d] no difficulty . . . in determining that the Secretary's requirements for the reporting of domestic financial transactions abridge no Fourth Amendment right of the banks themselves." *Shultz*, 416 U.S. at 66. And contrary to Plaintiffs' arguments, that conclusion was not solely or even primarily based on the amount of the reporting threshold. Rather, the reporting obligation at issue there was also reasonable because "the information is sufficiently described and limited in nature"; was "sufficiently related to a tenable congressional determination as to improper use of transactions of that type"; and because "[t]he bank is itself a party to each of these transactions, earns portions of its income from conducting such transactions, and in the past may have kept records of similar transactions on a voluntary basis for its own purposes." *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 66 (1974) (citing *United States v. Biswell*, 406 U.S. 311, 315 (1972)). All those factors weigh in favor of the Fourth Amendment reasonableness of the GTO.[12]

---

[12]  Similarly, Plaintiffs invoke *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), for the proposition that government investigations into corporate matters may violate the Fourth Amendment if they are "sweeping in nature" and "unrelated to the matter under inquiry as to exceed the investigatory power." Docket no. 41 at 31 (citing *Morton Salt*, 338 U.S. at 652). But since the GTO is "within the authority of the agency" and the information it seeks is "not too indefinite" and is "reasonably relevant" to the purposes of the BSA, *Morton Salt* is another

---

*Shultz* establishes the proper Fourth Amendment rubric applicable to the March 2025 GTO, which takes a similar form and arose in similar circumstances. MSBs along the southwest border are already engaged in a highly regulated industry subject to extensive recordkeeping and reporting requirements, as well as audits. *See, e.g.*, Docket no. 5-16 at 108–12, 202 (Andres Payan and Ashley Light testimony about non-GTO recordkeeping and reporting requirements). Plaintiffs have not shown a reasonable expectation of privacy that would impact reporting requirements like this one. Like the reporting in *Shultz*, the March 2025 GTO requires companies to "file reports dealing with particular phases of their activities[,]" 416 U.S. at 65, and was motivated by increasing use of covered entities for illicit purposes: "MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels, being in an area where cartels engaged in drug, human, and weapons trafficking intensively operate and need to move illicit cash across the border." *See* AR Mem. at 5.

*Shultz* disproves Plaintiffs' Fourth Amendment claim. As the Supreme Court recognized, Congress determined that the BSA's reporting requirements were necessary "in ferreting out criminal activity and desired to strengthen the statutory basis for requiring such reports." *Id.* at 38. Neither a warrant nor probable cause are required in this circumstance. Consistent with *Shultz*, Congress routinely enacts other reporting requirements, including as to information used for law enforcement purposes. *See, e.g.*, 8 U.S.C. § 1324a(b) (employment verification reporting requirements); 52 U.S.C. § 30104 (political campaigns); 26 U.S.C. § 6012 (tax returns). Plaintiffs have identified no authority casting Fourth Amendment doubt on such reporting

---

authority that weighs in favor of the GTO's validity, not against. *Morton Salt*, 338 U.S. at 652 ("Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest."); *see also Shultz*, 416 U.S. at 66 (same, citing *Morton Salt*).

enactments. Plaintiffs' insistence that a warrant is required, or that the GTO "acts as a general warrant[,]" Docket no. 41 at 2, 33, cannot be squared with *Shultz* or with the many other statutory reporting requirements that have long been understood as constitutional.

Plaintiffs' attempt to liken the GTO as an "overbroad subpoena for corporate records" fares no better. The city ordinance at issue in *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467 (S.D.N.Y. 2019) required the subject businesses—services that advertised and accepted bookings for short-term rentals—to submit a monthly report with detailed information about every transaction, with no limitations. There, the district court noted two features of the ordinance that mitigated its impact: (1) it did not "entail the on-site presence of state officers or any physical entry" into the plaintiffs' businesses and (2) it did not give the government "discretion as to the information that [the business] is required to produce." 373 F. Supp. 3d at 490. The March 2025 GTO shares those two features, which counsel against finding a Fourth Amendment violation. Moreover, in *Airbnb*, the district court relied on a factor that is not present here: the ordinance did "not have a temporal sunset" and was "devoid of any tailoring." *Id.* at 491. Here, the March 2025 GTO is limited both temporally and geographically, and those limitations flow directly from FinCEN's regulatory authority under the BSA.

And when it comes to showing that an administrative subpoena is unduly burdensome, "[m]erely referencing the agency's extensive requests or asserting that compliance would be costly is not enough." *Fed. Hous. Fin. Agency v. SFR Invs. Pool 1, LLC*, No. 217CV00914GMNPAL, 2018 WL 1524440, at *7 (D. Nev. Mar. 27, 2018). Plaintiffs cannot go beyond these insufficient showings. This is especially true since Plaintiff Valuta now acknowledges that they are not required to submit GTO reports on most categories of covered

transactions, Docket no. 5-1 at ¶¶ 38–39 ("we discovered that while we were filing CTRs on our money orders and money transfers, MoneyGram was filing CTRs on those same transactions."). In a similar vein, testimony from Payan's shows that GTO-covered transactions are a small fraction of overall business and that the interruption in check cashing services that occurred after the GTO took effect was partially caused by other factors, not just GTO compliance. Docket no. 5-16 at 106 (testimony that the portion of Payan's net income that comes from check cashing is "1.5 percent per month."); *see also id.* at 111, 107.

Here, the GTO also requires reporting of specific information under specific statutory criteria, rather than providing officers with leave to conduct limitless, discretionary searches of Plaintiffs' premises, persons, or files. *See* 31 U.S.C. § 5326; 90 Fed. Reg. at 12107. Like the BSA provisions at issue in *Shultz*, it does not create the risk of pretextual or arbitrary harassment present in some other cases. Indeed, as contrasted with cases involving "an arbitrary and discretionary demand to inspect company records," the Sixth Circuit and others have recognized the permissibility of "a warrantless inspection" in the form of "reporting requirement[s]" like those at issue in *Shultz. McLaughlin v. Kings Island, Div. of Taft Broad. Co.*, 849 F.2d 990, 994–95 (6th Cir. 1988); *see also Brock*, 834 F.2d at 996 n.2 (11th Cir. 1987) (observing that in cases like *Shultz*, "a uniform statutory or regulatory reporting requirement satisfies the Fourth Amendment concern regarding the potential for arbitrary invasions of privacy"); *Donovan v. Master Printers Ass'n*, 532 F. Supp. 1140, 1153 (N.D. Ill. 1981) (upholding Labor Management Reporting and Disclosure Act requirements and stating that the Fourth Amendment "simply requires that the reporting scheme imposed by the statute bear a reasonable relationship to a permissible subject of governmental inquiry and not place an undue burden on the defendant"). This distinction is present in *Shultz* itself. *See Shultz*, 416 U.S. at 62 (stating that "[u]nlike the

situation in" other cases dealing with defective warrant procedures, the BSA "do[es] not authorize indiscriminate rummaging among the records of the plaintiffs").

As to Plaintiffs' privacy argument, Docket no. 41 at 32–33, the Supreme Court has already rejected the argument that the customer of a financial institution can object to a subpoena applied to that institution because he "can assert neither ownership nor possession" in the business records of the financial institution, even where the Government requires those records to be maintained. *United States v. Miller*, 425 U.S. 435, 440 (1976). The Supreme Court rejected the argument in *Schultz* that the financial institution has a Fourth Amendment right to avoid reporting requirements and rejected the argument in *Miller* that the customer has a protected right to avoid such requirements. These controlling precedents cannot be ignored just because the reporting threshold at issue in this case is lower.

Plaintiffs' reliance on *Carpenter v. United States*, 585 U.S. 296 (2018), is also misplaced. *Carpenter* held *Miller*'s conclusion that a customer lacked an expectation of privacy in financial records held by a bank (i.e., the third-party doctrine) should not be extended to wireless customers' location information as transmitted to cell site towers. 585 U.S. at 318. But that type of stretch is not required here. Whether bank customers have a privacy interest in information held by a financial institution is precisely the issue here. *Carpenter* did not overrule *Miller*; it expressly recognized that location information differs from bank records of "negotiable instruments to be used in commercial transactions." *Carpenter*, 585 U.S. at 314 (quoting *Miller*, 425 U.S.C. at 442); *see also id.* at 309 ("qualitatively different category"); *id.* at 314 ("world of difference"); *id.* at 315 ("privacy concerns far beyond those considered in . . . *Miller*"). The Fifth Circuit's opinion in *United States v. Smith*, 110 F.4th 817 (5th Cir. 2024), involving a geofence warrant, is similarly distinct from the financial records institution presented here and in *Miller*.

Ultimately, *Miller* controls: individual MSB customers do not have a Fourth Amendment privacy interest in the MSB's records.

## C. Plaintiffs Have Not Established Irreparable Injury

Plaintiffs seeking preliminary relief must demonstrate that "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against the claim of irreparable harm." *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975). Generally speaking, a bare assertion of irreparable harm, or even a possibility of irreparable harm, is not sufficient, because "a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Plaintiffs' own declaration statements in this case, as well as their testimony in related litigation, demonstrate why they cannot show irreparable harm. First, both Plaintiffs acknowledge that, well before the GTO took effect, they already routinely asked customers for most of the information required to complete a CTR for most covered transactions. *See, e.g.*, Light Decl., Docket no. 5-1 at ¶ 16 (noting policy to record customer identification for money orders above $900, for all money transfers, for all check-cashing transactions, and for currency exchanges above $1,000). In the *TAMSB* action, Light testified she that did not know of any customer who had refused to provide customer identifying information, including Social Security numbers, when required—rather, "[t]hey were fine with that." Docket no. 5-16 at 215–17 ("**Q.** But even for those smaller dollar transactions, you collected customer identifying information? . .

. **A.** Yes. . . . **Q.** Yeah. Did people ever refuse? **A.** I don't know. I don't think so. **THE COURT:** But included Social Security number, address, all of that? **THE WITNESS:** Typically. Typically."). Indeed, while Payan professes to fear speculative "new levels of risk," customer backlash, and long lines caused by requests for additional information from customers, he has also given the following description of Payan's existing check cashing process: "We scrutinize the check, the identification, and the customer. We ask questions as we feel necessary, such as where they got the check, what it's for, the name of their boss, etc. . . . [and] we make a note of the customer's identification number[.]" Docket no. 5-3 at ¶ 15. And, for transactions where they "don't know the check," Payan's undertakes additional vetting: "we'll look up the information on the state comptroller's web page or on the city, or we'll Google the address, you know, on Maps"). Docket no. 5-16 at 97 ("I don't want to take a bad check.").

Both Light and Payan make exaggerated claims about the impact of the March 2025 GTO to their businesses. Light claims that the burden of submitting reports under the GTO required Valuta to stop offering certain services for a period after the GTO took effect, docket no. 5-1 at ¶ 18—but then acknowledges that this was based on a misunderstanding between Valuta and MoneyGram, which was in fact already submitting reports for money order and money transfer transactions conducted at Valuta. *Id* at ¶¶ 38–39 ("we discovered that while we were filing CTRs on our money orders and money transfers, MoneyGram was filing CTRs on those same transactions."). Payan similarly states in his declaration that Payan's was forced to stop cashing checks with values over $200 "because we cannot keep up with all the CTR filings." Docket no. 5-3 at ¶ 17. But he testified in the *TAMSB* action that the backlog coincided with both "check cashing season" (the period beginning in mid-February when "Treasury will start issuing [income tax] refunds to people who get, you know, big refunds[,]" Docket no. 5-16 at 111) and

also that pause occurred because he "had to take a leave for paternity," Docket no. 5-16 at 107—
but also that his mother and sister continued to process at least some check-cashing transactions
for amounts over $200, triggering additional CTRs. *Id.* at 113 ("they continued cashing some
more checks, and then they got more backed up.").

Plaintiffs' claims about the projected impact of the GTO on their businesses are difficult
to square with their testimony elsewhere. Payan states in his declaration that "[i]f the GTO
remains in place for 6 months, I expect Payan's will lose about 20–25% of its net revenue[,]"
which he states will threaten the business's viability. But he testified in the *TAMSB* action that
the portion of Payan's net income that comes from check cashing—its only category of
transaction that is subject to the GTO—is "1.5 percent per month." Docket no. 5-16 at 106. Light
herself attributes Valuta's financial difficulties, at least in part, to factors not traceable to
Defendants, such as overall economic difficulties and "an increasingly digital world," noting that
"[t]his year so far, business is generally slower, even for the slow season[,]" Docket no. 5-1 at ¶¶
11, 18; *see also* Docket no. 5-16 at 211–12 ("As an example, like, the weekends, people would
come shopping downtown quite a bit. But now you don't see the weekends as busy."). Payan,
similarly, testified that his business was impacted by the recent closure of the nearby
international bridge between El Paso and Juarez, Docket no. 5-16 at 105.

And significantly, both Plaintiffs have already taken steps toward implementing
technology, already in use at other covered MSBs and financial institutions, that will allow more
efficient submission of CTRs. Light testified that—although she has difficulty understanding
how it works—Valuta's database administrator, Clear View Systems, has already begun work on
establishing a secure file transfer protocol that would enable batch submission of reports required

by the GTO.[13] Docket no. 5-16 at 222–23. Light also testified that she has not investigated commercial software platforms used by some other MSBs to facilitate submission. *Id.* at 223 ("I've just checked with the system we have. I haven't gone outside to check."). And Payan has testified that his business has already purchased a computer system and software, although he has not yet set up the new system. Docket no. 5-3 at ¶ 33; Docket no. 5-16 at 118 ("it's a computer and a software . . . it has a chip reader and an optical reader").

Speculation that customers might prefer to go to banks to avoid ID requirements is likely implausible. *See, e.g.*, AR 000017 (generally higher fees at banks); Gacki Decl ¶ 19 (most banks will not perform certain services for non-account-holders and tend to check identification). The Gacki Declaration demonstrates that many covered businesses filed reports responsive to the GTO, even before additional similar reporting was required under the GTO. And the Paperwork Reduction Act (PRA) notice cited by Plaintiffs estimates that each CTR takes eight minutes to complete, an average of ranges from 3.24 minutes to over 20 minutes per CTR depending on filing method. *See* 85 Fed. Reg. 29022, 29029 (May 14, 2020), 89 Fed. Reg. 7767, 7768 (Feb. 5, 2024). Many nondepository institutions like MSBs use automated batch filing, and for them, the average time per CTR is estimated at 4.76 minutes per CTR. The PRA estimate is facially quite conservative for discrete, non-automated filers, and Plaintiffs' submissions estimating 25–30 minutes or more per CTR do not appear to take into account the types of transactions they do, the types of information and paperwork they already have, or other relevant factors.

Finally, Plaintiffs' failure to pursue other options and their delay in bringing suit militates against a finding of irreparable harm. "A party who faces an existential threat to its mission and

---

[13]  However (as Light's declaration also seems to reference) she testified that Clear View Systems is "hitting roadblocks because their company is actually based out of Canada." Docket no. 5-16 at 222–23.

survival—as Plaintiffs claim to face here—will presumably spring into action and seek relief as soon as practicable after discovering that threat," and an "unexplained delay before seeking a [preliminary injunctive relief] . . . implies a lack of urgency and irreparable harm." *See Las Americas Immigrant Advocacy Ctr. v. Paxton*, No. EP-24-CV-00352-DCG, 2024 WL 4430542, at *5 (W.D. Tex. Sept. 27, 2024). Here, the GTO was issued March 11 and took effect on April 14, but Plaintiffs waited more than two months after the GTO was announced before bringing their own action and moving for a TRO to enjoin reporting obligations that had been in effect for weeks. The Court can and should deny the motion for that reason alone.

### D. The Balance of Interests Tips in Favor of Defendants.

The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Moreover, when assessing whether to grant a preliminary injunction before the merits have been adjudicated, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). Any preliminary relief should be carefully tailored to address only the harms that plaintiffs have established. 11A Wright et al., FPP § 2947 (3d ed.)).

In the face of Plaintiffs' weak evidence of harm to a few MSBs, the agency's finding that these recordkeeping requirements are necessary to address money-laundering and cartel activities along the southwest border should carry the day. It is in the public interest for the Government to act swiftly on these issues, particularly in light of the ongoing fentanyl crisis and evidence that drug cartels are using MSBs to further their criminal activity. *See* AR 000011–12; Gacki Decl. ¶ 29 ("The information collected from the SW Border GTO will not only aid in disrupting this illicit flow of money by, for example, making structuring more difficult, but it will also assist Treasury and law enforcement partners in identifying and combatting cartel-related money

laundering."). The Gacki Declaration further explains that "given the profound national security, homeland security, terrorist financing, and money laundering threats inherent in the operation of these DTOs along the border, FinCEN determined that the potential benefits of the GTO outweigh the potential burdens the GTO may impose on covered MSBs." *Id*. ¶ 31. And an injunction "would cause significant harm to U.S. anti-money laundering efforts and the broader AML/CFT regime and thereby to the U.S. financial system as a whole." *Id*. at ¶ 32.

### E.  The Court Should Not Grant Relief to Non-Parties

Finally, the two named Plaintiffs ask that the Court grant relief not only for them, but for other, nonparty MSBs. Docket no. 41 at 36. But the Court's equitable power allows it to "administer complete relief *between the parties*[,]" not to grant relief to nonparties. *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631, at *11 (U.S. June 27, 2025) (internal quotation marks omitted); *see also Gill*, 585 U.S. at 72–73 ("A plaintiff's remedy must be tailored to redress *the plaintiff's* particular injury"); *but cf.* Docket no. 41 at 36 ("Plaintiffs are entitled to a preliminary injunction both for themselves and for other MSBs").

Plaintiffs propose three mechanisms for the Court to circumvent these limitations and reach their desired result of non-party relief. First, they suggest, the Court should simply leap ahead to entry of a final judgment on the merits, either based on Rule 65(a)(2) or by ruling on Plaintiffs' early summary judgment motion. Docket no. 41 at 34–36. But there are strong reasons for the Court not to rush to final judgment. First, in both *TAMSB* and *Novedades*, appellate review of the preliminary injunctions is underway. In *TAMSB* in particular, both Plaintiffs and Defendants have noticed appeals from the preliminary injunction order, with Plaintiffs seeking review of Judge Biery's limitation on injunctive relief to the parties based on arguments nearly identical to Plaintiffs' non-party relief arguments here. Since appellate review from two circuit

courts is forthcoming, there is no reason for this Court to rush to entry of a final judgment, either under Rule 65(a)(2) or through a rushed summary judgment ruling. And even aside from that forthcoming appellate review, the Court is entitled to sufficient time to evaluate the parties' arguments for summary judgment and prepare a ruling based on a full set of briefing. The Court need not and should not rush to a final merits decision on a preliminary injunction timetable.

The purpose of a preliminary injunction is not to adjudicate the ultimate merits, but "merely to preserve the relative positions of the parties"—and '[b]ecause of this limited purpose and the haste with which preliminary injunctions are often sought, it is 'generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits[,]'" notwithstanding Rule 65(a)(2). *Travelers Cas. & Sur. Co. of Am. v. Padron*, No. 5:15-CV-200-DAE, 2017 WL 9360906, at *12 (W.D. Tex. Aug. 2, 2017) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)); *see also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (same); *Heckler v. Redbud Hosp. Dist.*, 473 U.S. 1308, 1314 (1985) (Rehnquist, J., in chambers) ("Plainly, I think, the District Court has inappropriately used its 'preliminary injunction' as a vehicle for final relief on the merits.").

The APA's § 705 likewise explicitly incorporates the constitutional and equitable limitations on non-party relief. *See* 5 U.S.C. § 705 (permitting a court to stay agency action only "to the extent necessary to prevent irreparable injury"); *cf.* H.R. Rep. No. 79-1980, at 43 (1946) (recognizing § 705 relief "would normally, if not always, be limited to the parties complainant"). Plaintiffs have not established irreparable harm to each Plaintiff, much less more broadly, and no injunction should issue at all. Were the Court to do so, however, any relief granted should be limited to identified Plaintiffs. The same holds true if the Court proceeds to entry of a final judgment and grants relief under Section 706. Although controlling authority from the Fifth

Circuit holds otherwise,[14] Section 706 does not authorize vacatur and the APA as a whole "does not say anything about 'vacating' agency action ('wholesale' or otherwise)." *United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring in the judgment). And even within the Fifth Circuit, vacatur under the APA is not mandated: If the Court determines that any relief is appropriate, that relief should be limited to the traditional, party-specific remedies consisted with the background equity principles incorporated into the APA. *Arizona v. Biden*, 40 F.4th 375, 396–97 (6th Cir. 2022); *Texas*, 143 S. Ct. at 1980–81 (Gorsuch, J., concurring in the judgment).

As a final alternative—though not the "best path"—Plaintiffs argue that the Court should enter preliminary injunctive relief to the putative class that Plaintiffs have moved the Court to certify. Docket no. 41 at 38. But, for the reasons set forth in Defendants' forthcoming opposition, class certification is not appropriate, and so preliminary injunctive relief to the putative class is not, either. *See, e.g.*, *A.S.R. v. Trump*, No. 3:25-CV-00113, 2025 WL 1752382, at *3 (W.D. Pa. June 25, 2025) (Supreme Court's opinion in *A.A.R.P. v. Trump*, No. 24-1177, 2025 WL 1413856, at *1 (U.S. May 14, 2025) did not provide basis to reconsider denial of class certification motion). "A plaintiff's remedy must be tailored to redress *the plaintiff's* particular injury," *Gill v. Whitford*, 585 U.S. 48, 72–73 (2018) (emphasis added), and that equitable relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Any broader relief is inconsistent with Article III's judicial power, which "exists *only* to redress or otherwise protect against injury to the complaining party." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (emphasis added). It is also

---

[14] *Texas v. United States*, 126 F.4th 392, 418 (5th Cir. 2025). Notably, though the Fifth Circuit found that vacatur appropriate under the APA, it also limited the remedy to Texas—"the only plaintiff that has demonstrated or even attempted to demonstrate an actual injury"; an injury that was "fully redressable" by a limited injunction. *Texas*, 126 F.4th at 421 & n.47.

inconsistent with traditional equitable principles premised on "providing equitable relief only to parties." *Trump v. Hawaii*, 585 U.S. 667, 718 (2018) (Thomas, J., concurring); *cf. Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring).

Finally, under Federal Rule of Civil Procedure 65(c), the Court may issue such relief "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

Dated: July 11, 2025                                      Respectfully submitted,

                                                          **Justin R. Simmons**
                                                          United States Attorney

                                          By:      /s/ Robert D. Green
                                                          **Robert D. Green**
                                                          Texas Bar No. 24087626
                                                          Assistant United States Attorneys
                                                          U.S. Attorney's Office
                                                          601 NW Loop 410, Suite 600
                                                          San Antonio, Texas 78216
                                                          (210) 384-7362 (phone)
                                                          (210) 384-7312 (fax)
                                                          robert.green3@usdoj.gov
                                                          Angelica A. Saenz
                                                          Texas Bar No. 24046785
                                                          Assistant United States Attorney
                                                          700 E. San Antonio Ave., Suite 200
                                                          El Paso, Texas 79901
                                                          Office: (915) 534-6555
                                                          Facsimile: (915) 534-3490
                                                          Email: Angelica.Saenz@usdoj.gov

                                                          ***Attorneys for Defendant***